# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

| | |
|---|---|
| JUDITH WALTON as Personal Representative for the ESTATE OF FRANK SMITH, on behalf of the Estate and Survivor Judith Walton, | CIVIL DIVISION |
| | CASE NO. 3:16-cv-1130-J-39JRK |
|       Plaintiff, | |
| v. | |
| FLORIDA DEPARTMENT OF CORRECTIONS, WARDEN BARRY REDDISH, NAN JEFFCOAT, LT. JOSEPH ALLEN, CAPT. WILFRED ELLIS, CAPT. SHAWN SWAIN, LT. TERRY BACON, SGT. RODNEY CRISWELL, SGT. BRANDI GRIFFIS, OFFICERS BRIAN NORMAN, SHALEN BROWNING, MICHAEL SCHAFFER, and DUSTIN HOUGH, in their individual capacities, | |
|       Defendants. | |

## FOURTH AMENDED COMPLAINT

Plaintiff sues Defendants and alleges:

## Jurisdiction and Venue

1. Plaintiff's claim for relief is based on 42 U.S.C. § 1983 and state law claims.

   This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

2. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant

   to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

3. Plaintiff's claim is also based on Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, and 12133, and § 504 of the Rehabilitation Act.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and § 1391(c), as the events sued upon occurred in this judicial district.

5. Under § 95.11(10), Fla.Stat., actions based on intentional torts as described in §§ 782.04 and 782.07, Fla.Stat., for the murder or manslaughter of a disabled adult, may be commenced at any time.

6. All conditions precedent to this action have been performed or waived.

## Parties

7. Plaintiff, JUDITH WALTON, is the mother of Decedent Frank Smith and the Personal Representative of the Estate of Frank Smith, suing on behalf of the Estate and herself as Survivor.

8. The Florida Department of Corrections (FDOC) is a state agency charged with the operation of Florida prisons and the care and custody of prisoners. FDOC is sued here only for violation of the ADA and Rehabilitation Act.

9. At all times material hereto, Defendant BARRY REDDISH was the Warden of Union Correctional Institution. He is sued individually.

10. At all times material hereto, Defendant JOSEPH ALLEN was a Lieutenant at Union Correctional Institution. He is sued individually.

11. At all times material hereto, Defendant RODNEY CRISWELL was an Officer at Union Correctional Institution. He is sued individually.

12. At all times material hereto, Defendant BRANDI GRIFFIS was an Officer at Union Correctional Institution. He is sued individually.

13. At all times material hereto, Defendant DUSTIN HOUGH was an Officer at Union Correctional Institution. He is sued individually.

14. At all times material hereto, Defendant MICHAEL SCHAFFER was an Officer at Union Correctional Institution. He is sued individually.

15. At all times material hereto, Defendant BRIAN NORMAN was an Officer at Union Correctional Institution. He is sued individually.

16. At all times material hereto, Defendant SHALEN BROWNING was an Officer at Union Correctional Institution. He is sued individually.

17. At all times material hereto, Defendant WILFRED ELLIS was a Captain at Union Correctional Institution. He is sued individually.

18. At all times material hereto, Defendant SHAWN SWAIN was a Captain at Union Correctional Institution. He is sued individually.

19. Defendants acted under the color of law.

## Common Allegations of Fact

20. On or about July 3, 2012, Decedent Frank Smith ("Smith") was a prisoner in the care and custody of the Florida Department of Corrections (FDOC).

21. Frank Smith's permanent facility was Union Correctional Institution ("UCI") in Raiford, Florida in a unit for the severely mentally ill

22. At that time, Smith was a disabled adult,[1] diagnosed as paranoid schizophrenic and was taking antipsychotic medication.

23. Smith was described by a fellow-inmate as an "old-school bug" (severely mentally ill prisoner) and by an officer as "not all there."

24. Smith "heard voices" he called Sam and Henry and spoke to them often.

25. Smith told his mental health counselors that "Sam" was his guide.

26. Inmate Lester Williams said Smith made officers angry because he would not bathe and had trouble understanding and following simple commands.

27. Williams said officers sometimes physically assaulted Smith out of frustration with his frequent failure to follow their commands.

28. From June 26 to July 3, 2012, Frank Smith was at Shands Hospital in Gainesville (Shands) apparently being treated for hyponatremia, or low sodium, due to an overdose of antipsychotic medication.

29. While at Shands, staff notes indicated Smith seemed confused and followed commands "on and off" and thought the year was 2002.

---

[1] "'Disabled adult' means a person 18 years of age or older who suffers from a condition of physical or mental incapacitation due to a developmental disability, organic brain damage, or mental illness, or who has one or more physical or mental limitations that restrict the person's ability to perform the normal activities of daily living." § 825.101(3), Fla. Stat.

**A. The Initial Assault on Frank Smith in the Prison Van**

30.  On July 3, 2012, Frank Smith was transported from Shands back to UCI, about 55 minutes away by Transport Officer Rodney Criswell.

31.  Nearly two years after Smith's death, the Florida Department of Law Enforcement (FDLE) investigated the events that took Smith's life.

