**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JUDITH WALTON,

       Plaintiff,

v.

FLORIDA DEPARTMENT OF
CORRECTIONS, et al.,

       Defendants.

CASE NO. 3:16-cv-1130-J-39JRK

**PLAINTIFF'S RESPONSE TO DEPARTMENT OF CORRECTIONS**
**MOTION TO DISMISS THE FOURTH AMENDED COMPLAINT**

COMES NOW the Plaintiff, through counsel, and responds to the Motions of Defendants FLORIDA DEPARTMENT OF CORRECTIONS, BARRY REDDISH, SHAWN SWAIN and TERRY BACON to Dismiss the Fourth Amended Complaint as follows grounds:

1. Defendants seek dismissal of the operative complaint on these grounds:

   a. That Terry Bacon should be dismissed with prejudice as there are no causes of action stated against him;

   b. That Count I against Defendants Swain and Reddish should be dismissed based on immunity under § 768.28(9)(a), Florida Statutes;

   c. That Count II should be dismissed with prejudice against Defendants Swain and Reddish for failure to show common law conspiracy;

   d. That Count III should be dismissed with prejudice against Defendants Swain and Reddish for failure to show 42 USC 1983 conspiracy;

   e. That Count V should be dismissed with prejudice against Defendants Swaine and Reddish for failure to show deliberate indifference;

   f. That Count V should be dismissed against the Department of Corrections for violations of the ADA and Rehabilitation Act.

   g. That Plaintiff's claims for punitive damages should be stricken.

2. In summary, Plaintiff responds as follows:

   a. Defendants are correct that there are no causes of action stated against Terry Bacon. After the Order dismissing the Third Amended Complaint, Plaintiff did not choose to

re-instate Bacon as a defendant and deleted him from the list of parties and causes of action but inadvertently failed to remove him from the style. This is a scrivener's error and Plaintiff asks the Court to amend the style of the case to exclude him.

b. Sovereign immunity under § 768.28(9)(a) is not complete immunity but rather immunity qualified by the facts of a government employee's specific acts. As such, it is an intensely factual issue and Plaintiff submits she has plausibly pled facts to which the immunity is inapplicable.

c. Plaintiff submits that she has plausibly pled an agreement among the parties to violate the Decedent's rights consistent with the accepted construction of a common law conspiracy under Florida law.

d. Plaintiff submits that she has plausibly pled an agreement among the parties to violate the Decedent's rights consistent with the accepted construction of a conspiracy under 42 USC 1983.

e. Plaintiff submits that she has plausibly pled that Defendants Swain and Reddish were deliberately indifferent to violations of the Eighth Amendment rights of Decedent under 42 USC 1983.

f. Plaintiff submits that she has plausibly pled that the Florida Department of Corrections violated the ADA and Rehabilitation Act.

g. Plaintiff submits that she has plausibly pled entitlement to punitive damages from the individual defendants under the federal counts.

## MEMORANDUM OF LAW

Defendants offer the Court their own version of "Plaintiff's Allegations," which are intended to re-frame the facts pled by Plaintiff in his Fourth Amended Complaint in a light more favorable to Defendants, who re-phrase Plaintiff's facts using Defendants' choice of language and quote marks in the sense of "so-called."[1] Plaintiff urges the Court to disregard this fact statement. The best source of the facts pled by the Plaintiff is still the facts pled by the Plaintiff.

Motions to dismiss are disfavored and not often granted. See, e.g., *Universal Collision Center Inc. v. Travelers Ind. Co. of Conn.*, 2010 WL 2015242, at *1 (N.D. Fla. 2010) (*citing*

---

[1] Consistent with this condescending approach, Defendants insert "(sic)" after the word "lay" in "Smith lay on his back." "Smith lay" is the right usage. "Lay" is the past tense of "lie" (in the sense used here). https://www.writersdigest.com/online-editor/lay-vs-lie.

*Madison v. Purdy*, 410 F.2d 99, 100 (5th Cir. 1969) ("A motion to dismiss on the basis of the pleadings alone should rarely be granted.")). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (q*uoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also id*. at 679 ("a complaint that states a plausible claim for relief survives a motion to dismiss"). To meet this "plausibility standard," the plaintiff must plead sufficient facts that permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. While the Federal Rules of Civil Procedure do not require that allegations be set forth in detail—Rule 8(a) only requires a "short and plain statement" showing that plaintiff is entitled to relief—the claims must be "enough to raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555; *accord, e.g., Iqbal*, 556 U.S. at 678 (noting that Rule 8(a) does not require "'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation") (*quoting Twombly*). When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See, e.g., Brooks v. Blue Cross & Blue Shield of Fla. Inc*., 116 F.3d 1364, 1369 (11th Cir. 1997); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Howry v. Nisus, Inc*., 910 F.Supp. 576 (M.D.Fla.1995). The scope of review concerns the allegations contained within the four corners of the Complaint. *Rickman v. Precisionaire, Inc*., 902 F. Supp. 232, 233 (M.D. Fla. 1995) After *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), there is no longer a "heightened pleading standard" in the Eleventh Circuit as it relates to cases governed by Rule 8(a)(2), including civil rights complaints. *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010).

