JUDITH WALTON, as Personal
Representative for the ESTATE
OF FRANK SMITH, on behalf of the
Estate and Survivor Judith Walton,

        Plaintiff,

v.                                       Case No. 3:16-cv-1130-J-39JRK

FLORIDA DEPARTMENT OF
CORRECTIONS, et al.,

        Defendants.
_____

## ORDER

### I. Status

Plaintiff is proceeding on a Fourth Amended Complaint (Doc. 62; FAC). As personal representative of her son, Frank Smith's estate, Plaintiff asserts Smith's constitutional rights were violated when he was in the custody of the Florida Department of Corrections (FDOC) at Union Correctional Institution (UCI). Plaintiff names the following as Defendants: the FDOC; Warden Barry Reddish; Lieutenant Joseph Allen; Captain Wilfred Ellis; Captain Shawn Swain; Officer Rodney Criswell; Officer Brandi Griffis; Officer Brian Norman; Officer Shalen Browning; Officer Michael Shaffer; and Officer Dustin Hough. Before the Court are two motions to dismiss: Defendant Criswell's Motion to Dismiss (Doc. 63; Criswell Motion); and Defendants FDOC, Reddish, Swain, and Bacon's Motion to Dismiss (Doc. 69; FDOC Motion). Plaintiff has responded to both

motions, making them ripe for this Court's review (Doc. 72; Response to Criswell Motion) (Doc. 73; Response to FDOC Motion).[1]

## II. Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. Ashcroft v.Iqbal, 556 U.S. 662, 678 (2009); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Omar ex. rel. Cannon v. Lindsey, 334 F.3d 1246, 1247 (11th Cir. 2003). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." Iqbal, 556 U.S. at 678, 680. To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. The well-pled allegations must nudge the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570.  "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that [the p]laintiff can prove no set of facts that would entitle him to relief." Lindsey, 334 F.3d at 1247.

---

[1] Defendants Allen, Norman, Griffis, Browning, Schaffer, and Hough answered the FAC (Docs. 67, 68). Defendant Ellis has not responded.

### III. Complaint Allegations[2]

This lawsuit arises out of incidents that occurred on July 3, 2012. <u>See</u> FAC at 5. Plaintiff alleges Defendants gratuitously beat Smith or failed to intervene in the beating, resulting in Smith's death. <u>Id.</u> at 15, 21, 26. Smith was housed at UCI "in a unit for the severely mentally ill" because he was a "disabled adult, diagnosed as paranoid schizophrenic," who heard, spoke to, and followed commands of voices in his head. <u>Id.</u> at 4 (footnote omitted). <u>Id.</u> A fellow inmate said Smith "would not bathe and had trouble understanding and following simple commands," which angered officers, causing them to "sometimes physically assault[] Smith out of frustration." <u>Id.</u> Plaintiff alleges, "[Defendant] Criswell, like some other officers at UCI at that time, made a game of tormenting mentally ill inmates to see them get excited and react." <u>Id.</u> at 5. Plaintiff further alleges Defendant Criswell "had prior trouble with Smith and had animus toward him," and Criswell thought Smith was disrespectful and deliberately disobedient. <u>Id.</u> at 16.

On the day of the incidents that are the subject of this lawsuit, Defendants Criswell, Hough, and Cagle transported Smith back to UCI from Shands hospital, where Smith had been hospitalized for complications following an overdose of antipsychotic medications. <u>Id.</u> at 4-5. Notes from the hospital indicate Smith was confused, thinking the year was 2002. <u>Id.</u> at 4. Plaintiff alleges Smith and Defendant Criswell argued prior to leaving Shands because Smith had to use the restroom, but Criswell would not permit him to do so. <u>Id.</u> at 5. Smith urinated himself and was then forced to sit in his urine-soaked clothes for the approximately fifty-five-minute transport. During transport, Smith was chained and

_____

[2] Because the Court must accept all factual allegations in the FAC as true, <u>Miljkovic v. Shafritz & Dinkin, P.A.</u>, 791 F.3d 1291, 1297 (11th Cir. 2015), the recited facts may differ from those that ultimately can be proved.

belted in the prisoner compartment of the van, which Defendant Criswell drove. Defendant Hough accompanied as an armed passenger. Id. Defendant Cagle, also armed, followed the transport van in a security "chase" vehicle. Id. At some point during the transport, Smith began kicking a passenger window, breaking the glass. Id. Contrary to transport protocol, Defendant Criswell pulled the van over, allegedly because he was concerned Smith may escape. Id. at 5-6. Also contrary to transport protocol, Defendant Criswell entered the prisoner compartment. Criswell "used his Taser on Smith and struck him repeatedly." Id. at 6. Defendant Criswell denied striking Smith, but Defendant Hough said Criswell "use several knee-strikes on Smith." Defendant Hough did nothing to intervene. Id.

The transport van arrived at UCI at "just after 4:00 p.m.," though the control log does not reflect Smith's return to the prison. Id. at 7. Defendants Allen and Norman removed Smith from the van. Id. Smith had no visible injuries to his face or head, but Defendant Allen reported seeing blood on Smith's shirt. Id. at 7-8. Defendants Allen and Norman escorted Smith into the Movement Center, with Defendants Browning and Griffis accompanying. Id. Once inside the Movement Center, Defendants Allen and Norman took Smith into a holding cell, where they beat Smith so severely as to inflict "injuries similar to [those suffered by] a car wreck victim." Id. at 8, 25. Neither Defendants Griffis nor Browning intervened. Id. at 8. Smith appeared to be unconscious after the alleged beating, but "no one gave or offered to give first aid." Id. at 9.

