## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JUDITH WALTON,

     Plaintiff,

v.

                         CASE NO. 3:16-cv-1130-BJD-JRK

FLORIDA DEPARTMENT OF
CORRECTIONS, et al.,

     Defendants.

## PLAINTIFF'S RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT BY DEFENDANTS FLORIDA DEPARTMENT OF CORRECTIONS, BARRY REDDISH, WILFRED ELLIS, AND SHAWN SWAIN

COMES NOW the Plaintiff, through counsel, and responds to the Motions for Summary Judgment by FLORIDA DEPARTMENT OF CORRECTIONS, BARRY REDDISH, WILFRED ELLIS, and SHAWN SWAIN, as to Counts I, II, III, V, and VI, and would show as follows:

1.   The above Defendants seek final summary judgment on the basis that:

    a.  Plaintiff's Complaint is barred by the statute of limitations;

    b.  Plaintiff failed to comply with the Florida Wrongful Death Act;

    c.  Defendants Reddish, Ellis, and Swain did not use force;

    d.  The individual defendants are entitled to qualified immunity;

    e.  The intracorporate conspiracy doctrine bars the conspiracy counts;

    f.  Plaintiff cannot show discrimination on the basis of decedent's disability;

    g.  Plaintiff is not entitled to punitive damages.

2.    In summary, Plaintiff responds that Defendants' grounds for final summary judgment are entirely without basis as shown below.

### STATEMENT OF DISPUTED AND ADDITIONAL FACTS

Plaintiff incorporates by reference the facts alleged in her response to the Motions for Summary Judgment by the other Defendants. Plaintiff specifically responds to Defendants Statement of Undisputed Facts as follows:

### 1.  Facts Admitted and Disputed

Plaintiff admits that on July 3, 2012, Frank Smith was a prisoner of the Florida Department of Corrections (FDC) at Union Correctional Institution (UCI), that Smith was housed in a unit for the mentally impaired, that Defendant Reddish was Warden, and Ellis and Swain were Captains.[1] Disputed that Smith was unknown to all these Defendants. Captain Swain was identified as having used unnecessary force on Smith prior to his earlier trip to Shands Hospital with an unexplained head injury. (ECF 124-12, Harris Sworn Statement at 2, 11).

Admitted that Defendant Criswell transported Frank Smith back to UCI but disputed that this was his original assignment. He was originally assigned to Lester Smith. (ECF 124-1, FDLE Report at 53). Admitted that Dustin Hough was the passenger. Disputed that Smith was "banging his head on the plastic screen" if

---

[1] By October 4, 2012, one month after Frank Smith's death, Defendant Reddish had been removed as Warden of UCI and Capt. Ellis had been placed on administrative leave pending the completion of a criminal investigation involving Frank Smith and other inmates. (ECF 124-6, FDC Press Release; ECF 124-4, Ellis Notice of Leave).

"plastic screen" refers to the plexiglass divider between the prisoner compartment and the driver's area. On the prisoner's side was a rough metal grid, not plexiglass, and there was no indication of head or face injury when Smith left the van.[2] Admitted that Criswell reported Smith broke the glass van window.

Admitted that Criswell pulled the van over to the side of the road, entered the passenger compartment and used his Electronic Immobilization Device (EID) on Smith's leg. Disputed that the EID deployment was the limit of the force used by Criswell on Smith. Dustin Hough who took over the driving of the van said Criswell also used several knee-strikes on Smith. (ECF 124-1, FDLE Report at 57).

Admitted that Criswell called his Captain, OIC Wilfred Ellis from the road but disputed that Criswell did not tell Ellis that he had used force on Smith. Admitted that Ellis told Allen to report to the Movement Center to meet the van but disputed that Allen was not told about the use of force or that a jury could not reasonably infer that Ellis and Allen knew about the use of force ahead of time.