32.  Officers said Smith got in an argument with Criswell when he asked to use the bathroom before leaving Shands and Criswell did not give permission.

33.  Smith then urinated in his clothes and rode back soaked in urine.

34.  Criswell drove the van with Smith chained and belted in the back.

35.  Corrections Officer Dustin Hough (Hough) rode as the passenger.

36.  Sgt. Eric Cagle (Cagle) drove the security "chase" vehicle behind the van. With him was Michael Shaffer, as passenger. Both were armed.

37.  Criswell, like some other officers at UCI at that time, made a game of tormenting mentally ill inmates to see them get excited and react.

38.  At some point, close to the Reception and Medical Center in Lake Butler, Florida, Smith lay on his back and began kicking a passenger window.

39.  Criswell said he stopped the van because he was worried Smith, though belted and chained, might break through the metal grate and escape.

40.  Smith managed to break the glass although a grate and two horizontal steel bars would have prevented him from exiting the prison van.

41. One of the buckles on the seat belt also required a handcuff key.

42. Stopping a van during transport violates a central transport protocol.

43. Hough got out and removed the lock from the prisoner compartment.

44. Criswell then entered the prisoner compartment with Smith, which violated another standard tenant of the transport protocols and training.

45. Although Criswell often instructed corrections officers the outside transport protocols himself, he later said he did not know about these rules.

46. Sgt. Criswell said he received a 40-hour suspension for violating it.

47. Sgt. Cagle saw the van pull over to the side of the road and described it not as a quick emergency stop, but as a slow, deliberate move to the shoulder.

48. Criswell pulled over supposedly to inspect the damage but rather than inspect it from the outside, he unlocked the passenger door and entered.

49. Once inside, Criswell used his Taser on Smith and struck him repeatedly.

50. Criswell denied striking Smith at all, but Hough recalled seeing Criswell use several knee-strikes on Smith in the back of the van but did not intervene

51. The officers later told medical providers that Smith had caused his own injuries by banging his head on the windows of the van or a divider.

52. In his FDLE interview, Hough did not say he saw Smith banging his head.

53. As Smith exited the van, no one saw injuries to Smith's face or head but Lt. Allen recalled seeing Smith walking unsteadily.

**B.  The Second Assault on Smith in the Movement Center**

54.  While he was still in the prisoner compartment of the van with Smith,

Criswell called Officer in Charge (OIC) Capt. Wilfred Ellis on the incident.

55.  With Criswell in back, Hough was ordered to drive the van to the front of

UCI so Warden Reddish and other "white shirts" could see the damage.

56.  Ellis told Lt. Joseph Allen (Allen) of Criswell's call, ordering Allen to report

to the Movement Center since "they were having problems" with Smith.

57.  Officer Shalen Browning (Browning), working internal security, was in

Ellis' office at the time and heard the discussion about the broken window

and roadside stop and heard that officers "were aggravated" at Smith.

58.  Lt. Terry Bacon (Bacon), who supervised officers in the Movement Center,

said he was told by OIC Ellis that the prisoner compartment was breached.

59.  Lt. Bacon said he did not go to the Movement Center himself and said he

didn't know who was assigned to the Movement Center that day.

60.  According to records, the van arrived at UCI just after 4:00 p.m.

61.  In fact, Smith not on the control log as returning to UCI although he was

later logged out as leaving for the Shands Trauma Center at 5:00 p.m.

62.  When the van reached the Movement Center, Lt. Allen and Officer Brian

Norman (Norman) removed Smith from the van.

63.  Allen and Norman both had histories of involvement in inmate abuse.

64. Allen saw blood on Smith's shirt and said he was "unsteady on his feet."

65. Allen said he saw no visible injuries on Smith's face.

66. Sgt. Criswell has denied striking Smith and denied seeing any blood.

67. Later, Inspector Earnest J. (E.J.) Whatley would find blood in the van.

68. OIC Ellis was waiting for the transport inside the Movement Center.

69. Criswell said he entered the Movement Center to see OIC Ellis.

70. Ellis denied speaking to Criswell inside the Movement Center.

71. While there, Criswell saw Smith being wheeled out of the Center.

72. Since force was used, Ellis should have called for a video camera but didn't.

73. Ellis later said he was not informed of the breach of the van or of the use of force in the van although witnesses say he was aware of the breach although Sgt. Criswell called him on his cell phone during the incident.

74. Allen said he and Norman escorted Smith into the Movement Center with Sgt. Brandi Griffis (Griffis) walking ahead and opening the holding cell.

75. Officer Browning said he was walking behind Allen and Norman.

76. Neither Griffis nor Browning tried to intervene to prevent abuse.

77. Allen said Smith suddenly "just collapsed" on the holding cell floor but Norman said he fell "stiff-legged, straight forward" hitting his head.

78. Smith's injuries were inconsistent with Norman and Allen's accounts.

79. Allen saw blood flowing from a head wound onto the holding cell floor.

80. Smith appeared unconscious but no one gave or offered to give first aid.

81. When the incident at the holding cell happened, Allen said that Ellis was speaking with Criswell. Ellis then called for a video camera.

82. UCI Sgt. Cagle said afterwards that he heard there had been a use of force on Smith inside the Movement Center after they returned.