**A. Terry Bacon Should Be Deleted from the Style as a Scrivenor's Error**

Plaintiff inadvertently copied Terry Bacon's name into the style of the case when there was no intention to include him in the current complaint. Plaintiff agrees that Bacon's name should be deleted from the style of the case.

### B. Defendants Swain and Reddish Are Not Immune under 768.28(9)(a)

Section 768.28(9), Florida Statutes provides, in part, as follows:

No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

§ 768.28(9)(a) Florida Statutes.

However, that provision is highly fact-dependent. Unaccountably, Defendants refer to the allegations of misconduct against them as "a threadbare recital" that they "acted maliciously and in bad faith." (DE 63 at 20). To be fair, they plausibly show persons with a high calling to do justice acting as vigilantes to teach a lesson to a mentally ill man, at the cost of his life, because he was difficult and sometimes disrespectful. As a comparison, Defendants cite *Eiras v. Florida*, 239 F. Supp. 3d 1331, 1343 (M.D. Fla. 2017), a generic arrest case which both parties agreed was done within the scope of the officers' employment and with a warrant. *Eiras* found no evidence of "ill will, hatred, spite, [or] an evil intent," conduct "worse than gross negligence." *Id*. The Defendants' example doesn't square with the facts of this case.

In this case, there are a series of seemingly coordinated events leading to a death, that include multiple violations of Department of Corrections regulations:

a. Sgt. Criswell was not originally sent to pick up Frank Smith but his assignment was changed to bring Smith back to UCI.

b. Sgt. Criswell and Inmate Frank Smith have a verbal exchange and Smith end up urinating on himself before getting into the prison van;

c.  Sgt. Criswell, who teaches a prison van transport class violates prison van transport rules by stopping and entering the prisoner compartment;

d.  Sgt. Criswell uses force on a fully restrained prisoner in a locking seatbelt but apparently uses more force than he admits to using;

e.  Criswell calls his captain, Officer in Charge (OIC) Defendant Wilfred Ellis, to report the incident as Criswell is riding in the back of the van;

f.  Sgt. Criswell claims the prisoner repeatedly banged his head on a divider though witnesses say the prisoner shows no facial injuries;

g.  Someone calls the Warden, Barry Reddish, who asks that the van drive by the administration building so he can inspect the damage;

h.  The prisoner then enters the institution but there is no record that a prisoner named Frank Smith is back inside the prison;

i.  the prisoner on whom force was used is witnessed to have blood on his shirt and walks unsteadily when he leaves the prison van;

j.  Inspector Whatley would later find blood in the van;

k.  Defendant Captain Ellis, the OIC, comes to the Movement Center but fails to bring a video camera, which is required after a use of force;

l.  Inside the Movement Center, the prisoner ends up unresponsive on the floor but medical is not called to the scene;

m.  Emergency Medical Personnel state in their report that Frank Smith looks like he has been in a car wreck;

n.  After the incident, the incoming OIC, Swain, allows the blood to be cleaned up, the witnesses to go home, and the van to be driven away;

o.  Swain fails to call the Emergency Action Center or the Inspector;

p.  An investigation is started by Inv. Whatley but quickly cancelled;

q.  Frank Smith dies two months later of blunt trauma to his head and neck;

r.  Autopsy showed multiple visible abrasions, lacerations, edemas, and contusions of the legs, groin, midsection, and head;

s.  Medical Examiner Burt "cannot say (the injuries) are self-inflicted;

t.  Smith is just one of several prisoners badly beaten at UCI in 2012, another of whom almost dies and another suffers brain damage;

u.  FDLE starts an investigation and several prison officials are suspended and Warden Reddish is transferred to another prison.

This is far from the "threadbare recital" that a defendant "acted maliciously and in bad faith" as alleged by Defendants Reddish and Swain, citing *Eiras, supra*, and *Brivik v. Law*, 545 Fed.Appx. 804, 806 (11th Cir. 2013). In *Brivik*, Officer Law was simply alleged to have performed a "reckless" investigation resulting in prosecution of Brivik on felony charges. Brivik never alleged Law knew the statements in her affidavit were false and therefore the claims that her actions were malicious were conclusory, unlike the allegations here. *Id*. at 807.