After a delay in calling 911, Emergency Medical Services (EMS) arrived. Id. at 10. Paramedics had to intubate Smith using a laryngeal tube because he was having difficulty breathing. Id. Plaintiff alleges Defendants Ellis and Swain informed paramedics Smith

caused his own injuries by banging his head inside the transport van. Id. at 10, 28. A paramedic allegedly told investigators Smith's injuries appeared "more consistent with [those] suffered by the victim of a car wreck." Id. at 10. FDOC Inspector E.J. Whatley did not learn about "the incident" until about five or six hours later. Id. Defendant Ellis, the Captain on duty until 4:00 p.m., claims he "forgot" to call Inspector Whatley. Id. When Inspector Whatley arrived to investigate, Defendant Swain, who relieved Captain Ellis at 4:00 p.m., took Inspector Whatley to the holding cell where the alleged beating occurred. Id. at 11. Inspector Whatley found the cell had been cleaned of blood, but Defendant Swain could not explain why, saying "the scene was the responsibility of the 'day shift Captain,'" meaning Defendant Ellis. Id. Inspector Whatley also inspected the transport van and found some blood inside, which he photographed. Id. Inspector Whatley expressed concern that Smith had been removed from the holding cell in a wheelchair rather than a stretcher (because he was unconscious). Inspector Whatley was unable to interview the prison staff present during the incident because they had gone home. Id.

Smith languished for two months in the hospital, where he was diagnosed as paraplegic and suffering from traumatic brain injury. Id. at 20. For much of the time in the hospital, Smith was intubated and sedated, was disoriented as to time, and, when not intubated, had difficulty speaking. Id. at 21. Smith died on September 2, 2012. Id. at 20. The autopsy report indicates Smith had "multiple abrasions, lacerations, edemas and contusions of the legs, groin, midsection, and head," and the cause of his death "was complications of blunt head injuries." Id. at 12-13. The medical examiner could not conclude "Smith's fatal injuries were self-inflicted." Id. at 20.

According to Inspector Whatley, the investigation he began on July 3, 2012, was "taken from [him] . . . before it was completed." Id. at 11. Plaintiff asserts "[n]o further investigation was done until after Smith died in September and the Florida Department of Law Enforcement (FDLE) was called in." Id. When the FDLE began its investigation, Defendant Ellis was placed on administrative leave, and Defendant Reddish was removed as Warden. Id. Plaintiff asserts Defendant Reddish, in his role as Warden, "ordered the cover-up and delay while evidence was altered or destroyed and stories were coordinated." Id. at 12. Plaintiff alleges the following facts suggest a plan to conceal wrongdoing:

a) The control room did not record Smith entering the facility.

b) [Defendant] Ellis did not call for a video camera when the [transport] van arrived.

c) Smith, though unresponsive, was moved by wheelchair, not stretcher.

d) No medical staff were called to the scene of the injury.

e) Neither [Lieutenant] Bacon nor his officers reported the misconduct.

f) Blood in the van and in the holding cell was cleaned up.

g) [Lieutenant] Bacon permitted the blood in the holding cell to be cleaned up.

h) No one called an Inspector [Whatley] until witnesses left and blood was cleaned up.

i) The force investigation was called off until after Smith had died.

Id. at 9.

Plaintiff alleges claims under 42 U.S.C. § 1983 and under Florida state law. As relief, Plaintiff seeks compensatory and punitive damages and attorney's fees and costs. Id. at 32.

## IV. Analysis and Conclusions

### A. Claims Against Defendant Bacon

Defendant Bacon argues he should be dismissed with prejudice because Plaintiff asserts no cause of action against him. See FDOC Motion at 6. Plaintiff concedes the identification of Defendant Bacon in the case style is a scrivener's error. See Response to FDOC Motion at 1-2, 3-4. Accordingly, the FDOC Motion is due to be granted in part to the extent Defendant Bacon is due to be dismissed from this action.

### B. Claims Against Defendant Criswell Under § 1983

Plaintiff asserts two Counts against Defendant Criswell under § 1983: conspiracy to violate the Eighth Amendment (Count III) and excessive use of force (Count IV). See FAC at 24, 25. Defendant Criswell claims qualified immunity protects him from suit as to these claims. See Criswell Motion at 8. He states he was acting within the scope of his discretionary authority at all relevant times, id. at 9-10, and Plaintiff fails to allege his conduct "transgressed any bright lines of constitutional rights." Id. at 13. Plaintiff asserts she pleads Defendant Criswell's use of the Taser and other force served no "valid penological purpose" because Smith was fully restrained and the window he broke was covered by steel bars, preventing escape. See Response to Criswell Motion at 5. Plaintiff also states "[t]here is no indication that Defendant Criswell used his Taser to protect himself or some other person." Id.

An officer sued in his individual capacity "is entitled to qualified immunity for his discretionary actions unless he violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Black v. Wigington, 811 F.3d 1259, 1266 (11th Cir. 2016) (quoting Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir.

2009)). "Qualified immunity protects all but the plainly incompetent or those who knowingly violate federal law; it does not extend to one who knew or reasonably should have known that his or her actions would violate the plaintiff's federal rights." Gaines v. Wardynski, 871 F.3d 1203, 1207 (11th Cir. 2017). The doctrine is intended to afford public officials, in the course of discharging their discretionary functions, "breathing room to make reasonable but mistaken judgments about open legal questions." Ziglar v. Abbasi, 137 S. Ct. 1843, 1866 (2017) (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 743 (2011)).

To invoke the qualified-immunity defense, the defendant bears the initial burden to demonstrate he was acting in his discretionary authority at the relevant times. Dukes v. Deaton, 852 F.3d 1035, 1041-42 (11th Cir.), cert. denied, 138 S. Ct. 72 (2017). The question whether a corrections employee "acted within the scope of his employment is distinct from whether [he] acted unconstitutionally." Grider v. City of Auburn, Ala., 618 F.3d 1240, 1261 (11th Cir. 2010). "The scope-of-employment inquiry is whether the employee police officer was performing a function that, but for the alleged constitutional infirmity, was within the ambit of the officer's scope of authority (i.e., job-related duties) and in furtherance of the employer's business." Id. If a defendant successfully carries his burden, the burden shifts to the plaintiff to show "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Valderrama v. Rousseau, 780 F.3d 1108, 1112 (11th Cir. 2015) (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004)).