Admitted that the FDOC Vehicle Log for UCI, July 3, 2012 (Defendants' Summary Judgment Motion says "September 3, 2012" and Plaintiff assumes that is

---

[2] Part of the confusion is whether Criswell was telling SA Baker that Smith was banging his head against the prison van window glass or the plexiglass divider. In either case, the glass and the plexiglass are both covered, on the prisoner's side by a diamond-patterned metal screen that would have left marks on Smith's face and head if he struck it with any force. The divider is only plexiglass on the driver's side. (Exh. 1, Photo of divider). But Criswell said that he didn't recall Smith having any marks on his head or face. (ECF 106-1, Criswell Deposition at 21:1-10). There were no pattern injuries consistent with contact with the rough metal grid of the compartment divider on the prisoner's side. (ECF 115-19, Sperry Expert Report at 3 of 8).

a scrivener's error) shows the transport van returning at 4:05 p.m. Disputed, the inference that Smith was logged as returning at that time. The Control Room Log never shows Smith returning, only leaving to go back to the Shands Trauma Center at 5:30 p.m. It never shows him coming in. (ECF 124-11, Control Room Log at 5).

Admitted that Ellis, Norman, and Allen, met the van. Plaintiff disputes the inference that Lt. Allen would not have known he needed to call for a camera when he saw blood on Smith's shirt and saw that he was walking unsteadily (or as Officer Norman said, "stumbling") to the Movement Center. (ECF 124-9, Norman Sworn Statement at 4, 9). In fact, no video camera was ordered until after Smith had already been injured. (ECF 124-1, FDLE Report at 62). Admitted that Smith was taken to a holding cell. Disputed that he fell without force being applied.[3]

Admitted that Allen and Norman placed Smith in a wheelchair. Disputed that they did so out of concern for Smith. Allen was a long-time corrections officer and first responder. He started working for FDOC in 1996 (ECF 109-1, Allen Deposition at 8:8-13). He would have known the importance of a backboard for someone who has been injured in a fall (or who has been injured as Mr. Smith was injured). The still photograph from the video shows Mr. Smith's head hanging back unsupported

---

[3] A jury could draw a reasonable inference from the very different descriptions by Allen and Norman of how Smith fell. Allen said Smith "just collapsed." (ECF 124-1, FDLE Report at 61). Norman said he fell "stiff-legged." (ECF 124-1, FDLE Report at 65). Defendant Criswell said he was told Smith "took a dive." (ECF 124-1, FDLE Report at 54). The only living witnesses to how Smith fell would have been Allen and Norman. (ECF 124-1, FDLE Report at 61).

(Exh. 2, Still of Smith in Wheelchair). Disputed that Allen called the Emergency Action Center (EAC), which he claims for the first time at his deposition (ECF 109-1, Allen Deposition at 57:11-15), since he failed to make that claim in his interview with FDLE. (ECF 124-10, Allen Sworn Statement).

Admitted that Plaintiff's expert, Dr. Kris Sperry, MD, noted cuts and abrasions, a skull fracture to the right-frontal region, bilateral subdural hemorrhages and contusions on and under the surface of the brain, and spinal cord injuries but disputed the inference that those were the only injuries Sperry mentioned. Smith suffered numerous injuries, including fractures of the cervical spine near the point where the severe spinal cord injuries occurred that Sperry felt had caused the damage. (ECF 115-19, Sperry Expert Report at 3-8).

Admitted that Dr. Sperry opined that some facial injuries could have been caused by blows directed at Mr. Smith's face, shod feet or striking instruments. But these were minor injuries, inconsistent with patterned injuries that would have been caused by forceful contact. (Id. at 7).[4] Likewise, Dr. Sperry's opinion that the spinal cord injury that caused Smith's death was caused by a probable kick to the back of the neck by a shod foot did not depend on testimony that Smith was

---

[4] Defendants challenge Dr. Sperry's opinion that injuries were likely caused by blows by fists, shod feet, or striking instruments by noting that there is no evidence in the record to support this (other than the injuries themselves). But that is the nature of forensic evidence. It is often at odds with officers' testimony. Defendant Allen said he was unaware of any witnesses except himself and Officer Norman, to the final injuries suffered by Smith. (Exh. X, FDLE Report at 61).

punched, kicked or otherwise struck. In fact, the point of retaining a pathologist is to let the forensic evidence speak for itself.