83. Norman was later heard to say of Smith, "I kicked that fuck-boy's ass."

## C. The Plan and Cover-Up by Warden Reddish, OIC Ellis and OIC Swain

84. Warden Reddish was made aware of the first incident in the prison van and asked the van to be driven by the administration building to inspect it.

85. Afterwards, several things happened that were completely contrary to prison rules which were never addressed or corrected while Reddish was Warden.

   a) The control room did not record Smith entering the facility.

   b) OIC Ellis did not call for a video camera when the van arrived.

   c) Smith, though unresponsive, was moved by wheelchair, not stretcher.

   d) No medical staff were called to the scene of the injury.

   e) Neither Lt. Bacon nor his officers reported the misconduct.

   f) Blood in the van and in the holding cell was cleaned up.

   g) Lt. Bacon permitted the blood in the holding cell to be cleaned up.

   h) No one called an Inspector until witnesses left and blood was cleaned up.

   i) The force investigation was called off until after Smith had died.

86. On information and belief, Reddish agreed to a plan for Smith to be taught a lesson and to suppress or destroy evidence of the events.

87. Medical was not summoned to the scene and no stretcher was called for but Smith was loaded into a wheelchair and wheeled to the medical department.

88. Browning pushed Smith to medical with one of Smith's feet dragging on the ground wearing through the shoe and creating an open wound on his foot.

89. Ellis said he took the officers to his office to help them write their reports.

90. Ellis did not call the Emergency Action Center (EAC) contrary to protocol.

91. Officer Stephen Rugg called 911 for Emergency Medical Services (EMS).

92. Smith had trouble breathing and EMS staff attempted intubation twice before placing a "king tube" or laryngeal tube to facilitate breathing.

93. Smith was ultimately orally intubated when he reached Shands hospital.

94. EMS staff were told Smith "beat his head" inside a transport van.

95. Later, Paramedic Robert Koch (Koch) told investigators Smith's injuries looked more consistent with injuries suffered by the victim of a car wreck.

96. At the time, EMS staff did not report the inconsistencies they observed.

97. Associate Medical Examiner, Dr. Martha Burt (Burt) said after the autopsy that she "cannot say (Smith's injuries) are self-inflicted."

98. FDOC Inspector Earnest J. Whatley found out about the incident five or six hours after it happened and was told Captain Ellis "forgot" to call.

99. When Whatley arrived at UCI, Capt. Shawn Swain, who had relieved Capt. Ellis as OIC at 4:00 p.m. that day, took him to the holding cell.

100. Whatley asked if the blood in the holding cell had been cleaned up.

101. Although Swain had relieved Ellis at 4:00 p.m. that day, five minutes before the van with Smith had arrived at UCI, Swain said that was possible but the scene was the responsibility of the "day shift Captain."

102. Swain did not order the scene secured and the van was driven away.

103. The blood in the cell where Smith had been injured had been cleaned up.

104. Whatley found the van, with some blood inside, and photographed it.

105. Whatley was concerned when he learned Smith had been taken from the scene in a wheelchair, not a stretcher, though he was unconscious.

106. Whatley was told all the prison staff had gone home without interviews.

107. Whatley was never able to interview the staff because the investigation was "taken from me beforehand, before it was completed."

108. No further investigation was done until after Smith died in September and the Florida Department of Law Enforcement was called in.

109. On information and belief, Warden Reddish communicated with the Office of the Inspector General that he wanted the investigation stopped.

110. Captain Ellis was placed on "administrative leave" in October 2012, after Smith had died, FDLE was called in, and Reddish was removed as Warden.

111. Reddish had a reputation as a "kick-ass" officer coming up and continued as an administrator to foster violent "lesson-teaching" for inmate problems.

112. Jeffcoat failed to protect inmates, stop excessive force, though able, and helped cover up excessive force and reward and promote violent staff.

113. The officers involved in the force and observing but failing to intervene, threatened Smith with severe injury or death if he told what happened.

114. Reddish, while he was still at the institution, ordered the cover up and delay while evidence was altered or destroyed and stories were coordinated.

115. The series of events at the Movement Center after the van stopped at the administration building for inspection by Reddish seemed to follow a pattern of anomalies beginning with the failure to log the return by the control room.

116. Smith was just one of a series of inmates who were received severe injuries, including brain injuries, or death at UCI during the Reddish regime

117. Other inmates severely beaten during the same year included Rudolph Rowe, Leslie Smith, Christopher Arnold, Ronnie Daniels and Willie Knight.

118. Each of these inmates received potentially life-threatening physical injuries as a result of gauntlet-style beatings that targeted the head and vital organs.

119. Smith was fully restrained with handcuffs and shackles at the time of the beating and could not have offered meaningful resistance to the officers.

120. The cause of Smith's death was complications of blunt head injuries.

121. At his autopsy, Smith had multiple visible abrasions, lacerations, edemas and contusions of the legs, groin, midsection, and head.

122. Smith's injuries were inconsistent with the description of his exiting the van with no visible head injuries and the falling and hitting his head once.