## C.  Plaintiff Has Plausibly Alleged a Common Law Conspiracy

A civil conspiracy claim under Florida common law requires: (1) an agreement between two or more parties, (2) to do an unlawful act or to do a lawful act by unlawful means, (3) the doing of some overt act in pursuance of the conspiracy, and (4) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So.2d 1273, 1284 (Fla.Dist.Ct.App. 1997). Agreement is a necessary element of conspiracy, which is defined as an express or implied agreement of two or more persons to engage in an unlawful act. *Witmer v. Dep't of Bus. & Prof'l Regulation, Div. of Pari–Mutuel Wagering*, 631 So.2d 338, 342 (Fla. 4th DCA 1994) *Nicholson v. Kellin*, 481 So.2d 931, 935 (Fla. 5th DCA 1985) (stating that "[a] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose by unlawful means"). Each coconspirator need not act to further a conspiracy; each "need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." *Donofrio v. Matassini*, 503 So.2d 1278, 1281 (Fla. 2d DCA 1987) (also stating that "[t]he existence of a conspiracy and an individual's participation in it may be

inferred from circumstantial evidence"); *see also Nicholson*, 481 So.2d at 935 (confirming that an act done in pursuit of a conspiracy by one conspirator is an act for which each other conspirator is jointly and severally liable); *Charles v. Florida Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008). Agreements can rarely be proven by direct evidence but may depend on circumstantial evidence.

Eleventh Circuit cases agree that in proving a conspiracy to violate constitutional rights, agreement between the conspirators may be proven by circumstantial evidence. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir.1997); *Grider v. City of Auburn*, 618 F.3d 1240,1260 (11th Cir. 2010); *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 970 F.2d 785, 789 (11th Cir.1992); *Am. Fed'n of Labor & Cong. of Indus. Organizations v. City of Miami*, FL, 637 F.3d 1178, 1191 (11th Cir. 2011).

In *United States v. Ramsdale*, 61 F.3d 825, 829 (11th Cir. 1995), the court said that "[p]articipation in such an agreement need not be proven by direct evidence — "a common purpose and plan may be inferred from a 'development and collocation of circumstances.'" A conspiracy may, and often is, proven by "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Tamargo*, 627 F.2d 887, 888 (11th Cir. 1982); *United States v. Knowles*, 66 F.3d 1146, 1155 (11th Cir. 1995).

Absent direct evidence of agreement among  defendants, a conspiracy can be established by circumstantial evidence sufficient to permit an inference of agreement." *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 221, 59 S. Ct. 467 (1939). As the Middle District held:

> Plaintiff need not produce a "smoking gun" to establish the "understanding" or "willful participation" required to show a conspiracy, but must show some evidence of agreement between the defendants. Rowe, 279 F.3d at 1283-1284. See also Arline v. City of Jacksonville, 359 F. Supp. 2d 1300, 1312 (M.D. Fla. 2005). Circumstantial evidence may be sufficient to establish a conspiracy if it proves the existence of the conspiracy. Burrell v. Board of Trs. of Ga. Military Coll., 970 F.2d 785, 789 (11th Cir. 1992).

*Edison v. Florida,*2007 U.S. Dist. LEXIS 843 (M.D. Fla. 2007). Plaintiff has pled a chain of events that goes far beyond simply working for the same government entity.

A complaint must "contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1347.

Proof of the commission of an act which furthered the purpose of the conspiracy is an example of the type of circumstantial evidence [that can] prove the existence of an agreement." *United States v. Arias–Izquierdo*, 449 F.3d 1168, 1182 (11th Cir.2006). *Koch v. Royal Wine Merchants, Ltd.*, 907 F. Supp. 2d 1332, 1346–47 (S.D. Fla. 2012). "[O]nly slight evidence is required to connect a particular defendant to a conspiracy once the conspiracy has been established." *In re Managed Care Litig.,* 430 F. Supp. 2d 1336, 1347 (S.D. Fla. 2006), *aff'd sub nom. Shane v. Humana, Inc.,* 228 Fed. Appx. 927 (11th Cir. 2007).

Here, officers were frustrated with Frank Smith because he would not bathe and frequently failed to follow their commands. (DE 62, ¶ 26). Sgt. Criswell got in an argument with Smith over Smith's request to use the bathroom as they left Shands Hospital and Smith ended up urinating in his clothing. (Id. ¶ 32-33). On the ride back to Union C.I., Smith broke a window though he was still restrained and could not escape. (Id. at ¶ 38-40). Criswell stopped the van and entered the prisoner compartment in violation of transport regulations although he taught a class on the subject. (Id. at ¶ 39-46). Criswell used his Taser on Smith without any indication of a valid penological purpose in the complaint, and also used several knee strikes which were witnessed by Officer Hough but which Criswell denied. (Id. at ¶ 49-50). Officer Shalen Browning heard