Plaintiff asserts in her FAC that Defendant Criswell "[a]t all times . . . was an Officer at [UCI]." FAC at 3. Plaintiff further alleges Defendant Criswell encountered Smith while carrying out his duties as an officer of UCI: Defendant Criswell was the "Transport Officer"

who drove the van carrying Smith from Shands back to UCI, and Criswell was suspended for violating prison protocol during the transport. Id. at 5, 6. However, Plaintiff also avers "Defendants all acted . . . not within the scope of their employment but willfully and wantonly for their own purpose." Id. at 22. According to Plaintiff, Defendant "Criswell, like some other officers at UCI . . . made a game of tormenting mentally ill inmates." Id. at 5. Plaintiff further alleges Defendant "Criswell had prior trouble with Smith and had animus toward him." Id. Moreover, Plaintiff alleges Defendant Criswell knowingly and intentionally violated transport protocols by stopping the van and entering the prisoner compartment, suggesting Defendant Criswell acted out of his own frustration and motivation to intentionally harm Smith. Id. at 6. Finally, Plaintiff alleges Defendant Criswell conspired with other Defendants, "acting outside the scope of [his] employment[] to cause the underlying tort of murder or manslaughter of Frank Smith." Id. at 22. These allegations, considered together, permit a reasonable inference that Defendant Criswell abused his position to "teach Smith a lesson" for personal motivations unrelated to the FDOC's interests. Id. at 16-17.

Accordingly, Defendant has not carried his burden to demonstrate he was acting within the scope of his employment at the relevant times. Accepting Plaintiff's factual allegations as true and permitting logical inferences to be drawn from the facts, Defendant Criswell's actions were not done "in furtherance of the [FDOC's] business." See Grider, 618 F.3d at 1261. While Defendant Criswell's official position afforded him the opportunity to harm Smith, Plaintiff alleges Criswell's actions were taken for personal satisfaction and not within his discretionary authority to fulfill his job duties. Even if Defendant carried his burden to demonstrate he acted within the scope of his employment, Plaintiff pleads facts

that, if proven, demonstrate the violation of a clearly established constitutional right to be free from a gratuitous use of force.

Plaintiff explains Smith, a mentally ill inmate, was in full restraints and in a locking seatbelt, sitting alone in the prisoner compartment of the transport van with an armed guard present and a security "chase" vehicle following the van. Id. at 4-6. Smith broke the window by kicking it, though there were steel bars to prevent escape, and Smith remained fully restrained. Id. at 5. Accordingly, Smith was not a flight risk. Arguably, Smith posed a risk of harm to other drivers when he broke the window of a van driving on a public roadway; however, when Defendant Criswell entered the prisoner compartment in violation of transport protocol, the risk of harm had ceased. Plaintiff alleges no facts to suggest Smith posed a continuing risk of harm to others or himself. See id.

Even assuming the initial use of the taser was appropriate under the circumstances to gain control over Smith, Defendant Criswell's decision to repeatedly strike Smith was unreasonable given Smith was fully restrained and not posing a risk of harm to others. See Piazza v. Jefferson Cty., Ala., --- F.3d ---, No. 18-10487, 2019 WL 2049785, at *4 (11th Cir. May 9, 2019) ("Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need.") (emphasis in original) (quoting Danley v. Allen, 540 F.3d 1298, 1309 (11th Cir. 2008)). Moreover, Plaintiff alleges Defendant Criswell denied seeing any blood on Smith or in the van, but Defendant Allen reported seeing blood on Smith's shirt, and Smith was reportedly "unsteady on his feet." See FAC at 8. Defendant Criswell also allegedly told paramedics Smith "repeatedly hit his head on the plexiglass of the divider between the drivers [sic] and the prisoner compartment," but no one observed any injuries to Smith's face when

he exited the van. Id. at 16. Upon consideration of all facts and circumstances, a reasonable juror could find Defendant Criswell breached the prisoner compartment for the sole purpose of harming Smith and took affirmative steps to conceal the use of force. A plausible inference that follows is that Defendant Criswell concealed the incident because he knew his intentional actions were constitutionally impermissible.

Accepting the allegations and reasonable inferences as true, Defendant Criswell used force against Smith for no valid penological purpose. An officer's use of force maliciously and sadistically for the very purpose of causing harm was a clearly-established Eighth Amendment violation at the time of the alleged events. See Skrtich v. Thornton, 280 F.3d 1295, 1304 (11th Cir. 2002) ("The law of excessive force in this country is that a prisoner cannot be subjected to gratuitous or disproportionate force that has no object but to inflict pain."). Johnson v. Breeden, 280 F. 3d 1308, 1321 (11th Cir. 2002) (citing Hudson v. McMillian, 503 U.S. 1 (1992)) ("Acting with . . . specific malevolent intent to cause harm, at least where . . . more than de minimis injury results, violates the Cruel and Unusual Punishment Clause of the Eighth Amendment, and that was clearly established law at the time."). Accordingly, Defendant Criswell is not entitled to qualified immunity based on the allegations in the FAC.

### C. Deliberate Indifference Claims Against Defendants Reddish and Swain

In Count V of her FAC, Plaintiff asserts Defendants Reddish and Swain were deliberately indifferent to the excessive use of force by officers at UCI, in violation of the Eighth Amendment. See FAC at 27. Plaintiff alleges Defendants Reddish and Swain "maintained a practice of arranging or facilitating the use of excessive force and suppressing investigations [and evidence] of misconduct." Id. Plaintiff further alleges

"Defendants performed, caused, planned, or encouraged excessive force and made further acts of excessive force substantially certain to occur." Id. Defendants Reddish and Swain contend Plaintiff does not allege facts to "suggest [they] adopted engaged [sic] in a pattern of indifference or that this was the moving force behind the alleged constitutional injuries." FDOC Motion at 13 (emphasis in original). They further argue the "alleged pattern or practices [of excessive force] are wholly unsubstantiated." Id. at 12.