Admitted that the Personal Representative and Survivor, Judith Walton, is 70 years old and blind and was not able to say, at deposition, what had been alleged in the operative complaint. Admitted that she didn't know who Rodney Criswell was or what role any of the defendants might have played in her son's death, or that she did not profess any knowledge of a conspiracy. Disputed that any of these facts are material evidence of anything.

Admitted that when Frank Smith's sister Kimberly Walton was asked at deposition if she believed her brother was in the hospital because he "banged his head," she replied, "I couldn't say nothing, no." Disputed that Kimberly Walton ever said "the first time that she thought that officers may have hit him or there was a question about his death was when she visited him in the hospital sometime after July 3, 2012, but prior to his death on September 14 (sic) 2012." is simply false. Ms. Walton was asked: "When was the first time that you thought that the officers may have hit him, or there was a question about his death?" She responded that her initial concern was to visit her brother and to find out where he had been taken. (ECF 107-1, Kimberly Walton Deposition at 30:6-24). Ms. Walton was frustrated at not being able to find her brother. Nowhere does she claim insight into the cause of his death. (ECF 107-1, Kimberly Walton Deposition at 30:6-24). Ms. Walton was

frustrated at not being able to find where her brother had been taken. Later in the deposition, Ms. Walton was asked: "In the Paragraph 7 (of her declaration), it says that, "'We didn't learn that there was any reason to believe that Frank was beaten to death by officers until sometime in August 2016, when we had Mr. Cook file this lawsuit.' So, what happened in August 2016?"

Ms. Walton responded,

> Well, the -- After all the investigation, that's what made me really think about, you know, everybody was investigating what was going on, and it just wasn't adding up. So, it took a lot of time, a lot of questions, a lot of people was involved, a lot of people was called out. So, I mean, nobody could give a definite answer what really happened to my brother.

(ECF 107-1, Kimberly Walton Deposition at 33:4-12). This apparently refers to the FDLE investigation that began after Frank Smith's death. Later still, she talks about talking to an attorney to help her find where DOC had taken her brother. (Id. at 34:19-35:3). Finally, admitted that there was a recording that purported to be an interview of Frank Smith by Inspector Whatley.

## 2.  Additional Material Facts

On June 26, 2012, Frank Smith was taken to Shands with an unexplained head injury. He was at Shands for a week and was to be returned on July 3, 2012. Captain Wilfred Ellis was the Officer in Charge on that day. Someone called Transport Officer Sgt. Rodney Criswell and re-assigned him from Lester Smith to Frank Smith. (ECF 124-1, FDLE Report at 53).

Smith asked Criswell to be permitted to use the restroom but ended up

urinating on himself. Criswell reported 

that he stopped the van on County Road

231 because Smith was being disorderly.

The Reception and Medical Center is on

the route from Gainesville to UCI and would have been 18 minutes closer if he

needed to stop the van and inspect the damage.[5] (Exh. 3, Google Maps). When

Criswell stopped the van and used his EID on Smith, he also used knee strikes,

according to Officer Dustin Hough. (ECF 124-1, FDLE Report at 57). Criswell

denied having struck Smith. (ECF 77 at ¶¶ 49, 50).

Criswell reported making a phone call from the back of the transport van to

his Captain, Wilfred Ellis, who was Officer in Charge (OIC) that day. Criswell got

his correctional certificate in 1998 (ECF 106-1, Criswell Deposition, at 6:23-25), so

by 2012, he was a 14-year officer and a sergeant. He also trained other officers.

(ECF 106-1 at 8:17-18). A jury could reasonably infer that he knew that since force

had been used on Smith, it would be required for Ellis to have a video camera

waiting for the van. And yet Defendant Ellis claims Criswell never told him that

earlier on the phone. (ECF 124-1, FDLE Report at 72).

---

[5] Criswell admitted to SA Mark Baker that he often taught the DOC "Outside Escort" class but
didn't know he was prohibited from stopping on the road during a transport. He said he served a
40-hour suspension for violating DOC policy. (ECF 124-1, FDLE Report at 54).

## MEMORANDUM OF LAW

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). a party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir.2000).