123. Smith's injuries are consistent with a second use of force inside the Movement Center that was substantial and brutal.

124. None of the officers there intervened to prevent the improper use of force.

125. Medical personnel were not timely called to the scene for assistance.

126. No medical doctor was called by security or medical staff and none responded to the scene, or to the infirmary at UCI.

127. Allen, Norman, and Browning improperly moved Smith after his injury.

128. Upon information and belief Decedent Frank Smith did not have a 911 call placed until long after the second savage and brutal beating.

129. The correctional officers and the medical staff ignored Decedent Frank Smith's need for urgent medical assistance. The denial exposed him to undue suffering and an untimely and unnecessary death.

130. Inmate homicides have been a systemic issue according to statistics compiled by the Florida Department of Corrections. From the time period 2011 to 2014, there have been a total of at least 32 inmate deaths that were determined to be homicides by the Medical Examiner.

131. Warden Reddish and his administrators knew of excessive force and abuse, of inmates through daily reports and long-term death and injury statistics.

132. Data compiled by the Florida Department of Corrections show ten male homicides in Florida's correctional institutions in the year of 2011.

133. Data compiled by the Florida Department of Corrections, show six male homicides in Florida's correctional institutions in the year of 2012.

134. Data compiled by the Florida Department of Corrections show seven male homicides in Florida's correctional institutions in the year of 2013.

135. Data compiled by the Florida Department of Corrections show eleven male homicides in Florida's correctional institutions in the year of 2014.

136. Data compiled by the Florida Department of Corrections show 324 deaths in Florida's correctional institutions, the year Frank Smith was killed.

137. From the years 2009-2014, prison deaths dramatically increased as a result of incidents involving the use of force by correctional officers.

138. Before and since this incident, Defendants have cooperated to permit:

   a) officer-on-inmate assaults;

   b) cover-ups involving reporting breaches and erasing evidence;

   c) failure to report or accurately report use of force details;

   d) failure to timely summon video cameras for uses of force;

   e) suppression of or undue influence on use of force investigations;

f)  failure to document or preserve evidence;

g)  failure to punish abuses, false reports, or rule violations once discovered.

139. Defendants were aware their administrative and supervisory practices were substantially certain to cause the kind of harm suffered by Smith.

140. The Defendants' conduct herein, including but not limited to their decision to "teach lessons" to difficult inmates and to reward and promote violent abusive officers proximately caused the damages to Plaintiff.

141. The Defendants each acted to violate Frank Smith's constitutional rights or failed to intervene to prevent the violation of his rights, though able.

142. The Defendants interfered with timely medical treatment to save Frank Smith's life or failed to intervene to prevent such interference, though able.

143. Defendants acted collectively and jointly to violate Frank Smith's rights.

144. Defendants acted with specific intent to harm Frank Smith and did so.

145. Defendants reached an implicit or explicit understanding and:

a)  Agreed to commit and to stand silent and acquiesce in acts which resulted in the severe physical injury and death of Frank Smith;

b)  Agreed to observe the Blue Code of Silence which among Florida prison officials is the meaning of the motto, "We Never Walk Alone."

c)  Agreed to delay medical treatment to Smith, though unconscious, and wheel him to medical in a wheelchair rather than call for a gurney;

d)  Agreed to delay timely disclosure to investigators and the Emergency Action Center and to let all the witnesses leave the premises;

e) Agreed to hide and destroy and alter evidence, to engage prisoners and others to help hide, destroy, and cover up evidence and remain silent;

f) Agreed to coordinate their accounts of the use of force to minimize inconsistencies, to encourage strategic lack of knowledge or memory;

g) Agreed to give false and misleading statements to investigators and continue misinformation for years after their criminal actions;

h) Agreed to call off and discontinue the investigation that had been started and fail to report the events to superiors until Frank Smith's death on September 4, 2012, in the wake of a series of brutal beatings at UCI.

i) Specifically, as to **Rodney Criswell**:

   i. Criswell had prior trouble with Smith and had animus toward him;

   ii. Criswell like other officers considered Smith disrespectful;

   iii. Criswell, like other officers, saw Smith as deliberately disobedient;

   iv. Criswell was not originally sent to pick Smith up but his assignment was changed to Smith's transport;

   v. On July 8, 2014, falsely denied striking Frank Smith with multiple blows, including knee strikes, without any valid penological purpose under oath to an FDLE agent;

   vi. On July 8, 2014, falsely swore that Frank Smith repeatedly hit his head on the plexiglass of the divider between the drivers and the prisoner compartment although Smith had no visible injuries to his head and although the plexiglass is on the drivers' side and on the prisoner's side is a rough metal grid that would have left clear marks on Smith's head if he had struck the divider with force.

   vii. On July 8, 2014, falsely swore that he did not know or did not remember he was not supposed to stop a transport van by the side of the road and enter the passenger compartment even though he taught the class on transport procedures.

   viii. On July 8, 2014, falsely swore that it is a common thing for prisoners to throw themselves to the ground head-first;

ix.    Had a phone conversation with Captain Ellis from the road and arranged to teach Smith a lesson once they returned to UCI.