Captain Ellis talking to Criswell on the phone and heard that officers "were aggravated" at Smith. (Id. at ¶ 57). After speaking with Criswell, Captain Ellis told Lt. Joseph Allen to report to the movement center since "they were having problems" with Smith. (Id. at ¶ 56). Captain Ellis came to meet the van at the movement center without a video camera, which would have been protocol after a use of force. (Id. at ¶ 72-73). Captain Swain, taking over from Ellis at 4:00 p.m., failed to secure the scene of the injury, allowing blood to be cleaned up, the witnesses to go home without interviews, and the van to be driven away. (Id. at ¶ 99-103). Warden Reddish asked that the van be driven by the Administration Building so he could see the damage and would have seen Criswell in back with Smith. (Id. at ¶ 84). Afterwards, the control room did not record Smith returning. (Id. at ¶ 85a). Medical was not called to the scene where Smith lay unresponsive. (Id. at ¶ 85d). Blood in the van and in the holding cell was cleaned up. (Id. at ¶ 85f). No one called an Inspector until witnesses left and blood was cleaned up. (Id. at ¶ 85h). The force investigation was called off until after Smith had died. (Id. at ¶ 85i). These facts supply circumstantial evidence of an agreement involving Defendants Reddish and Swain, among others.

Of course, the conspiracy is not free-standing. The wrongful act is not the conspiracy itself, but the purpose of the conspiracy. An action for civil conspiracy only exists if "the basis for the conspiracy is an independent wrong or tort which would constitute a cause of action if the wrong were done by one person." *Blatt v. Green, Rose, Kahn & Piotrkowski*, 456 So.2d 949, 951 (Fla. 3d DCA 1984). *Orange Lake Country Club, Inc. v. Reed Hein & Associates, LLC*, 617CV1542ORL31DCI, 2019 WL 645214, at *5 (M.D. Fla. Jan. 4, 2019).

### D. Plaintiff Has Plausibly Alleged a 42 USC § 1983 Conspiracy

To plead a conspiracy under 42 U.S.C. § 1983, a plaintiff must show "an underlying actual denial of constitutional rights" *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008),

and that defendants "reached an understanding" to deny those rights. *Id.*, *citing Bendiburg v. Dempsey*, 909 F.2d 463 (11th Cir. 1990). A plaintiff need not "produce a smoking gun" as to the understanding or willful participation required to show conspiracy but "must show some evidence of agreement between the defendants." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283-84 (11th Cir. 2002). "[I]t is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators . . . and from other circumstantial evidence" *Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp.2d 1253, 1267 (N.D. Ga. 2002); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 569 (11th Cir. 1998).

The optimal proof of a conspiracy is the admission of a conspirator. But that is a rare luxury. In *Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*, 394 U.S. 700 (1969), the U.S. Supreme Court held that though a party had "no letters, agreements, correspondence, or any other testimonials to a conspiracy among the several defendants, . . . no formal agreement is necessary to constitute an unlawful conspiracy." *Id.* at 703-04 (*citing American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125 (1946).

During 2011 and 2012, a rash of severe beatings of prisoners rocked Union Correctional Institution (UCI), resulting in severe brain damage to one inmate, the death of Frank Smith, the near-death of others resulting in the removal of Barry Reddish as UCI Warden. (DE 62, ⁋ 110). After coming in contact with Union C.I. Sgt. Rodney Criswell, Lt. Joseph Allen, and Officer Brian Norman, Decedent Frank Smith was hospitalized and lingered gravely injured for two months before dying. At his autopsy, Smith was found to have multiple visible abrasions, lacerations, edemas and contusions of the legs, groin, midsection, and head. He died of blunt head injuries. (DE 62, ¶ 121).

Plaintiff has clearly pled that several Defendants actively participated in an application of excessive force and others were near enough to have taken some action to intervene to protect Smith, including Hough, Shaffer, Griffis and Browning. Criswell was with Smith in a confined space and was observed by witness Hough striking Smith (though Criswell denied having done so) prior to Smith showing the first signs of significant injuries. (DE 62, ⁋⁋ 50, 64-66). Later, Inspector Whatley would find blood in the van that Criswell had occupied with Smith. (DE 62, ⁋ 67). Allen and Norman were the only other officers in close proximity to Smith. They removed him from the prison van and escorted him to where he ended up unconscious in a pool of blood. (DE 62, ⁋⁋ 62, 74, 77). Defendants Reddish, Ellis, and Swain, organized the welcoming party for Smith and covered up the evidence to an extent the justifies an inference of guilt. Inspector Whatley started an investigation and said he was called off. (DE 62, ⁋ 107). An inference could reasonably be drawn that only Defendant Reddish had the power to call off an investigation.