The Eleventh Circuit recognizes a supervisor may be liable under § 1983 when the supervisor personally participates in a violation of an inmate's constitutional rights or, in the absence of personal participation, when the inmate otherwise demonstrates a causal connection between the supervisor's actions and the alleged constitutional violation. See Valdes v. Crosby, 450 F.3d 1231, 1236 (11th Cir. 2006).

> A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.

Id. at 1237 (citing Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003)).

Contrary to Defendants' assertion, Plaintiff does allege Defendants Reddish and Swain were aware of prior instances of excessive force, and their deliberate indifference to the history of abuse was the moving force behind Smith's injuries and death. See FAC at 14, 18, 27-28. Plaintiff explicitly avers "Warden Reddish and his administrators knew of excessive force and abuse, [sic] of inmates through daily reports and long-term death and injury statistics," id. at 14, and Defendant Reddish "[h]ad a career reputation of being supportive of and rewarding physically abusive security officers." Id. at 18. Plaintiff further alleges Defendants Reddish and Swain "were aware of the correctional officers' tendency

to [use] excessive force against the inmates," and Defendants "maintained a practice of arranging or facilitating the use of excessive force." Id. at 27. Finally, Plaintiff alleges Defendants Reddish and Swain's actions were the "direct, proximate, and foreseeable" cause of Smith's injuries and death. Id. at 28. These allegations, accepted as true, state a claim for deliberate indifference. See Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014) (explaining the elements of a deliberate indifference claim: an objective risk of serious harm posed to the plaintiff and defendant's deliberate disregard of the risk despite having subjective knowledge of it).

Defendants even acknowledge Plaintiff alleges Defendants Reddish and Swain "had knowledge of correctional officers' tendency to use excessive force against inmates and essentially fostered the use of excessive force by arranging for incidents of excessive force, destroying evidence[,] and suppressing corresponding investigations." See FDOC Motion at 12 (citing FAC at 27). Defendants do not contend these allegations fail to state a claim for relief. Instead, they argue Plaintiff is unable to substantiate these allegations because she cites data reflecting the number of homicides at FDOC prisons across the state rather than at UCI while under the supervision and control of Defendants Reddish and Swain. Id. To the extent Defendants find Plaintiff's cited statistical data insufficient to substantiate her allegations, see id., they may attack the sufficiency of Plaintiff's evidence at the appropriate time. Plaintiff need not prove her claim at this stage of the proceedings.

Plaintiff also alleges Defendants Reddish and Swain personally participated in the incidents that resulted in Smith's death, which, if true, establishes the requisite causal connection for supervisor liability. For instance, Plaintiff asserts Defendant Reddish "agreed to a plan for Smith to be taught a lesson," see FAC at 10, suggesting Defendant

Reddish was complicit in the beating that resulted in Smith's death. Plaintiff further asserts Defendant Reddish "ordered the cover up and delay while evidence was altered or destroyed and stories were coordinated." Id. at 12. Plaintiff alleges Defendant Reddish "[o]rdered or sustained orders that Frank Smith not be logged in as having entered the UCI compound," and ordered or sustained orders that "witnesses go home at the end of the shift, that the van be garaged, and that evidence be cleaned up." Id. at 19. Additionally, Plaintiff alleges Defendant Reddish terminated Inspector Whatley's investigation and "favored and rewarded officers who kept the code of silence and maintained secrecy regarding the events of July 3, 2012." Id. at 18. As to Defendant Swain, Plaintiff similarly alleges he participated in a plan to conceal the actions of those who physically beat Smith. Plaintiff states, "Swain failed to notify the Inspector as required by protocol," told the paramedics Smith caused his own injury, "allowed the witnesses to disperse," and "ordered and permitted evidence, including blood, to be cleaned up before an investigation could take place." Id. at 28.

Defendants argue the allegations of Defendants' actions taken after Smith's injury (to conceal relevant facts and evidence) do not constitute evidence of a "pattern of indifference," citing two cases from the Northern District of Georgia: Putnam v. City of Atlanta, No. 1:10-CV-03243-RWS, 2012 U.S. Dist. LEXIS 116371, at *22-24 n.4 (N.D. Ga. Apr. 16, 2012); Tabb v. Veazey, No. 1:05-cv-1642, 2007 U.S. Dist. LEXIS 22428, at *5 (N.D. Ga. Mar. 28, 2007). See FDOC Motion at 13. Defendants rely on Putnam and Tabb for the proposition that actions the defendants take after the incident that is the subject of a plaintiff's complaint cannot constitute evidence of the existence of a policy of

deliberate indifference that was the moving force behind the alleged constitutional violation. Id.

The Court reads Plaintiff's allegations regarding the "cover-up" to demonstrate Defendants Reddish and Swain personally participated in the events on July 3, 2012, not to demonstrate a pattern of indifference to past instances of excessive use of force. Indeed, in her response, Plaintiff states a jury could infer Defendants Reddish and Swain passively participated in the "group[] assault" of Smith. See Response to FDOC Motion at 17-18. Regardless, as noted, the Court finds Plaintiff alleges facts to demonstrate a pattern of indifference in the absence of Defendants' actions to conceal the alleged incidents and evidence.

Assuming the allegations against Defendants Reddish and Swain are true, a jury could plausibly conclude they were deliberately indifferent to excessive use of force, either by adopting a policy to permit or encourage the officers' use of excessive force or through their personal participation in the relevant incidents.

### D. Conspiracy Claims Against Defendants Criswell, Reddish, and Swain

Plaintiff asserts common causes of action against Defendants Criswell, Reddish, and Swain, including a common-law civil conspiracy claim (Count II) and a conspiracy claim under § 1983 (Count III). See FAC at 22-25. The existence of a conspiracy presupposes an underlying constitutional violation. Because the Court finds Plaintiff alleges sufficient facts to state an Eighth Amendment violation against Defendants Criswell, Reddish, and Swain, the question now is whether Plaintiff alleges facts to demonstrate a conspiracy among these Defendants to deprive Smith of his constitutional rights.