### A. The Statute of Limitations Was Tolled by Delayed Discovery

Frank Smith was a mentally-impaired inmate at Union Correctional Institution, Dorm T, a mental health dorm. (Exh. 4, Individualized Service Plan Review at 1-2). He was diagnosed with Schizophrenia, paranoid type (Id). Smith suffered from hallucinations and had the voices of Sam and Henry who told him about his family members. He said "Sam" told him to put a noose around his neck, which he did. (Id.). An inmate with whom Smith shared a housing area, Lester Williams, said Smith "couldn't always comprehend what he was being told to do.

(ECF 124-1, FDLE Report at 20). After his injury and return to Shands Hospital,
Surgeon Maryam Rahman told the family there was a real possibility that he will
be quadriplegic. (Exh. 5, Shands Records at 591). They requested aggressive care
and asked to be permitted to visit. (Id.).

Defendants concede that for a 42 USC § 1983 claim, the statute of
limitations "does not begin to run until the facts that support a cause of action are
apparent or should be apparent to a person with a reasonably prudent regard for his
rights." *Mullinax v. McElhenney*, 817 F.23 711, 716 (11th Cir. 1987). Under state
law, when a defendant fraudulently conceals the existence of a cause of action, the
statute of limitations is tolled during the time of the fraudulent concealment. *Butler
Univ. v. Bahssin*, 892 So. 2d 1087, 1092 (Fla. 2d DCA 2004).

Frank Smith was mentally ill, disoriented, and paralyzed. He suffered
hallucinations. And there is no basis for the conclusion that the Walton family was
put on notice that Frank Smith was beaten to death by corrections officers at UCI.
The fact that Kimberly Walton talked to a lawyer when she had trouble getting
access to her brother does not raise that presumption.

Personal Representative and Survivor, Judith Walton, is 70 years old and
blind and was not able to say, at deposition, what had been alleged in the operative
complaint. She didn't know who Rodney Criswell was or what role any of the
defendants might have played in her son's death. She did not profess knowledge of

10

a conspiracy. Her perceptual deficits are not material evidence of anything.

When Frank Smith's sister Kimberly Walton was asked at deposition if she believed her brother was in the hospital because he "banged his head," she replied, "I couldn't say nothing, no." When Ms. Walton was asked: "When was the first time that you thought that the officers may have hit him, or there was a question about his death?" She responded that her initial concern was to visit her brother and to find out where he had been taken. (ECF 107-1, Kimberly Walton Deposition at 30:6-24). Ms. Walton was frustrated at not being able to find her brother. Nowhere does she claim insight into the cause of his death.

Ms. Walton was asked: "In the Paragraph 7 (of her declaration), it says, " 'We didn't learn that there was any reason to believe that Frank was beaten to death by officers until sometime in August 2016, when we had Mr. Cook file this lawsuit.' (ECF 107-1, Kimberly Walton Deposition at 33:4-12). This clearly refers to the FDLE investigation after Frank Smith's death, which closed in 2015. Later still, she talks about asking an attorney only to help find where DOC had taken her brother. (Id. at 34:19-35:3). The Walton family was told Frank Smith "did it to himself." They had no earlier notice of the facts that eventually gave rise to the instant lawsuit. The Waltons had notice of the potential cause of action in August 2016.

**B.  Plaintiff Did Not Fail to Comply with Florida's Wrongful Death Act**

Defendants argue that Plaintiff failed to comply with Florida's Wrongful

Death Act because one cannot bring a wrongful death claim against a municipality until the claimant first presents "the claim in writing to the appropriate agency" and the "agency denies the claim in writing." (ECF 117 at 12). However, Plaintiff clearly did not bring the claim against a municipality, but rather, against the individual defendants. Thus, the notice provision does not apply.