j)  Specifically, as to **Wilfred Ellis**:

    i.    On July 29, 2014, falsely swore that although Criswell called him from the road about what happened, that Criswell didn't mention a use of force and that's why he didn't have a camera meet the van;

    ii.    Ellis didn't arrange for a camera for the reason that he knew there would be a further use of force against Smith at the Movement Center at UCI and did not want the events to be recorded;

    iii.    On July 29, 2014, falsely swore that although he witnessed Smith leaving the van, he didn't realize Criswell had been inside the prisoner compartment or that there had been a use of force until 15 minutes after arrival, and after Smith was injured and unresponsive, at which time he finally called for a camera;

    iv.    On July 29, 2014, falsely swore to reasons for not calling a camera for 15 minutes after the van arrived other than the true reasons – to give officers time to beat Smith unconscious without video.

k)  Specifically, as to **Shawn Swain**:

    i.    On July 31, 2014, falsely swore that although he went on duty at 4:00 p.m. on July 3, 2012, he had no responsibility for cover-up activities that occurred after 4:00 p.m. at UCI;

    ii.    On July 31, 2014, falsely swore that though he had taken over as Officer in Charge, he had no duty to call Emergency Action Center;

    iii.    On July 31, 2014, falsely swore he had no duty to preserve evidence or prevent the van and witnesses from leaving.

    iv.    On July 31, 2014, falsely pretended not to know the protocol surrounding a use of force or the duties of his office.

l)  Specifically, as to **Joseph Allen**:

    i.    On July 11, 2014, falsely swore that Smith spontaneously collapsed on the floor in the holding cell;

    ii.    On July 11, 2014, falsely swore that neither he nor Brian Norman struck Frank Smith and that Smith just fell down and hit his head;

    iii.    On July 3, 2012, assisted the other officers in coordinating their incident reports;

    iv.    On July 3, 2012, failed to notify the Emergency Action Center of the fact that Frank Smith was injured and unresponsive;

    v.    On July 3, 2012, failed to notify the Institutional Inspector that Frank Smith was injured and unresponsive.

m) Specifically as to **Brian Norman**:

    i.    On July 11, 2014, falsely swore that Smith spontaneously collapsed on the floor in the holding cell;

    ii.    On July 11, 2014, falsely swore that neither he nor Joseph Allen struck Frank Smith;

    iii.    On July 3, 2012, assisted the other officers in coordinating their incident reports to eliminate contradictions;

    iv.    Bragged to other inmates that he had beaten Smith;

    v.    On July 3, 2012, failed to notify the Emergency Action Center of the fact that Frank Smith was injured and unresponsive;

    vi.    On July 3, 2012, failed to notify the Institutional Inspector that Frank Smith was injured and unresponsive.

n) Specifically as to **Barry Reddish**:

    i.    Had a career reputation of being supportive of and rewarding physically abusive security officers.

    ii.    Terminated the fledgling investigation that had been started by Inspector E.J. Whatley;

    iii.    Maintain silence on the events, failing to report the events to his superiors and keeping the lid on until Frank Smith's death;

    iv.    Favored and rewarded officers who kept the code of silence and maintained secrecy regarding the events of July 3, 2012;

v.  Took a special interest in Frank Smith in that he had the prison van driven past his office so that he could "inspect the damage."

vi.  Ordered or sustained orders that Frank Smith not be logged in as having entered the UCI compound on July 3, 2012;

vii.  On July 3, 2012, failed to notify the Institutional Inspector that Frank Smith was injured and unresponsive.

viii.  On July 3, 2012, failed to notify the Emergency Action Center that Frank Smith was injured and unresponsive.

ix.  Ordering or sustaining orders that witnesses go home at the end of the shift, that the van be garaged, and that evidence be cleaned up.

146. In so doing, Defendants pursued their own, independent criminal interests which were inconsistent with the interests of their agency.

## D. Additional Facts Relevant to the Statute of Limitations

147. At his death, Smith was diagnosed as paranoid schizophrenic and was taking antipsychotic medication and housed in a unit for the severely mentally ill.

148. Hospital notes from Shands indicated Smith was disoriented to time.

149. Smith was described by a fellow-inmate as an old-school bug (severely mentally ill prisoner) and by an officer as "not all there."

150. After his injuries at UCI, Smith was unresponsive.

151. After being seen briefly in medical at UCI, he was returned to Shands.

152. EMS staff reported that Smith looked like he had been in a car wreck.

153. On July 10, 2012, Shands notes indicate Smith was ventilator dependent.

154. Smith was diagnosed with a spinal cord injury and was said to be paraplegic.

155. From July 3 through at least July 12, 2012, Smith would not have been able to speak due to being intubated and sedated.

156. On July 9, 2012, it was noted that Smith had an "altered mental status secondary to TBI (Traumatic Brain Injury)."

157. From July 9 to at least July 15, 2012, Smith had a tracheostomy, which normally prevents any intelligible speech.

158. On July 24, 2012, Smith was prescribed a feeding tube.

159. On August 21, 2012, two weeks before Smith's death, Inspector Earnest J. ("EJ") Whatley interviewed Smith using mostly leading questions.