UCI Officers disliked Smith because he was mentally ill and was difficult to care for, (DE 62, ⁋ 26, 29). During transport he had urinated on himself. (DE 62, ⁋ 33). That afternoon and evening, a series of unusual events occurred. Criswell called the Officer in Charge (OIC), Wilfred Ellis, to report what happened. (DE 62, ⁋ 54). Ellis told Lt. Joseph Allen to meet the van at the movement center because they were "having problems" with Smith. (DE 62, ⁋ 56). Sgt. Cagle told FDLE investigators he heard of another use of force on Smith in the Movement Center. Norman was heard saying of Smith, "I kicked that fuck-boy's ass." (DE No. 62, ⁋ 83).

After Warden Reddish ordered the prison van to stop by his office so he and other administrators could see the damage to the van (DE 62, ⁋ 55), Smith was taken into the prison without Smith being logged in. (DE 62, ⁋⁋ 60-61). Ellis was waiting inside the Movement

Center. (DE 62, 68). Ellis had been called by Criswell from the scene.[2] (DE 62, ℙ 54). Since force had been used in the van, Ellis should have had a camera operator there but did not, (DE 62, ℙ 72). Shortly after Smith entered the movement center, he was unconscious on the floor in a pool of blood. (DE 62, ℙ 79). Allen and Ellis did not give first aid or call medical but loaded Smith in a wheel chair. No one reported the incident. The Inspector was not called. The blood in the holding cell was cleaned up, the witnesses left, and the beginnings of an investigation by Inspector Whatley were called off. (DE 62 at 85a-i).

### 1. The Supervisors and Inspector

UCI had become a brutal place under Warden Barry Reddish and Assistant Warden Nan Jeffcoat. Their subordinates, Wilfred Ellis, Shawn Swain, Terry Bacon, and Inspector E.J. Whatley, all played critical roles in the events involving Smith. Reddish and Jeffcoat were removed from their jobs after Smith's death. Reddish was moved to Lawtey C.I., a less important prison, and Jeffcoat after serving a suspension ended up at Palatka C.I.

The afternoon Smith was fatally beaten, Capt. Wilfred Ellis, the Officer in Charge (OIC) that day, after talking to Criswell, called Lt. Joseph Allen, told him to report to the Movement Center, saying Inmate Smith was returning to UCI and "we're having some problems with him." (DE 62, ℙ 56). Ellis "forgot" to call the On-Call Inspector about the incident. (DE 62, ℙ 98). Subsequently the pools of blood were cleaned up without being photographed or otherwise documented. Bacon, then administrative lieutenant and was told about the roadside breach of the prisoner compartment of the van by Criswell, a rule violation, but did nothing and kept it quiet. Captain Shawn Swain came on duty at 4 p.m., before the prison van carrying Smith

---

[2] Captain Ellis conceded that when there is a use of force, a camera should be called. He had just finished talking to Sgt. Criswell, the officer who had just used force on Smith. Both were veteran corrections security officers and would have known to exchange that information.

reached the institution, but told Whatley that preserving the scene (not destroying evidence) was the responsibility of the "day shift captain. (DE. No. 33, ⁋ 89-90). Swain arrived at the movement center as Smith was being removed by wheelchair and later went back when Inspector Whatley asked to take pictures. By then the blood had been cleaned up.[3]

Defendant Whatley was upset that he only learned about the injury several hours after it happened. Whatley went to the hospital to interview Smith and essentially used leading questions to put words in Smith's mouth. Smith appeared to be afraid to name the officers who harmed him and said he "did it to myself." Whatley was subsequently taken off the case. No one debriefed Whatley until he was interviewed by FDLE after Smith's death.

### 2. The Officers at the Scene

Plaintiff has pled that many officers at UCI hated Smith because he suffered from mental health disabilities and was difficult to care for. Inmates said Smith couldn't always comprehend what he was being told to do. This made the correction officers angry and they took it out on Smith by beating on him. Inmates say that officers would also often refuse to feed Smith. During the transport on July 3, 2012, Smith had urinated on himself. (DE No. 3, ¶ 28-31).

Defendants Joseph Allen, Rodney Criswell, Dustin Hough, Michael Schaffer, Eric Cagle, Brian Norman, Brandi Griffis and Shalen Browning were all at the scene of the uses of force. Plaintiff has alleged that Frank Smith was killed by the officers who transported him and others at the "Movement Center" who assisted while he was beaten or failed to intervene. Security Staff involved in the excessive force and failure to intervene included Defendant Criswell, Norman, Griffis, Browning, and Allen, who actively participated in the excessive force, aided in the excessive force, or failed to intervene to stop it although close to the action

---

[3] Blood spatter analysis can be an excellent forensic tool to show how force was used.

and able to do so. Hough and Shaffer were in the close confines of the van or nearby when force was used and could have stopped it.