"A plaintiff claiming a § 1983 conspiracy must prove the defendants 'reached an understanding' to violate the plaintiff's constitutional rights." <u>Grider</u>, 618 F.3d at 1260. "[T]he linchpin for conspiracy is agreement, which presupposes communication." <u>Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., Fla.</u>, 956 F.2d 1112, 1122 (11th Cir. 1992). While a plaintiff may not rely on conclusory allegations to state a claim for relief, <u>Iqbal</u>, 556 U.S. at 680, facts supporting a conspiracy may be circumstantial. <u>See</u> <u>Grider</u>, 618 F.3d at 1260 (citing <u>Burrell v. Bd. of Trs. of Ga. Military Coll.</u>, 970 F.2d 785, 789 (11th Cir. 1992)). To state a claim for civil conspiracy under Florida law, a plaintiff must allege "(1) an agreement between two or more parties (2) to do an unlawful act by unlawful means (3) the committing of an overt act in pursuance of the conspiracy and (4) damage to the plaintiff as a result of the act." <u>Vista Marketing, LLC v. Burkett</u>, 999 F. Supp. 2d 1294, 1297 (M.D. Fla. 2014) (quoting <u>Bankers Life Ins. Co. v. Credit Suisse First Bos. Corp.</u>, 590 F. Supp. 2d 1364, 1368 (M.D. Fla. 2008)).

In her FAC, Plaintiff does more than simply conclude Defendants engaged in a conspiracy to deprive Smith of his constitutional rights. Plaintiff explains with specificity a series of events and circumstances that permit a reasonable inference that Defendants reached an agreement to physically harm Smith and to conceal the beatings and evidence. Plaintiff alleges "Defendants reached an implicit or explicit understanding" and:

a) Agreed to commit and to stand silent and acquiesce in acts which resulted in the severe physical injury and death of Frank Smith;

b) Agreed to observe the Blue Code of Silence which among Florida prison officials is the meaning of the motto, "We Never Walk Alone."

c) Agreed to delay medical treatment to Smith, though unconscious, and wheel him to medical in a wheelchair rather than call for a gurney;

d) Agreed to delay timely disclosure to investigators and the Emergency Action Center and to let all the witnesses leave the premises;

e) Agreed to hide and destroy and alter evidence, to engage prisoners and others to help hide, destroy, and cover up evidence and remain silent;

f) Agreed to coordinate their accounts of the use of force to minimize inconsistencies, to encourage strategic lack of knowledge or memory;

g) Agreed to give false and misleading statements to investigators and continue misinformation for years after their criminal activities;

h) Agreed to call off and discontinue the investigation that had been started and fail [sic] to report the events to superiors until Frank Smith's death on September 4, 2012, in the wake of a series of brutal beatings at UCI.

FAC at 15-16.

As to Defendant Criswell specifically, Plaintiff alleges he "had animus toward" Smith and called Defendant Ellis from the transport van for the purpose of "arrang[ing] to teach Smith a lesson" upon their return to UCI. Id. at 16-17. Defendant Criswell's argument that this isolated statement is ambiguous or conclusory views it through too narrow a lens. See Criswell Motion at 16. When considered in the context of other allegations, this statement is not conclusory but suggestive of an intent and plan to harm Smith. For instance, Plaintiff alleges Defendant Criswell called Defendant Ellis [w]hile [Criswell] was still in the prisoner compartment of the van with Smith," and Defendant Hough then took over as driver. Defendant Hough "was ordered to drive the van to the front of UCI" so Defendant Reddish and other supervisors "could see the damage." Id. at 7. Defendant Browning was in Defendant Ellis's office at the time of the call and heard "that officers were aggravated [with] Smith." Id. When the transport van arrived at UCI, Smith's return was not recorded in the control log, and Defendant Ellis did not arrange for

a camera.[3] Id. at 7, 8. Plaintiff also alleges there was blood inside the van and on Smith's shirt, though the presence of the blood was unexplained or denied, and someone attempted to clean the van. These facts permit a plausible inference that something improper occurred inside the van, and the officers involved arranged with those in supervisory positions back at UCI to conceal what occurred and to coordinate an alternative "story" to explain Smith's condition.

While Plaintiff alleges Defendant Criswell's physical interaction with Smith ended once Smith was escorted into the Movement Center, a reasonable juror could conclude Defendants Criswell and Ellis agreed to permit harm to befall Smith once they returned to the Movement Center and agreed to cover up the use of force that occurred inside the van. At this early stage, the Court is not inclined to say as a matter of law Plaintiff fails to state a claim for conspiracy against Defendant Criswell.

With respect to Defendants Reddish and Swain, Plaintiff alleges facts that permit the inference that they knew Plaintiff would be or had been seriously injured and organized efforts to permit the alleged beating inside the Movement Center and to destroy evidence of wrongdoing. For instance, Plaintiff alleges Defendant Reddish ordered that the transport van "be driven by the administration building [so he could] inspect it," and then the transport van had been cleaned of blood before Inspector Whatley was called. Id. at 9. It appears Defendant Swain's role was more limited; however, Plaintiff alleges Defendant Swain took part in the efforts to conceal the incident, including telling

_____

[3] Defendant Ellis claims he did not arrange for a camera because he was unaware of the use of force. FAC at 8. However, the facts permit the plausible inference that Defendant Ellis indeed knew of the incident on the van and purposely failed to request a camera. Id. at 8, 17.

paramedics Smith injured himself, permitting blood to be cleaned, and permitting those on duty to go home rather than to stay for the necessary investigation. See id. at 11, 17.