Defendants also seek the protection of § 768.28(9)(a), Fla.Stat., arguing that a jury could not reasonably find that any of them "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." As a comparison, Defendants cite *Eiras v. Florida*, 239 F. Supp. 3d 1331, 1343 (M.D. Fla. 2017), a generic arrest case which both parties agreed was done within the scope of the officers' employment and with a warrant. *Eiras* found no evidence of "ill will, hatred, spite, [or] an evil intent," conduct "worse than gross negligence." *Id*. The Defendants' example doesn't square with the facts of this case. In this case, there are a series of seemingly coordinated events leading to a death, that include multiple violations of Department of Corrections regulations:

   a.  Sgt. Criswell was not originally sent to pick up Frank Smith but his assignment was changed to bring Smith back to UCI.

   b.  Criswell and Smith have a verbal exchange and Smith ends up urinating on himself before getting into the prison van;

   c.  Criswell, who teaches a prison van transport class violates transport rules by stopping and entering the prisoner compartment;

d. Criswell uses force on a restrained prisoner in a locking seatbelt and uses more force than he admits to using;

e. Criswell calls his Officer in Charge (OIC) Defendant Wilfred Ellis, to report the incident as Criswell is riding in the back of the van;

f. Criswell claims Smith repeatedly banged his head on a divider though witnesses say he shows no apparent facial injuries;

g. Warden, Barry Reddish asks that the van drive by the administration building so he can inspect the damage;

h. The prisoner then enters the institution but there is no record that a prisoner named Frank Smith is back inside the prison;

i. the prisoner on whom force was used is witnessed to have blood on his shirt and walks unsteadily when he leaves the prison van;

j. Inspector Whatley would later find blood in the van;

k. Captain Ellis, the OIC, comes to the Movement Center but fails to have a video camera there, which is required after a use of force;

l. Inside the Movement Center, the prisoner ends up unresponsive on the floor but medical is not called to the scene; no backboard is used;

m. Smith is taken to medical in a wheelchair and not a stretcher;

n. Emergency Medical Personnel state in their report that Frank Smith looks like he has been in a car wreck;

o. After the incident, incoming OIC, Swain, allows blood to be cleaned up, witnesses to go home, and the van to be driven away;

p. Swain fails to call the Emergency Action Center or the Inspector;

q. An investigation is started by Inv. Whatley but then cancelled;

r. Frank Smith dies two months later of blunt trauma to his head and neck;

s. Autopsy showed multiple visible abrasions, lacerations, edemas, and contusions of the legs, groin, midsection, and head;

t. Medical Examiner Burt "cannot say (the injuries) are self-inflicted;

u. Smith is just one of several prisoners badly beaten at UCI in 2012, another of whom almost dies and another suffers brain damage;

v. FDLE starts an investigation and several prison officials are suspended and Warden Reddish is transferred to another prison.

On these facts, a jury could reasonably find Defendants "acted maliciously and in bad faith." It should be noted that Defendant Swain's denial that he knows Smith is contradicted by evidence that he was among the officers who had used force on Smith in T Dorm. (ECF 124-12, Harris Sworn Statement at 2 and 11).

## C. Defendants Share Liability Despite Not Personally Using Force

Defendants contend that Plaintiff is trying to hold them responsible for the harm to the Decedent vicariously for wrongful acts performed by subordinates. But there is evidence of conspiracy, including the series of events that followed the "inspection" of the damaged van that suggests manipulation of events at the highest level. As the Captain and Officer in Charge (OIC), It was primarily Defendant Swain who would have had to call the Emergency Action Center and the Inspector. He did not. Although the events started with Sgt. Criswell, Frank Smith was handed off to another set of prison officials under the supervision of Warden Reddish, Wilfred Ellis, and Captain Swain.

## D. Defendants Are Not Entitled to Qualified Immunity

The defense of qualified immunity is unavailable because the use of malicious and sadistic use of force to cause harm is a clear violation of the Constitution and Supreme Court precedent. *Skrtich v. Thornton*, 280 F.3d 1295, 1301

(11th Cir. 2002). Whether a use of force is excessive, and thus violates the inmate's constitutional right to be free from cruel and unusual punishment, depends on whether the jailer's act "shocks the conscience," *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007). Under these facts, it does.

On the facts offered by Defendants, Frank Smith slammed his head into a plexiglass divider and then collapsed/fell stiff-legged onto a concrete floor. If those are the facts, they don't need the special grace of qualified immunity. But if Mr. Smith was gratuitously beaten in the transport van or the Movement Center, then on no account would qualified immunity be available. Since 1986, the U.S. Supreme Court has made it clear that the issue of Eighth Amendment "cruel and unusual punishment" turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986).