160. It was noted by Whatley that Smith could not raise his right hand.

161. Smith assented to Whatley's suggestion that Smith had injured himself.

162. As a result of the paralyzing blunt force injuries to his head and neck, Frank Smith died at RMC on September 4, 2012.

163. Associate Medical Examiner, Martha Burt, who performed the autopsy, stated that she could not say that Smith's fatal injuries were self-inflicted.

164. Prior to his injury July 3, 2012, Frank Smith had a diagnosis of paranoid schizophrenia and was delusional, hearing voices, including his guide, Sam.

165. After his injuries on July 3, 2012, and prior to his death September 4, 2012:

    a) Smith was diagnosed as paraplegic and was unable to write;

    b) Smith was diagnosed with traumatic brain injury;

   c)  Decedent was intubated and sedated much of the time;

   d)  When not intubated, Smith could speak only with difficulty;

   e)  Smith's speech was sometimes unintelligible;

   f)  Smith was disoriented as to time;

   g)  Smith could not have filed a lawsuit in his own behalf;

   h)  Smith could not have filed grievances antecedent to filing a lawsuit;

   i)  Smith could not reasonably have been expected to have communicated with another person to the extent necessary to permit a lawsuit;

   j)  Smith's family were told Smith had "done it to himself."

   k)  When Smith's family visited, he was intubated and could not speak.

   l)  When Smith's family visited him, one or more corrections officers were in the hospital room at all times.

166. Prison officials told Frank Smith's family on their visit that he had "done it to himself" and the family had no way to know any different.

167. As a delusional paranoid schizophrenic, Frank Smith cannot be said to have been a person with a reasonably prudent regard for his own rights.

168. Had he the mental capacity, he still would not have had the physical means.

169. The question claim accrual presents a question of fact for a jury.

170. Decedent, Frank Smith's death was a direct and proximate result of the Defendants collective wrongful acts done under color of law.

**Causes of Action**

I.   **§ 768.16 et seq., Florida Statutes, Wrongful Death Act
     (Criswell, Allen, Norman, Ellis, Swain, Reddish)**

171. Plaintiff re-alleges the Common Allegations of Fact.

172. Plaintiff is entitled to relief against Criswell, Allen, Norman, Ellis, Swain,

     and Reddish pursuant to § 768.16 et seq., for causing the death of the

     Decedent Frank Smith in violation of sections 768.16 et al.; 782.04, or

     782.07, Fla.Stat., for the murder or manslaughter of a disabled adult.

173. The above-named Defendants all acted under color of law, but not within the

     scope of their employment but willfully and wantonly for their own purpose.

174. Plaintiff seeks all damages allowable under section 768.21, Florida Statutes

     for the Estate and for the statutory survivor.

     WHEREFORE, Plaintiff seeks relief as noted below.

II.  **Common Law Civil Conspiracy pursuant to *Margolin v. Morton F. Plant
     Hosp. Ass'n, Inc.*, 342 So. 2d 1090 (Fla. 2d DCA 1977). *See also Kee v.
     Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1542 (11th Cir. 1990).)**

175. Plaintiff re-alleges the Common Allegations of Fact.

176. Plaintiff is entitled to relief against Defendants Reddish, Allen, Ellis, Swain,

     Criswell, and Norman because they each conspired, acting outside the scope

     of their employment, to cause the underlying tort of murder or manslaughter

     of Frank Smith, which formed the purpose of the conspiracy.

177. Alternatively, the Defendants are liable for the tort of civil conspiracy, standing alone, based upon *Margolin v. Morton F. Plant Hosp. Ass'n, Inc.*, 342 So. 2d 1090 (Fla. 2d DCA 1977) and *Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1542 (11th Cir. 1990)[2] based upon the reason of the coercive force of numbers and the exceptional circumstances surrounding the facts of this case which have led to the instant cause of action.

178. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

179. In so doing, Defendants created and prolonged the secrecy surrounding their joint wrongful acts and deprived Plaintiff of fair notice of a cause of action.

180. This misconduct described in this Count was undertaken with malice, and deliberate indifference to the rights of others, including Mr. Smith.

181. As a direct result of Defendants' conspiracy to deprive Mr. Smith of his constitutional rights, he suffered severe physical injuries and death.

182. The term of the conspiracy began prior to Smith's death and continued at least until the State Attorney declined prosecution on April 10, 2015.

183. Defendants conspired to do an unlawful act by unlawful means and each Defendant engaged in overt acts in furtherance of the conspiracy.

---

[2] These cases are essentially anti-trust cases but also can be applied to other factual situations where the conspiracy is based on the coercive power of large numbers of conspirators and exceptional circumstances in which the common efforts cause the harm to the victim.

184. The resulting injuries are the protections of the First Amendment, Article IV Privileges and Immunities, the Fifth Amendment, the Fourteenth Amendment to the U.S. Constitution, and Article I, Section 21, of the Florida Constitution, and Frank Smith's death or murder.

WHEREFORE, Plaintiff seeks damages as noted below.

III. **Conspiracy under 42 U.S.C. 1983 to Violate the Eighth Amendment**

185. Plaintiff re-alleges the Common Allegations of Fact.

186. Plaintiff is entitled to relief against Defendants Reddish, Allen, Ellis, Swain, Criswell, and Norman for violation of the Eighth Amendment.