Defendant Cagle said he understood that "force" was used on Smith when he got to the Movement Center. Asked who used force on Smith, he replied, "Whoever was waiting" in the Movement Center. Defendants Allen and Norman were waiting for Smith at the Movement Center and took Smith off the van. Allen said Smith had blood on his shirt and was already walking unsteadily when he left the van. Soon afterwards, Smith "fell" and sustained a serious head injury. From that point, Smith was unconscious.

Defendant Allen said no one was touching Smith when he fell. The Medical Examiner, Martha Burt, stated her "findings are hard to reconcile with events as described" in the written statements of the officers. She told FDLE investigators she "cannot say (Smith's injuries) are self-inflicted." (DE 62, ₱ 97)

Although Smith was then unconscious, Defendant Browning pushed him to medical in a wheel chair instead of a gurney. This would be consistent with pretending Smith was not severely injured. Along the way, Smith's foot fell to the pavement but Browning kept pushing him even though the pavement was wearing through Smith's shoe and then through the skin of his foot. (DE 62, ₱ 88).

 Eleventh Circuit cases agree that in proving a conspiracy to violate constitutional rights, agreement between the conspirators may be proven by circumstantial evidence. *Grider v. City of Auburn*, 618 F.3d 1240,1260 (11th Cir. 2010); *Burrell v. Bd. of Trustees of Ga. Military Coll*., 970 F.2d 785, 789 (11th Cir.1992); *Am. Fed'n of Labor & Cong. of Indus. Organizations v. City of Miami*, FL, 637 F.3d 1178, 1191 (11th Cir. 2011).

In *United States v. Ramsdale*, 61 F.3d 825, 829 (11th Cir. 1995), the court said that

"[p]articipation in such an agreement need not be proven by direct evidence — "a common purpose and plan may be inferred from a 'development and collocation of circumstances.'" In other words, the existence of a conspiracy may, and often is, proven by "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Tamargo*, 627 F.2d 887, 888 (11th Cir. 1982); *United States v. Knowles*, 66 F.3d 1146, 1155 (11th Cir. 1995).

"In the absence of direct evidence of agreement among the defendants, a conspiracy can be established by circumstantial evidence sufficient to permit an inference of agreement." *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 221, 59 S. Ct. 467 (1939). As the court said in *Edison v. Florida*,

> Plaintiff need not produce a "smoking gun" to establish the "understanding" or "willful participation" required to show a conspiracy, but must show some evidence of agreement between the defendants. Rowe, 279 F.3d at 1283-1284. See also Arline v. City of Jacksonville, 359 F. Supp. 2d 1300, 1312 (M.D. Fla. 2005). Circumstantial evidence may be sufficient to establish a conspiracy if it proves the existence of the conspiracy. Burrell v. Board of Trs. of Ga. Military Coll., 970 F.2d 785, 789 (11th Cir. 1992).

2007 U.S. Dist. LEXIS 843 (M.D. Fla. 2007). Plaintiff has pled a chain of events that goes far beyond simply working for the same government entity.

The intracorporate conspiracy doctrine is not applicable. The conspirators were not guided by a desire to further the goals of the Florida Department of Corrections. Their motivation was to gratify their own proclivity for tormenting and physically abusing mentally ill inmates. Any reliance on the Intracorporate Conspiracy Doctrine is misplaced. These conspirators were covered by the "personal stake exception" to the intracorporate conspiracy doctrine. Under that exception, corporate agent may be liable for conspiring with other corporate agents where "the agent has a personal stake in the activities that are separate and distinct from the corporation's interest." *Cedar Hills Props. Corp. v. E. Fed. Corp*., 575 So.2d 673, 676 (Fla. 1st DCA. 1991).

The personal stake exception was first formulated by the Fourth Circuit in an anti-trust case. *Greenville Publ'g Co. v. Daily Reflector, Inc*., 496 F.2d 391, 399–400 (4th Cir. 1974); *Hackett v. Metro. Gen. Hosp*., 422 So.2d 986, 988 n.2 (Fla. 2d DCA 1982) (*citing Greenville* as authority for the personal stake exception recognized in Florida). The Third Circuit held the exception applies "when the employees have acted for their sole personal benefit and thus outside the course and scope of their employment." *Heffernan v. Hunter*, 189 F.3d 405, 412 (3d Cir. 1999) (*emphasis added*); *see also Buschi v. Kirven*, 775 F.2d 1240, 1253 (4th Cir. 1985) (while authorized acts of an employee would be protected under the intracorporate conspiracy doctrine, unauthorized acts would not). As these cases instruct, the personal stake exception requires more than some incidental personal benefit—the exception applies only "where corporate employees are shown to have been motivated solely by personal bias." *Hartman*, 4 F.3d at 470 (emphasis added). *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc*., 302 F. Supp. 3d 1319 (M.D. Fla. 2016) (M.D. Fla. Nov. 4, 2016), and aff'd, 703 Fed. Appx. 814 (11th Cir. 2017).