Aside from these specific allegations, Plaintiff lists a series of facts that permit the reasonable conclusion that Defendants worked together to conceal the incident on the transport van and the incident inside the Movement Center: Smith, while unconscious, was moved using a wheelchair; Inspector Whatley was not called until five or six hours after the incidents, after the blood was cleaned and guards were off duty; and Defendant Ellis "took the officers to his office to help them write their reports." Id. at 9-10. The facts alleged circumstantially permit an inference of a conspiracy to deprive Smith of his constitutional rights, both under § 1983 and under Florida law. See Grider, 618 F.3d at 1260; Vista Marketing, LLC, 999 F. Supp. 2d at 1297. See also Ali v. Connick, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015) (finding Plaintiff demonstrated a question of material fact on his conspiracy claim under § 1983 where he presented evidence that defendants agreed to cover up an unconstitutional use of force by falsifying documents to reflect plaintiff caused his own injuries).

Defendants argue that, if the Court finds Plaintiff alleges a conspiracy, the intracorporate conspiracy doctrine applies. See Criswell Motion at 22; FDOC Motion at 11. Plaintiff maintains the intracorporate conspiracy doctrine is inapplicable because it does not apply to criminal behavior and Defendants' actions were motivated by "their own proclivity for tormenting and physically abusing mentally ill inmates." Response to Criswell Motion at 17; Response to FDOC Motion at 15. The intracorporate conspiracy doctrine bars a claim for conspiracy when the alleged actors work for one employer or agency. McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000). Because a

conspiracy requires action by two or more people, by its terms, a conspiracy cannot exist if a plaintiff complains of acts by employees within an agency, which "under basic agency principles . . . are considered to be those of a single actor." Id. The doctrine extends to public entities and its employees. Grider, 618 F.3d at 1261.

The Eleventh Circuit recognizes at least one exception to the intracorporate conspiracy doctrine, which applies when a plaintiff alleges criminal conduct or conduct that could result in criminal charges. Id. (citing McAndrew, 206 F.3d at 1034); see also Dickerson v. Alachua Cty. Comm'n, 200 F.3d 761, 770 (11th Cir. 2000). Here, Plaintiff alleges Defendants conspired to pursue "criminal interests," see FAC at 19, and "to cause the underlying tort of murder or manslaughter." Id. at 22. Accepting these facts as true, which this Court must do, Plaintiff properly invokes the criminal conduct exception to the intracorporate conspiracy doctrine. Additionally, the Eleventh Circuit recognizes, but has not yet adopted, a second exception, which applies when the plaintiff alleges a defendant employee "has an independent personal stake in his unconstitutional acts and is not acting to further the [employer's] illegal objective." Id. See also Dickerson, 200 F.3d at 770 (recognizing the "personal stake" exception but declining to adopt it because the facts did not support its application in that case). Plaintiff alleges Defendants acted for "their own, independent criminal interests which were inconsistent with the interests of their agency." FAC at 19. Accepting Plaintiff's allegations as true, the "personal stake" exception applies.

### E. Immunity Under Florida State Statutes Section 768.28

In Count I of her FAC, Plaintiff asserts a claim for wrongful death against Defendants Criswell, Reddish, and Swain. Id. at 22. Defendants assert they are immune

from suit under section 768.28(9)(a), Florida Statutes. See Criswell Motion at 20-21; FDOC Motion at 6.[4] Florida Statutes section 768.28(9)(a) provides an officer of the state is entitled to immunity for injuries caused while performing actions within the scope of his employment "unless such officer . . . acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a).

As discussed above, Plaintiff alleges Defendants acted for their personal satisfaction or motivations. And, in Count I specifically, Plaintiff alleges "Defendants all acted . . . not within the scope of their employment but willfully and wantonly for their own purpose." FAC at 22. Because Plaintiff attributes to Defendants Criswell, Reddish, and Swain conduct done "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights," they are not entitled to the benefit of state-law immunity. See § 768.28(9)(a). See also Prieto v. Malgor, 361 F.3d 1313, 1320 (11th Cir. 2004) (recognizing section 768.28(9)(a) shields an officer from liability for injuries caused while acting in the scope of employment but not when the officer acts "with bad faith or malicious purpose"); Haberski v. Bufano, 728 F. App'x 903, 909 (11th Cir. 2018) (holding the defendant officer was not entitled to immunity because, after the plaintiff was restrained and no longer resisting, the officer continued using force so severe that he broke the plaintiff's arm but still would not release his grip).

---

[4] Defendant Criswell asserts sovereign immunity shields him from liability as to all state-law claims asserted against him. See Criswell Motion at 20. The Court will address sovereign immunity in the context of Count I because Defendants present the argument as directed to that claim. However, the analysis applies to any state-law claim against these Defendants.

Contrary to Defendants' assertions, the Court finds Plaintiff's allegations, taken as a whole, are not conclusory or "bare bones." <u>See</u> Criswell Motion at 20; FDOC Motion at 7. Plaintiff alleges Defendants used force, or failed to intervene in the use of force, on a restrained, mentally ill inmate who was not resisting or disobeying orders, and the use of force was so severe that the inmate suffered injuries requiring immediate medical attention (which was intentionally delayed) and resulting in death. Plaintiff also describes a brutal beating that left Smith unconscious, unable to breathe on his own, and caused paraplegia and traumatic brain injury. Accepting these facts as true, the officers used force "that was constitutionally unreasonable under the circumstances." <u>See</u> 728 F. at 909. And, Defendants' attempts to conceal the beating and the evidence of it supports a plausible inference that their actions were undertaken "with bad faith or malicious purpose." <u>See</u> <u>Prieto</u>, 361 F.3d at 1320. Accordingly, Defendants are not shielded by immunity as to the state-law claims against them.