### E. Criminal Purpose Exception to Intracorporate Conspiracy Rule

Eleventh Circuit cases agree that in proving a conspiracy to violate constitutional rights, agreement between the conspirators may be shown by circumstantial evidence. *Grider v. City of Auburn*, 618 F.3d 1240,1260 (11th Cir. 2010); *Burrell v. Bd. of Trustees of Ga.Military Coll.*, 970 F.2d 785, 789 (11th Cir.1992); *Am. Fed'n of Labor & Cong. of Indus. Organizations v. City of Miami, FL*, 637 F.3d 1178, 1191 (11th Cir. 2011).

In *United States v.* Ramsdale, 61 F.3d 825, 829 (11th Cir. 1995), the court said that "[p]articipation in such an agreement need not be proven by direct evidence — "a common purpose and plan may be inferred from a 'development and collocation of circumstances.'" In other words, the existence of a conspiracy may, and often is, proven by "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Tamargo*, 627 F.2d 887, 888 (11th Cir. 1982); *United States v. Knowles*, 66 F.3d 1146, 1155 (11th Cir. 1995).

"In the absence of direct evidence of agreement among the defendants, a conspiracy can be established by circumstantial evidence sufficient to permit an inference of agreement." *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 221, 59 S. Ct. 467 (1939). As the court said in *Edison v. Florida*,

> Plaintiff need not produce a "smoking gun" to establish the "understanding" or "willful participation" required to show a conspiracy, but must show some evidence of agreement between the defendants. Rowe, 279 F.3d at 1283-1284. See also Arline v. City of Jacksonville, 359 F. Supp. 2d 1300, 1312 (M.D. Fla. 2005). Circumstantial evidence may be sufficient to establish a conspiracy if it proves the existence of the conspiracy. Burrell v. Board of Trs. of Ga. Military Coll., 970 F.2d 785, 789 (11th Cir. 1992).

2007 U.S. Dist. LEXIS 843 (M.D. Fla. 2007). Plaintiff has pled a chain of events that goes far beyond simply working for the same government entity.

The intracorporate conspiracy doctrine is not applicable. The doctrine has been held not to apply to criminal behavior – whether it appears in a criminal or civil case. In one such civil case, the Eleventh Circuit held as follows:

> Accordingly, we hold that just as the intracorporate conspiracy doctrine cannot shield a criminal conspiracy from prosecution under the federal criminal code, the doctrine cannot shield the same conspiracy, alleging the same criminal wrongdoing, from civil liability arising under 42 U.S.C. § 1985(2). Therefore, we reverse the district court's order dismissing McAndrew's § 1985(2) claim as barred by the intracorporate conspiracy doctrine and remand for further proceedings consistent with this opinion.

*McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1034 (11th Cir. 2000).

The officers involved in gratuitous beatings of inmates constituted essentially a gang of vigilantes who felt free to violate the Department rules and kept their worst actions hidden from at least some officials and inspectors. Defendant Criswell, in particular, was primarily motivated by his dislike of mentally ill inmates and was acting not primarily for his employer, but for his own interest in tormenting and abusing mentally ill inmates.

### F.  Plaintiff Makes Out A Claim for Violation of the ADA/RA

Mr. Smith was a person with a severe mental health disability. As such, he was entitled to the same beneficial considerations and safe living conditions as any other inmate but because of his mental health status, he was trapped in an abusive confinement system. To provide Mr. Smith with safe living conditions would have required a special accommodation to protect him from predatory and sadistic corrections officers like Criswell, Norman, Allen and others.

Mr. Smith was an "otherwise qualified" person who should have been able to take advantage of FDC mental health programs dealing with his particular

disability. Because of the failure of UCI administrators, including Defendants, to control officers like Criswell, Norman, and Allen, the programs that were nominally designed to help inmates like Mr. Smith served to render him a victim of officers who enjoyed taunting and tormenting mentally-ill inmates.