187. Defendants acted under color of law to further the conspiracy.

188. Each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

189. In so doing, Defendants created and prolonged the secrecy surrounding their joint wrongful acts depriving Plaintiff of fair notice of a cause of action.

190. As a direct result of Defendants' conspiracy to deprive Mr. Smith of his constitutional rights, he suffered severe physical injuries and death.

191. The term of the conspiracy began prior to Smith's death and continued at least until the State Attorney declined prosecution on April 10, 2015.

192. Defendants conspired to do an unlawful act by unlawful means and each Defendant engaged in overt acts in furtherance of the conspiracy.

193. The injury to Smith due to the conspiracy, was his death or murder.

WHEREFORE, Plaintiff seeks damages as noted below.

## IV.   42 U.S.C. § 1983: Excessive Use of Force/Failure to Intervene

194. Plaintiff re-alleges the Common Allegations of Fact.

195. Plaintiff is entitled to relief against Joseph Allen, Brandi Griffis, Rodney Chriswell, Dustin Hough, Michael Schaffer, Brian Norman, and Shalen Browning for violation of the Eighth Amendment to the U.S. Constitution.

196. As more completely described in Section A, above,

   a) Criswell entered the compartment and savagely struck and Tased Smith, using unnecessary force without a valid penological purpose;

   b) Criswell formed a plan with Ellis to "teach a lesson" to Smith when he returned to UCI, to be further handled at the Movement Center.

   c) Hough and Shaffer watched and failed to intervene, though able;

197. As more completely described in Section B, above,

   a) Allen formed a plan with Ellis to "teach a lesson" to Smith when he returned to UCI, to be further handled at the Movement Center.

   b) Allen and Norman battered Smith with no penological purpose as they entered the holding cell, inflicting injuries similar to a car wreck victim;

   c) Griffis and Browning watched and failed to intervene, though able;

   d) All officers followed Allen to collaborate their written reports;

e) All officers failed to write complete and truthful reports or record entries;

f) None of the officers reported the misconduct and simply went home.

g) Allen made sure no officer was disciplined for lying or injuring Smith.

198. The aforesaid Defendants, while acting under color of state law and by virtue of the authority vested in them by the State of Florida or its subdivisions or agencies, unlawfully and without justification jointly and severally violated the Eighth Amendment when Defendants:

a) Had actual knowledge that the officers had plans to physically assault, harass, attack, and cause harm, not excepting death, to Smith;

b) Violently struck Smith and slammed Smith causing severe head and neck injuries, ultimately causing his untimely death;

c) Failed to secure timely medical attention to Smith while pretending that he was not seriously injured by placing him in a wheelchair; or

d) Being present at and becoming aware of the severe physical abuse of Smith, failed to intervene to stop the abuse of Smith, though able.

199. As a direct and proximate result of the above-described excessive use of deadly force and violence on the Decedent Frank Smith, the Decedent sustained brutal and severe physical injuries resulting in his untimely death.

200. As Plaintiff has been obliged to retain counsel for redress, pursuant to 42 U.S.C. 1988, Plaintiff is entitled to reasonable attorney fees, as well as costs.

WHEREFORE, Plaintiff seeks damages as noted below.

## V.   42 U.S.C. § 1983: Deliberate Indifference to Excessive Force (Reddish, Ellis, Swain, and Allen)

201. Plaintiff re-alleges the Common Allegations as if fully set forth herein.

202. Plaintiff is entitled to relief against Barry Reddish, Wilfred Ellis, and Shawn Swain, for violation of the Eighth Amendment of the U.S. Constitution.

203. Prior to July 3, 2012, aforementioned Defendants evinced deliberate indifference to constitutional rights of inmates, which ultimately caused the violation of Decedent, Mr. Smith's constitutional rights and his death.

204. Prior to July 3, 2012, the Defendants were aware of the correctional officers' tendency to excessive force against the inmates.

205. Defendants maintained a practice of arranging or facilitating the use of excessive force and suppressing investigations of misconduct, altering, suppressing or destroying evidence or ordering others to do the same.

206. Defendants performed, caused, planned, or encouraged excessive force and made further acts of excessive force substantially certain to occur.

207. As further set out in Sections B and C above, Defendants:

a) Ellis and Allen coordinated Smith's return with Warden Reddish and Jeffcoat, instructing control not to log in the returning inmate in order to obscure timelines while a "lesson" was taught to Smith.

b) Ellis learned of the breach and use of force but failed to order a video

camera as required by the rules until after the "lesson" had been taught.

c) Ellis, Swain, and Allen pretended Smith was not seriously injured by putting him in a wheelchair instead of calling medical for a stretcher.

d) Ellis and Swain, as arriving and departing Officers in Charge, failed to call the Emergency Action Center (EAC) as required by protocol.

e) Ellis and Swain failed to notify the Inspector as required by protocol.

f) Ellis and Swain passed on to EMS that Smith banged his head in the van

g) Reddish, Jeffcoat, Ellis, Swain and Allen encouraged or ordered EMS and corrections staff not to report the obvious beating injuries.

h) Reddish, Ellis, and Swain, ordered and permitted evidence, including blood, to be cleaned up before an investigation could take place.

i) Reddish, Ellis and Swain allowed the witnesses to disperse.

j) Reddish and Jeffcoat ordered that the investigation be halted.

k) Reddish and Jeffcoat arranged to ensure and promise that there would be no discipline of any officer for the injuries to Smith.