Moreover, non-employees, like the inmates who cleaned up the blood, and the Emergency Medical Services staff – not part of the Department of Corrections – also failed to report any wrongdoing. The EMS staff had been told Smith "beat his head" inside a transport van but they were suspicious since one of the paramedics said Smith's injuries looked more consistent with the victim of a car wreck. (DE 62, ₱ 94-95).

The intracorporate conspiracy doctrine has also been held not to apply to criminal behavior – whether it appears in a criminal or civil case. In one such civil case, the Eleventh Circuit held as follows:

> Accordingly, we hold that just as the intracorporate conspiracy doctrine cannot shield a criminal conspiracy from prosecution under the federal criminal code, the doctrine cannot shield the same conspiracy, alleging the same criminal wrongdoing, from civil liability arising under 42 U.S.C. § 1985(2). Therefore, we reverse the district court's order

dismissing McAndrew's § 1985(2) claim as barred by the intracorporate conspiracy doctrine and remand for further proceedings consistent with this opinion.

*McAndrew v. Lockheed Martin Corp*., 206 F.3d 1031, 1034 (11th Cir. 2000).

The officers involved in gratuitous  beatings of inmates constituted essentially a gang of vigilantes who felt free to violate the Department rules and kept their worst actions hidden from at least some officials and inspectors. Defendant Criswell, in particular, was primarily motivated by his dislike of mentally ill inmates (DE 62, ℙ 37), and was acting not primarily for his employer, but for his own interest in tormenting and abusing mentally ill inmates.

### E.  Plaintiff Makes Out A Claim for Deliberate Indifference as to Reddish and Swain

Separate and apart from the conspiracy, Plaintiff also pleads counts of deliberate indifference under 42 USC 1983 against Defendants Reddish and Swain to the employment of excessive force against Smith. Plaintiff plausibly pled that Warden Reddish was aware of the plan to punish Smith, albeit by circumstantial evidence, including the series of events that followed his "inspection" of the van that had been damaged. (DE 62 at ¶¶ 84-86). As the Captain and Officer In Charge (OIC), It was primarily Defendant Swain who would have had to call the Emergency Action Center and the Inspector. He did not. (DE 62, ¶ 99-103). Although the events started with Sgt. Criswell, Frank Smith was handed off to another set of prison officials under the supervision of Warden Reddish and Captain Swain.

A plaintiff can recover for group assaults without necessarily attaching each blow or bullet to a particular officer. *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002) ("we reject the argument that the force administered by each defendant in this collective beating must be analyzed separately to determine which of the defendants' blows, if any, used excessive force"). Other circuits agree. *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000); *Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990) (ten officers could be held liable where they acted as a unit);

*Rutherford v. City of Berkeley*, 780 F.2d 1444, 1448 (9th Cir. 1986) (jury could infer that three

officers who were present during a beating participated in it); *Grandstaff v. City of Borger, Texas*,

767 F.2d 161, 168 (5th Cir. 1985) (where numerous officers fired shots, plaintiff's estate need not

identify whose bullet killed him); *Davis v. Hill*, 173 F.Supp.2d 1136, 1144 (D.Kan. 2001); *Merritt*

*v. Hawk*, 153 F.Supp.2d 1216, 1223-24 (D.Colo. 2001) (describing the beating and identifying

those present was sufficient to allege their direct participation); *Skorupski v. Suffolk County*, 652

F.Supp. 690, 694 (E.D.N.Y. 1987).

### F.  Plaintiff Makes Out A Claim for Violation of the ADA/RA

Mr. Smith is alleged to be a person with a severe mental health disability. (DE 62, ¶ 21-

29). As such, he was entitled to the same beneficial considerations and safe living conditions as

any other inmate but because of his mental health status, he was trapped in an abusive

confinement system. To provide Mr. Smith with safe living conditions would have required a

special accommodation to protect him from predatory and sadistic corrections officers like

Criswell, Norman, Allen and others.

Mr. Smith was an "otherwise qualified" person who should have been able to take

advantage of FDC mental health programs dealing with his particular disability. Because of the

failure of UCI administrators, including Defendants, to control officers like Criswell, Norman,

and Allen, the programs that were nominally designed to help inmates like Mr. Smith served to

render him a victim of officers who enjoyed taunting and tormenting mentally-ill inmates.

### 1.  Discrimination, Intentionality and Harm

Many institutional claims of discrimination for purposes of the ADA and Rehabilitation

Act are not claims that the disabled person is selected from out of a group as a target of

discrimination. If a prison population were made up solely of inmates who needed wheelchairs

to get around and every pathway was intersected by steps and steep curbs, that would be discriminatory even if it applied to each inmate in exactly the same way to the same effect.