### F. Claim Against the FDOC

Finally, in Count VI, Plaintiff asserts a claim against the FDOC under Title II of the Americans with Disabilities Act (ADA).[5] <u>See</u> FAC at 29. Defendant FDOC argues Plaintiff fails to state claims against it because Plaintiff does not allege Smith was denied access to benefits or services on the basis of a disability. FDOC Motion at 14-15. Under Title II

---

[5] It is unclear whether Plaintiff also intends to state a claim under the Rehabilitation Act (RA). <u>See</u> FAC at 29. Plaintiff's heading for Count VI references the RA, though, in her allegations, Plaintiff does not reference or cite to the RA, focusing solely on the ADA. <u>See</u> <u>id.</u> To the extent Plaintiff intends to state a claim under the RA, the Court's analysis as to the ADA claim equally applies. <u>See</u> <u>J.S., III by & through J.S. Jr. v. Houston Cty. Bd. of Educ.</u>, 877 F.3d 979, 985 (11th Cir. 2017) ("Discrimination claims under the ADA and the [RA] are governed by the same standards, and the two claims are generally discussed together.").

of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. State prisons are public entities for purposes of the ADA. Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998).

In enacting the ADA, Congress aimed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1081 (11th Cir. 2007) (quoting § 12101). To state a claim of discrimination under the ADA, "a claimant must [allege]: '(1) that he is a qualified individual with a disability; and (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.'" Owens v. Sec'y, Fla. Dep't of Corr., 602 F. App'x 475, 477 (11th Cir. 2015) (quoting Bircoll, 480 F.3d at 1083). Plaintiff alleges, and the FDOC concedes for purposes of its motion, that Smith was a qualified individual with a disability. See FAC at 29-30; FDOC Motion at 14. The FDOC disputes the second and third elements, maintaining Smith was not denied the benefit of services, programs, or activities[6] and, even if he was, such a denial was not due to his disability. See FDOC Motion at 14, 15.

The FDOC's argument that Plaintiff fails to allege Smith was denied access to services is not persuasive. The ADA does not mandate that a plaintiff be denied access

---

[6] The Court will reference the terms "services, programs, or activities" collectively as "services."

to services as the sole means of establishing liability. The final clause of the statute provides a plaintiff may establish liability, alternatively, by demonstrating he was "subjected to discrimination." See § 12132. See also Bircoll, 480 F.3d at 1084-85 (recognizing the Eleventh Circuit "has explained that the final clause of § 12132 protects qualified individuals . . . from being subjected to discrimination . . . and is not tied directly" to the provision of or access to services) (internal quotation marks omitted).

As the FDOC recognizes in its motion, see FDOC Motion at 16, "a plaintiff may establish discriminatory intent through a showing of deliberate indifference." See Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 345 (11th Cir. 2012). Plaintiff alleges the FDOC, "its agents and employees, acted intentionally and/or with deliberate indifference to Mr. Smith's need for a reasonable accommodation." FAC at 31. Plaintiff provides specific examples of the FDOC's "fail[ure] to accommodate Smith's mental health disability," saying the FDOC,

    a. permitt[ed] practices whereby inmates with mental health disabilities are punished when they can't understand or follow commands;

    b. fail[ed] and intentionally refus[ed] to train Defendant FDOC employees regarding the safe management of mentally ill inmates;

    c. fail[ed] and intentionally refus[ed] to consider Mr. Smith's particular disability when moving and escorting him;

    d. permitt[ed] sadistic officers to bait and abuse Mr. Smith; [and]

    e. fail[ed] to use alternatives to force to manage Mr. Smith.

Id. These allegations, if true, invoke liability under the final clause of § 12132. If the FDOC treated mentally ill inmates, including Smith, more harshly than inmates in the general population, Smith was "subjected to discrimination." See Bircoll, 480 F.3d at 1084-85; see also Wolfe v. Fla. Dep't of Corr., No. 5:10-CV-663-OC-PRL, 2012 WL 4052334, at *5

(M.D. Fla. Sept. 14, 2012) (finding the plaintiff stated a claim where he alleged the FDOC had no policy for providing safe living conditions for asthmatic prisoners and did not train officers on how to safely handle prisoners suffering from asthma).

The Supreme Court has recognized, without deciding, that a plaintiff with a mental disability may demonstrate "discrimination" under the final clause of § 12132 if the plaintiff shows an officer engaged him in a manner that failed to "reasonably accommodate[] [his] disability." City & Cty. of San Francisco, Calif. v. Sheehan, 135 S. Ct. 1765, 1773 (2015).[7] And, other district courts have found a plaintiff's allegation that a correctional facility generally failed to accommodate his known disability states a claim under the ADA. See, e.g., Nattiel v. Fla. Dep't of Corr., No. 115CV00150WTHGRJ, 2017 WL 5774143, at *1 (N.D. Fla. Nov. 28, 2017) (finding plaintiff stated a claim under the ADA where he alleged the FDOC failed to assess whether chemical agents could safely be used on him knowing he had asthma and a glass eye); Arenas v. Ga. Dep't of Corr., No. CV416-320, 2018 WL 988099, at *8 (S.D. Ga. Feb. 20, 2018) (holding the plaintiff's claims under the ADA and RA survived a motion to dismiss where she alleged the prison failed to provide appropriate living accommodations for her son's known mental disability, resulting in his suicide); Arnold v. City of York, No. CIV.A. 4:03-1352, 2004 WL 2331781, at *3 (M.D. Pa. June 28, 2004), report and recommendation adopted, 340 F. Supp. 2d 550 (M.D. Pa. 2004) (holding the decedent's estate stated a claim under the ADA by alleging the defendant failed to adopt or modify policies on how to safely handle mentally ill persons, after the decedent died of positional asphyxia brought about by a combination of the exertions of

---

[7] In Sheehan, the plaintiff alleged officers used force to subdue and arrest her in a manner that failed to reasonably accommodate her mental disability. See Sheehan, 135 S. Ct. at 1772.

his delusional state and being hog-tied face down). Like the plaintiffs in the cited cases, Plaintiff here alleges the prison failed to accommodate Smith's mental disability such that he was at a heightened risk of harm, resulting in injury. These allegations state a claim under § 12132's catch-all provision.