## 1.  Discrimination, Intentionality and Harm

Many institutional claims of discrimination for purposes of the ADA and Rehabilitation Act are not claims that the disabled person is selected from out of a group as a target of discrimination. If a prison population were made up solely of inmates who needed wheelchairs to get around and every pathway was intersected by steps and steep curbs, that would be discriminatory even if it applied to each inmate in exactly the same way to the same effect.

Discriminatory intent may be proven by a showing a defendant "knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood." *Liese v. Indian River County Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012). Assignment of mentally ill inmates to a living area where mentally ill inmates are predictably seriously injured constitutes at least deliberate indifference.

In describing the relationship between the practice of baiting and beating mentally ill inmates, Inmate Lester Williams explained that Smith upset the officers because he "had mental health issues and couldn't always comprehend what he was being told to do." (ECF 124-1, FDLE Report at 20). Sometimes officers would

also deny Smith food, putting empty food trays in the feeding box to make it look to the cameras like he was being fed. (Id.). Marcellas Harris notes:

> This dude-- you know a term bug, meaning a person who got mental issue. He not sane or he not stable as a competent person. You got officers at that institution-- I could name a slew of their names. First and last names. Michael Wiggs-- Sergeant Michael Wiggs, Captain Shawn Swain, Sergeant Charles Williams, Sergeant Eric Jackson. I could go down a list of their names, where they physically just beat-- you could be-- you know that this person, they take medication, and he may take his meds and they'll come on the wings and, "Eric's on the wing; get off the door!" And he's just standing by his bed. And due to the fact he not sitting in his bed, they pulled him out, put him on proper restriction, beat him up and gassed him.

(ECF 124-12, Harris Sworn Statement at 2-3). If living in peace is not a program benefit at UCI, being able to eat certainly is. Proving deliberate indifference in the refusal to feed inmates cannot require elaborate demonstration.

## 2. Defendants Had Notice of Need for Accommodations

Defendants claim not to be aware of Mr. Smith's need for accommodation but they were well-known. A demand for accommodation need not be made where the disabled individual's needs are apparent. *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 n.7 (1st Cir. 2001); *Chisolm v. McManimon*, 275 F.3d 315, 330 (3d Cir. 2001) (reversing holding that request for accommodation was necessary, where the public entity "had knowledge of [plaintiff's] hearing disability but failed to discuss related issues with him") (*citing Randolph v. Rogers*, 170 F.3d 850, 858-59 (8th Cir. 1999)); *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 165 (5th Cir.1996) (noting disabled individual's burden to request an accommodation applies "[w]here

the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent"); *L.J. McCoy v. Texas Dept. of Criminal Justice*, 2006 WL 2331055, S.D. Texas, \*26-\*28). A demand for accommodation may provide notice but it is the notice, not the demand, that is required. A department of corrections that holds custody of thousands of persons diagnosed with mental illness is well aware of the special protections persons with mental illness need to live safe and meaningful lives.

### G. Punitive Damages Are Not Barred by the Plaintiff's Death

If a jury can reasonably find that the facts alleged by Plaintiff are true, the predicate for punitive damages will be reached. Defendants also argue that punitive damages cannot be recovered for the constitutional claims, citing *Sharbaugh v. Beaudry*, 267 F.Supp.3d 1326 (N.D. Fla. 2017). This is a misunderstanding of Sharbaugh which, though it did not permit the decedent's pre-death pain and suffering damages, did permit punitive damages. *Sharbaugh* makes clear that the Florida Wrongful Death Act "is not hostile to § 1983 claims nor does it target § 1983 plaintiffs for adverse treatment. It makes both compensatory and *punitive damages* available for the wrongful death." *Id.*, 267 F. Supp. 3d 1326, 1335–36 (N.D. Fla. 2017) (*emphasis added*)

WHEREFORE, Plaintiff moves this Honorable Court to DENY the Motion for Summary Judgment by Defendants FDC, Reddish, Ellis, and Swain.

Respectfully submitted,   *s/ James V. Cook*
JAMES V. COOK, ESQ.
Florida Bar Number 0966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

ATTORNEY FOR PLAINTIFF

I CERTIFY the foregoing was filed electronically on 1/27/20 and served the same date on counsel registered to be notified by the CM/DE electronic mail system.

*s/James V. Cook*