208. As a direct, proximate, and foreseeable result of the Defendants' deliberate indifference, Mr. Smith suffered severe physical injuries and death.

209. As Plaintiff has been obliged to retain counsel for redress, pursuant to 42 U.S.C. 1988, Plaintiff is entitled to reasonable attorney fees, as well as costs.

WHEREFORE, Plaintiff seeks damages as noted below.

## VI.    Violations of the ADA and Rehabilitation Act (FDOC)

210. Plaintiff re-alleges the Common Allegations as if fully set forth herein.

211. Plaintiff is entitled to relief for disability discrimination against FDOC for

   violating Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101

   et seq., (hereinafter "ADA") which provides in pertinent part:

   No qualified individual with a disability shall, by reason of such disability,
   be excluded from participation in or be denied the benefits of the services,
   programs, or activities of a public entity, or be subjected to discrimination
   by such entity.

   42 U.S.C. § 12132

   Title II of the Act prohibits, among other things:

   • limiting a qualified individual's enjoyment of any right, privilege,
     advantage, or opportunity enjoyed by others receiving an aid, benefit, or
     service of an agency; and

   • subjecting a qualified individual to discrimination under any program or
     activity conducted by an agency.

   28 C.F.R. § 39.130.

212. Mr. Smith was disabled as defined at 42 U.S.C. § 12102(2), as he suffered a

   physical impairment that substantially limited one or more of his major life

   activities, including, but not limited to, mental health disability.

213. Mr. Smith was a "qualified individual" as defined at 42 U.S.C. § 12131(2):

   "Qualified Individual" means a person with a disability who meets the

   essential eligibility requirements for receipt of services or participation in

programs or activities provided by the entity (with or without regard to any auxiliary aids or modifications).

214. FDOC is a public entity that has violated Title II of the ADA.

215. FDOC is an entity that receives federal funding.

216. Union Correctional Institution is a facility and its operation comprises a program and service for purposes of Title II of the ADA.

217. Defendant FDOC authorized its agents and employees to act for Defendant FDOC when they committed the ADA violations alleged herein.  Defendant FDOC's agents and employees accepted the undertaking of acting on behalf of FDOC when they committed the ADA violations alleged herein. Defendant FDOC had control over its agents and employees when they committed the ADA violations alleged herein.

218. The ADA violations alleged herein and committed by Defendant FDOC's agents and employees were done while acting within the course and scope of their employ and/or agency with Defendant FDOC. Thus, Defendant FDOC is vicariously liable for the actions of its agents and employees when they committed the ADA violations alleged herein.

219. Mr. Smith's need for a reasonable accommodation was known and obvious.

220. Defendant FDOC, its employees, and agents knew and/or should have known of Mr. Smith's need for a reasonable accommodation.

221. FDOC, its agents and employees, acted intentionally and/or with deliberate indifference to Mr. Smith's need for a reasonable accommodation by:

a. failure to accommodate his mental health disability;

b. permitting practices whereby inmates with mental health disabilities are punished when they can't understand or follow commands;

c. failing and intentionally refusing to train Defendant FDOC employees regarding the safe management of mentally ill inmates;

d. failing and intentionally refusing to consider Mr. Smith's particular disability when moving and escorting him;

e. permitting sadistic officers to bait and abuse Mr. Smith;

f. failing to use alternatives to force to manage Mr. Smith.

222. As a proximate result of defendant FDOC's, its employees', and agents' failure and intentional refusal to provide Mr. Smith with a reasonable accommodation for his disability, he suffered physical harm and death.

WHEREFORE, Plaintiff seeks damages as noted below.

## Damages

223. As a direct, proximate and foreseeable result of the acts and omissions of the Defendants, the Survivors and the Estate have sustained the following damages, and seeks same from the Defendants:

a) The Estate of Frank Smith has sustained the following damages:

1. Final expenses incurred as a result of the injuries to Mr. Smith that have become a charge on his Estate or were paid on his behalf;

b) The Survivors have sustained the following damages:

1.  Loss of support and services of their loved one;

2.  Mental pain and suffering from the dates of injury and continuing.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests of the Court:

A.  Compensatory damages in an amount to be determined;

B.  Punitive damages against the individual defendants;

C.  Reasonable attorney's fees and costs under 42 U.S.C. § 1988;

D.  Trial by jury on all counts so triable; and

E.  Any further relief this Court deems just and proper.

Respectfully submitted,

_s/ James V. Cook_____
JAMES V. COOK, ESQ.
Florida Bar Number 0966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

I CERTIFY the foregoing was filed electronically on 2/26/19, and served the same date on counsel registered to be notified by the CM/ECF electronic mail system:

_s/James V. Cook_