Discriminatory intent may be proven by a showing of "deliberate indifference." *Liese v. Indian River County Hosp. Dist*., 701 F.3d 334, 345 (11th Cir. 2012). Deliberate indifference requires a showing a defendant "knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood." *Id*. at 344. The acts of the supervisory officials mentioned above were either deliberately indifferent of intentional in nature. Assignment of mentally ill inmates to a living area where mentally ill inmates are predictably seriously injured constitutes at least deliberate indifference. The failure to supervise and discipline chronically abusive officers is deliberately indifferent. Should Plaintiff be able to prove these allegations, a jury could reasonably infer deliberate indifference to a known risk of harm.

### 2. Defendants Had Notice of Need for Accommodations

Defendants claim not to be aware of Mr. Smith's need for accommodation but they were well-known. (DE 62 at ¶¶ 21-25). A demand for accommodation need not be made where the disabled individual's needs are apparent. *Reed v. LePage Bakeries, Inc*., 244 F.3d 254, 261 n.7 (1st Cir. 2001); *Chisolm v. McManimon*, 275 F.3d 315, 330 (3d Cir. 2001) (reversing holding that request for accommodation was necessary, where the public entity "had knowledge of [plaintiff's] hearing disability but failed to discuss related issues with him") (*citing Randolph v. Rogers*, 170 F.3d 850, 858-59 (8th Cir. 1999)); *Taylor v. Principal Financial Group, Inc*., 93 F.3d 155, 165 (5th Cir.1996) (noting disabled individual's burden to request an accommodation applies "[w]here the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent"); *L.J. McCoy v. Texas Dept. of Criminal Justice*, 2006 WL 2331055, S.D. Texas, *26-*28). A demand for accommodation may provide notice but it is the notice, not the

demand, that is required. To continue the analogy to an employee-employer relationship, the employee "must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir.1996); *O'Neal v. Atlanta Gas and Light Co*., 968 F.Supp. 721, 723 (S.D.Ga.), aff'd, 122 F.3d 1079 (11th Cir.1997). A department of corrections that holds custody of thousands of persons diagnosed with mental illness is well aware of the special protections persons with mental illness need to live safe and meaningful lives.

### G. Punitive Damages Are Not Barred by the Plaintiff's Death

Counsel for the Department of Corrections and Defendants Reddish and Swain, maintain that "[t]he personal representatives of a deceased party to a suit cannot prosecute or defend the suit after his death, unless the cause of action, on account of which the suit was brought, is one that survives by law." *Ex parte Schreiber*, 110 U.S. 76, 80 (1884). Of course, actions under Florida's Wrongful Death Act and 42 USC § 1983 both *do survive* the death of a decedent and are not causes of action for the decedent, but for the Estate and Survivors. As the Northern District of Florida held in *Sharbaugh v. Beaudry*,

> Florida's comprehensive wrongful death statutory scheme expresses a clear legislative intent to hold wrongdoers liable when their actions result in death and compensates the decedent's estate as well as living survivors, who otherwise would bear the loss from the decedent's death. See Fla. Stat. § 768.17; see also Brazier, 293 F.2d at 409 (instructing that both classes of victims should be regarded). The FWDA is not hostile to § 1983 claims nor does it target § 1983 plaintiffs for adverse treatment. It makes both compensatory and *punitive damages* available for the wrongful death. Thus, the FWDA provides a meaningful remedy that is sufficiently "tailored to the interests protected" under § 1983 (in this case, wrongful death). This is not inconsistent with § 1983's policy of providing compensation. See Carey, 435 U.S. at 259, 98 S.Ct. 1042.

*Id*., 267 F. Supp. 3d 1326, 1335–36 (N.D. Fla. 2017) (*emphasis added*)

WHEREFORE, Plaintiff moves this Honorable Court to DENY Defendants FDC, Reddish and Swain's Motion  to Dismiss the Fourth Amended Complaint.

| | |
|---|---|
| Respectfully submitted, | *s/ James V. Cook*<br>JAMES V. COOK, ESQ.<br>Florida Bar Number 0966843<br>Law Office of James Cook<br>314 West Jefferson Street<br>Tallahassee, Florida 32301<br>(850) 222-8080; 561-0836 fax<br>cookjv@gmail.com<br><br>ATTORNEY FOR PLAINTIFF |

I CERTIFY the foregoing was filed electronically on 4/5/19 and served the same date on counsel registered to be notified by the CM/DE electronic mail system, and by U.S. Mail to Wilfred Ellis at 15202 N.W. 147th Drive, Gainesville, FL 32615.

*s/James V. Cook*