Moreover, Plaintiff's allegations plausibly implicate the denial of access to services under the preliminary clause of § 12132. For instance, failing to accommodate a person's known disability, which thereby impacts that person's access to safe housing and living conditions, may constitute a denial of access to services. See, e.g., Arenas, 2018 WL 988099, at *8 (stating that access to safe housing may constitute a "service" or "benefit" under the ADA[8]); Nattiel v. Tomlinson, No. 1:15-CV-150-WTH-GRJ, 2017 WL 5799233, at *6 n.7 (N.D. Fla. July 13, 2017), report and recommendation adopted sub nom. Nattiel v. Fla. Dep't of Corr., No. 115CV00150WTHGRJ, 2017 WL 5774143 (N.D. Fla. Nov. 28, 2017) (noting a prisoner's access to the safe use of chemical agents in consideration of his disabilities—asthma and a glass eye—could constitute a "service of which [the p]laintiff was allegedly denied the benefit"); see also Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998) (holding an arrestee's transportation to the police station constitutes a "service" within the meaning of the ADA because the arrestee has a right to the benefit of transportation that meets his disability needs).[9]

---

[8] In Arenas, the district court noted the defendants did not dispute access to fair housing was a service or benefit under the ADA. See Arenas, 2018 WL 988099, at *8 n.6.

[9] The Court recognizes that in Bircoll, the Eleventh Circuit found the plaintiff's reliance on Gorman misplaced because the plaintiff in Bircoll did not complain about transportation during an arrest. Bircoll, 480 F.3d at 1084. The Bircoll court declined to "enter the circuits' debate about whether police conduct during an arrest is a program," and instead found the "catch-all" phrase of § 12123 applicable. Id. (emphasis added). The case before this Court involves access to services, such as transportation and safe housing, in the context of incarceration, not arrest. Accordingly, to the extent Bircoll declined to adopt Gorman's

Finally, the Court finds Plaintiff alleges Smith was discriminated against because of his mental illness, satisfying the third element required to state a claim under the ADA. Plaintiff alleges Defendants harmed Smith at least in part because of his mental illness: Plaintiff asserts Defendant Criswell and other officers "made a game of tormenting mentally ill inmates," of which Smith was one; the officers transporting Smith on July 3, 2012, were "aggravated" with Smith; officers, including Criswell, thought mentally ill inmates were disrespectful and disobedient; and Criswell arranged with Defendant Ellis and others to teach Smith, a mentally ill inmate, a lesson. Plaintiff further alleges, specifically in support of the ADA claim, that the FDOC authorized its officers to "punish" and "abuse" mentally ill inmates rather than train its officers how to safely manage them. See FAC at 31. With respect to Smith, Plaintiff alleges the FDOC intentionally refused to consider Smith's disability when moving or escorting him, permitted "sadistic officers to bait and abuse" him, and failed to consider or use alternatives to force when dealing with Smith. Id. These allegations permit the reasonable inference that the alleged discriminatory conduct against Smith was because of his disability. Accordingly, Plaintiff has done enough to plausibly state a claim under the ADA. The Court is not prepared to foreclose Plaintiff's claim at this early stage of the litigation and without the benefit of a factually developed record.

---

holding given the factual discrepancies, the general principle from Gorman remains applicable here: that the term "services" has been broadly interpreted. Moreover, the Bircoll court considered the plaintiff's claim in the context of a summary judgment record and order, not at the preliminary pleading stage.

**G. Punitive Damages**

Defendants contend Plaintiff's request for punitive damages should be stricken, arguing a "claim for punitive damages does not survive the death of Mr. Smith." FDOC Motion at 16. Plaintiff responds her claims survive Smith's death, and the survivors are entitled to both compensatory and punitive damages under Florida's comprehensive Wrongful Death Act (WDA). <u>See</u> Response to FDOC Motion at 20.

Upon review of the parties' filings and applicable law, the Court finds Plaintiff's request for punitive damages survives at this stage of the litigation. As this Court's sister court observed, "§ 1983 is 'deficient' as to survival of a decedent's claim for damages for personal injury resulting in death." <u>Sharbaugh v. Beaudry</u>, 267 F. Supp. 3d 1326, 1333 (N.D. Fla. 2017). In cases brought under § 1983, when federal law is deficient, courts "fill the gap" by looking to the law of the forum state. <u>See</u> <u>Brazier v. Cherry</u>, 293 F.2d 401, 409-10 (5th Cir. 1961). The Florida Supreme Court has held that Florida's WDA permits the recovery of punitive damages upon a showing of wantonness or reckless disregard. <u>See</u> <u>Martin v. United Sec. Servs., Inc.</u>, 314 So. 2d 765, 767 (Fla. 1975) (holding punitive damages are recoverable "if the facts justify the imposition of this penalty"). <u>See also</u> <u>Sharbaugh</u>, 267 F. Supp. 3d at 1337 (recognizing that "punitive damages remain available for malicious conduct" under Florida's WDA). As addressed at length in this order, Plaintiff alleges Defendants' conduct was willful and wanton. Accordingly, her request for punitive damages is not due to be stricken.

It is now

**ORDERED:**

1.      Defendant Criswell's Motion to Dismiss (Doc. 63) is **DENIED**.

2.      Defendants FDOC, Reddish, Swain, and Bacon's Motion to Dismiss (Doc. 69) is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** to the extent Defendant Bacon is dismissed with prejudice. The motion is **DENIED** in all other respects.

3.      The Court directs the **Clerk** to enter judgment dismissing Defendant Bacon with prejudice.

4.      Defendants Criswell, FDOC, Reddish, and Swain shall answer the Fourth Amended Complaint (Doc. 62) within **twenty days** of the date of this Order.

**DONE AND ORDERED** at Jacksonville, Florida, this 14th day of May, 2019.

_____
BRIAN J. DAVIS
United States District Judge

Jax-6
c: Counsel of Record