## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JUDITH WALTON,

     Plaintiff,

v.

FLORIDA DEPARTMENT OF
CORRECTIONS, et al.,

     Defendants.

CASE NO. 3:16-cv-1130-J-39JRK

## PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANT CRISWELL

COMES NOW the Plaintiff, through counsel, and responds to Defendant Criswell's Motion for Summary Judgment and would show that Defendant Criswell seeks Summary Judgment on these grounds:

a.  The 42 USC 1983 Count is barred by the Statute of Limitations;

b.  The Facts Do Not Sufficiently Establish a Claim for Excessive Force;

c.  Conspiracy Count Is Barred by Intracorporate Conspiracy Doctrine;

d.  The Facts Do Not Sufficiently Establish a Claim for Conspiracy;

e.  The Wrongful Death Count is barred by the Statute of Limitations;

f.  Criswell's Acts Were Not the Proximate Cause of Smith's Death.

## STATEMENT OF DISPUTED AND ADDITIONAL FACTS

Plaintiff incorporates by reference the facts alleged in her response to the Motions for Summary Judgment by the other Defendants. Plaintiff responds to Defendants Statement of Undisputed Facts as follows:

## 1.  Facts Admitted and Disputed

Plaintiff admits that on July 3, 2012, Frank Smith was a prisoner of the

Florida Department of Corrections (FDC) at Union Correctional Institution (UCI),

convicted of serious felonies, that Smith was housed in T Dorm, a unit for the

mentally impaired, where Lieut. Joseph Allen and Officer Brian Norman were,

respectively, Administrative Lieutenant and Administrative Officer. Admitted that

Smith had a long history of paranoid schizophrenia and other mental health issues,

suffered hallucinations, hears voices, and had attempted suicide.

Disputed that Smith had a history of falling and injuring himself but rather

that Smith had a history of being beaten by officers in T Dorm where his injuries

were often blamed on self-harm, (ECF 124-1, FDLE Report at 20, Williams Sworn

Statement; ECF 124-12, Harris Sworn Statement at 3, 4, 6, 9). Disputed that

Criswell had "no issues" with Smith in that Sgt. Criswell was specifically

associated with beatings of Smith in T Dorm. (Id.).

Admitted that Smith was taken to Shands Hospital in Gainesville with a

head injury, a contusion on his forehead, blood in his left ear and blood on his lip,

but the transport was on June 26, 2012, not June 27. (See Exh. 2, Shands Medical

Records at 1). But disputed that it was "after falling." Rather, Smith was being

beaten by Criswell and others, for trying to insist that officers take off his cuffs

through the food slot rather than inside his cell where inmates could be beaten

without witnesses. (ECF 124-1, FDLE Report at 20, Williams Sworn Statement).

Admitted that Smith was discharged from Shands Hospital to go back to UCI on July 3, 2012, and that he was transported by Sgt. Criswell and Officer Hough with Sgt. Eric Cagle and Officer Michael Schaffer as escort. But disputed that Sgt. Criswell was the officer originally assigned to Smith. Rather, Criswell received a phone call that morning telling him to switch from inmate Leslie Smith to Frank Smith. (ECF 124-1, FDLE Report at 53, Criswell Sworn Statement).

Admitted that Smith was reluctant to go with Criswell and that he urinated on himself, that he was escorted to the van and placed in the back and secured in the seat. Admitted that Sgt. Criswell was the driver and Officer Hough was the passenger and that Cagle and Schaffer were following the van. Admitted that there was a Plexiglas divider lined with a metal grate on the prisoner's side.

Disputed that Smith banged his head on the divider since the metal grate would have left marks on his head and face and witnesses state he had none. (ECF 124-1, FDLE Report at 42-43, Cagle Sworn Statement). Disputed that Smith removed his lap seat belt since Criswell admits he was still secured by a second buckle that could only be unlocked with a key. (ECF 124-1, FDLE Report at 80, Criswell Sworn Statement). Admitted that Smith kicked and broke a van window.

Admitted that Criswell stopped the van and entered the prisoner compartment and used his Electronic Immobilization Device (EID) on Smith.

Disputed he used no further force after using the EID. Officer Hough sitting in the

front seat saw Criswell use "several knee strikes," which Criswell continues to

deny doing. Criswell noted no blood on Smith when he entered the van but later,

Lieut. Allen noticed blood on the front of Smith's shirt as he left the van. Allen said

Smith was walking unsteadily as they headed toward the Movement Center. (ECF

124-10, Allen Sworn Deposition at 2, 5). Defendant Norman said Smith was

"stumbling" and that "he had some sort of injury to be stumbling around." (ECF

124-9, Norman Sworn Statement at 4, 9).

Admitted that after Criswell used his EID, Criswell held Smith down and

Smith did not resist. Admitted that Criswell called his Officer in Charge (OIC),

Capt. Wilfred Ellis and told him what happened. Admitted that Hough drove the

transport van to the UCI Movement Center. Disputed that Criswell was surprised at

not seeing a camera waiting for them **if**, Criswell had really not told Capt. Ellis of

the use of force in the van since a camera would only be called if Ellis was made

aware of that fact. Admitted that there was no camera at the Center. Admitted that

inside the Movement Center Smith suffered an injury that rendered him

quadriplegic. Disputed that Criswell had no history of excessive force but admitted

that he had never been disciplined for it. (ECF 124-1, FDLE Report at 20, Williams

Sworn Statement; ECF 124-12, Harris Sworn Statement at 3, 6, 9).

Admitted that Frank Smith's family called an attorney when they had trouble

getting to see Mr. Smith in the hospital but disputed that what was meant by "investigating what happened to him" referred to his being beaten by officers, but rather referred to trying to find out where FDC had taken Smith after he left Shands Hospital. Admitted that suit was filed on September 6, 2016, more than four years after Smith's death, but further submitted that September 4, 2016, was a Sunday, and that September 5, 2016, was Labor Day, so the first business day after Friday, September 2, 2016, was Tuesday, September 6, 2016.

### 2.  Additional Material Facts

On June 26, 2012, Frank Smith was taken to Shands with an unexplained head injury. He was at Shands for a week and was to be returned on July 3, 2012. Captain Wilfred Ellis was the Officer in Charge on that day. Someone called Transport Officer Sgt. Rodney Criswell and re-assigned him from Lester Smith to Frank Smith. (ECF 124-1, FDLE Report at 53).

Smith asked Criswell to be permitted to use the restroom but ended up urinating on himself. Criswell reported that he stopped the van on County Road 231 at about 3:45 p.m. (Exh. 1, UOF Incident Report at 1) because Smith was  being disorderly. The Reception and Medical Center is on the route from Gainesville to UCI and would have been 18 minutes closer if he needed to stop the

van and inspect the damage.[1] (ECF 125-3, Google Maps, RMC to UCI). When Criswell stopped the van and used his EID on Smith, he also used knee strikes, according to Officer Dustin Hough. (ECF 124-1, FDLE Report at 57). Criswell denied having struck Smith. (ECF 77 at ¶¶ 49, 50).

Criswell reported making a phone call from the back of the transport van to his Captain, Wilfred Ellis, who was Officer in Charge (OIC) that day. Criswell got his correctional certificate in 1998 (ECF 106-1, Criswell Deposition, at 6:23-25), so by 2012, he was a 14-year officer and a sergeant. He also trained other officers. (ECF 106-1 at 8:17-18). A jury could reasonably infer that he knew that since force had been used on Smith, it would be required for Ellis to have a video camera waiting for the van. And yet Defendant Ellis claims Criswell never told him that earlier on the phone. (ECF 124-1, FDLE Report at 72).

As Lieut. Allen and Officer Norman removed Smith from the van, Allen saw blood on his shirt. Criswell did not recall seeing any blood on Smith when he entered the van or any marks on his head or face from banging against the metal grid divider. (ECF 106-1, Criswell Deposition at 21:1-10).

At the close of the Department of Corrections Administrative Investigation, it was recommended that the allegation against Sergeant Rodney Criswell for

---

[1] Criswell admitted to SA Mark Baker that he often taught the DOC "Outside Escort" class but didn't know he was prohibited from stopping on the road during a transport. He said he served a 40-hour suspension for violating DOC policy. (ECF 124-1, FDLE Report at 54).

Improper Conduct, in violation of F.A.C Chapter 33-208.002(1), Failure to

Follow Oral or Written Instructions and F.A.C. Chapter 33-208.002(10),

Negligence, be termed "Sustained." It was found that Criswell violated Security

Procedure 602.024(7)(D) which states:

> Incidents involving inmate disruption, e.g., fighting, assaults, damaging the
> transport vehicle, etc., require that the transporting officers cautiously assess
> the seriousness of the situation and determine whether it requires immediate
> intervention or can wait until assistance can be obtained from the nearest
> Department facility or other law enforcement facility in the immediate area.
> If possible and if time permits, the transport vehicle should be diverted
> immediately to the nearest secure Department facility. Only as a last resort
> and after notifying the nearest Department facility and/or local law
> enforcement entity should the vehicle stop and the security of the caged area
> be compromised to address the situation. The armed officer should maintain
> a safe distance from the vehicle at all times while the other officer attempts
> to resolve the situation.

Sergeant Criswell admitted to stopping the transport van on the side of

County Road 231 somewhere around the Lake Butler area and breaching the

secure caged area of the van. Criswell did not notify the nearest Department

facility and/or local law enforcement prior to stopping the van and breaching the

secure caged area despite being in close proximity to RMC. Sergeant Criswell's

actions could have jeopardized officer safety as well as public safety.

Sergeant Criswell was suspended without pay from his position of

Correctional Officer Sergeant for forty (40) hours due to his violation of policy.

# MEMORANDUM OF LAW

Summary judgment is appropriate when pleadings and evidence demonstrate "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment has the initial burden to show the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## A. 1983 Statute of Limitations Was Tolled by Delayed Discovery

Defendants concede that for a § 1983 claim, the statute of limitations "does not begin to run until the facts that support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Mullinax v. McElhenney*, 817 F.23 711, 716 (11th Cir. 1987).

Frank Smith was a mentally-impaired inmate at UCI, Dorm T, a mental health dorm. (ECF 125-4, Individualized Service Plan Review at 1-2). He was diagnosed with Schizophrenia, paranoid type. (Id.). Smith had hallucinations and heard voices of Sam and Henry who told him about his family. He said "Sam" told him to put a noose around his neck, which he did. (Id.). An inmate with whom Smith shared a housing area, Lester Williams, said Smith "couldn't always comprehend what he was being told to do. (ECF 124-1, FDLE Report at 20). After his injury and return to Shands Hospital, Surgeon Maryam Rahman told the family there was a real possibility that Smith would be quadriplegic. (ECF 125-5, Shands

Records at 591). They requested aggressive care and asked to visit. (Id.).

When Frank Smith's sister Kimberly Walton was asked at deposition if she believed her brother was in the hospital because he "banged his head," she replied, "I couldn't say nothing, no." When Ms. Walton was asked: "When was the first time that you thought that the officers may have hit him, or there was a question about his death?" She responded that her initial concern was to visit her brother and to find out where he had been taken. (ECF 107-1, Kimberly Walton Deposition at 30:6-24). Ms. Walton was frustrated at not being able to find her brother. Nowhere does she claim insight into the cause of his death.

Ms. Walton was asked: "In the Paragraph 7 (of her declaration), it says, " 'We didn't learn that there was any reason to believe that Frank was beaten to death by officers until sometime in August 2016, when we had Mr. Cook file this lawsuit.' (ECF 107-1, Kimberly Walton Deposition at 33:4-12). This clearly refers to the FDLE investigation after Frank Smith's death, which closed in 2015. Ms. Walton talks about asking an attorney to help find where DOC had taken her brother. (Id. at 34:19-35:3). The family was told Frank Smith "did it to himself." They had no earlier notice of the facts that eventually gave rise to the instant lawsuit. The Waltons had notice of the potential cause of action in August 2016..

**B. The Evidence for Excessive Force Is Sufficient to Submit to a Jury**

In describing his use of force on the transport van, Defendant Criswell

maintains that he used his Electronic Immobilization Device (EID) and had no need to use any other kind of force. Taking Criswell at his word for these purposes, there exists evidence that Criswell also used physical blows. His fellow corrections officer, Dustin Hough, has maintained that Criswell also used several knee strikes – which Criswell does not admit.

Moreover, the officers who took Smith from the van remarked on other indicators of force that Criswell does not admit to. Defendants Allen and Norman both say that Smith was walking "unsteadily" or "stumbling" as he walked from the van. Defendant Allen also noticed blood on Smith's shirt. Allen said that he felt that Smith may have been running on adrenaline as he left the van and just ran out. These observations constitute evidence, albeit circumstantial, from which a jury could reasonably infer additional unadmitted force.

Frank Smith was certainly injured in the Movement Center since the injury that ultimately killed him would not have permitted him to walk from the van to the holding cell. But there appears to be no way to completely separate the injuries that Smith sustained in the van from those he sustained in the Movement Center so that both Criswell and also Allen and Norman should be held accountable for the indivisible injury and its ultimate result in Smith's death.

### C. Criswell Cannot Rely on the Intracorporate Conspiracy Doctrine

The intracorporate conspiracy doctrine is not applicable. The doctrine has

been held not to apply to criminal behavior – whether it appears in a criminal or civil case. In one such civil case, the Eleventh Circuit held as follows:

> Accordingly, we hold that just as the intracorporate conspiracy doctrine cannot shield a criminal conspiracy from prosecution under the federal criminal code, the doctrine cannot shield the same conspiracy, alleging the same criminal wrongdoing, from civil liability arising under 42 U.S.C. § 1985(2). Therefore, we reverse the district court's order dismissing McAndrew's § 1985(2) claim as barred by the intracorporate conspiracy doctrine and remand for further proceedings consistent with this opinion.

*McAndrew v. Lockheed Martin Corp*., 206 F.3d 1031, 1034 (11th Cir. 2000).

The officers involved in gratuitous beatings of inmates constituted essentially a gang of vigilantes who felt free to violate the Department rules and kept their worst actions hidden from at least some officials and inspectors. Defendant Criswell, in particular, was primarily motivated by his dislike of mentally ill inmates and was acting not primarily for his employer, but for his own interest in tormenting and abusing mentally ill inmates.

### D. There Is Evidence from Which a Jury Could Infer a Conspiracy

Eleventh Circuit cases agree that in proving a conspiracy to violate constitutional rights, agreement between the conspirators may be proven by circumstantial evidence. *Grider v. City of Auburn*, 618 F.3d 1240,1260 (11th Cir. 2010); *Burrell v. Bd. of Trustees of Ga.Military Coll*., 970 F.2d 785, 789 (11th Cir.1992); *Am. Fed'n of Labor & Cong. of Indus. Organizations v. City of Miami, FL*, 637 F.3d 1178, 1191 (11th Cir. 2011).

In *United States v.* Ramsdale, 61 F.3d 825, 829 (11th Cir. 1995), the court said that "[p]articipation in such an agreement need not be proven by direct evidence — "a common purpose and plan may be inferred from a 'development and collocation of circumstances.'" In other words, the existence of a conspiracy may, and often is, proven by "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Tamargo*, 627 F.2d 887, 888 (11th Cir. 1982); *United States v. Knowles*, 66 F.3d 1146, 1155 (11th Cir. 1995).

"In the absence of direct evidence of agreement among the defendants, a conspiracy can be established by circumstantial evidence sufficient to permit an inference of agreement." *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 221, 59 S. Ct. 467 (1939). As the court said in *Edison v. Florida*,

> Plaintiff need not produce a "smoking gun" to establish the "understanding" or "willful participation" required to show a conspiracy, but must show some evidence of agreement between the defendants. Rowe, 279 F.3d at 1283-1284. See also Arline v. City of Jacksonville, 359 F. Supp. 2d 1300, 1312 (M.D. Fla. 2005). Circumstantial evidence may be sufficient to establish a conspiracy if it proves the existence of the conspiracy. Burrell v. Board of Trs. of Ga. Military Coll., 970 F.2d 785, 789 (11th Cir. 1992).

2007 U.S. Dist. LEXIS 843 (M.D. Fla. 2007). Plaintiff has pled a chain of events that goes far beyond simply working for the same government entity.

### E.  Statute of Limitations Does Not Bar Wrongful Death Claim

The limitations period for a Florida wrongful-death claim is ordinarily two

years. See Fla. Stat. § 95.11(4)(d). But when the decedent is a "disabled adult," a claim asserting murder or manslaughter may be brought at any time; there is no statute of limitations. See Id. § 95.11(10). This statute cites to 782.05, and 782.07, manslaughter or aggravated manslaughter of a disabled person, "a person who causes the death of any elderly person or disabled adult by culpable negligence..." See Fla. Stat. § 782.07(2). The element of culpable negligence is defined in Section 784.05, Florida Statutes, as "an act which a reasonable person would know is likely to result in death or great bodily harm to another person, even though done without any intent to injure anyone but with utter disregard for the safety of another." *See J.C. v. State*, 233 So. 3d 519, 521 (Fla. 2d DCA 2018).

A jury could conclude that the Defendants committed a murder, or manslaughter of a disabled adult (which on the statutory culpable negligence standard would not be difficult on this record). Further, a jury could easily conclude that Smith was disabled based on his mental health impairment of paranoid schizophrenia. Thus, this Court should find that, because a jury could conclude that the individual FDC employees committed murder or manslaughter of a disabled adult vis a vis culpable negligence, the statute of limitations applicable to those individuals for the damages listed in Florida Statutes § 768.21 are being sought against those individuals, the statute of limitations contained in Florida Statutes § 95.11(10) should apply to the Defendants as it relates to Plaintiffs' claims.

### F.  Criswell Cannot Escape Liability for Smith's Injury and Death

Defendant Criswell maintains that based on the testimony of Plaintiff's expert, he cannot be liable for the death of Plaintiff's decedent. That is a misreading of the facts and the law. Plaintiff's expert pathologist, Dr. Kris Sperry, did say that Mr. Smith could not have walked from the van to the holding cell with the spinal injury that caused his paraplegia and death. However, that is not to say that Mr. Smith was uninjured when he left Criswell's transport van.

Defendants Allen and Norman have been fairly specific in noting indications of injuries to Smith as they removed Smith from Criswell's van. Allen saw blood on Smith's shirt. Criswell said did not recall seeing any blood on Smith when Criswell entered the van or any marks on Smith's head or face from banging against the metal grid divider. (ECF 106-1, Criswell Deposition at 21:1-10). Criswell also said that other than the EID deployment, there was no need for any other force against Smith. But Dustin Hough, sitting in front seat of the van saw Criswell use "several knee strikes," although Criswell denies it. Allen also said Smith was walking unsteadily as they headed toward the Movement Center. (ECF 124-10, Allen Sworn Deposition at 2, 5). Defendant Norman said Smith was "stumbling" and that "he had some sort of injury to be stumbling around." (ECF 124-9, Norman Sworn Statement at 4, 9). The implication is that Mr. Smith had already suffered an injury that made him weak and unsteady and contributed to what they describe as a "fall" or "collapse."

The Florida Supreme Court has held that where a plaintiff sues the first of two successive tortfeasors and establishes liability, but the jury cannot apportion the injury between the two after both parties have had the opportunity to present evidence on the issue, the first tortfeasor will be liable for the entire injury. The requirement of proving proximate cause as it relates to the issue of apportionment is relaxed so as to allow recovery for the indivisible injury.

Furthermore, "a tortfeasor should not escape responsibility when two independent causes both proximately contribute to cause an ultimate injury and plaintiff has done everything that could reasonably have been expected of her to segregate the damages as between the two accidents." *Gross v. Lyons*, 721 So.2d 304, 307 (Fla. 4DCA 1998). In such an instance, prior tortfeasors will be liable for whole injuries just as subsequent tortfeasors have been liable for entire unapportionable injuries, thereby providing full relief for proven injuries suffered by victims of negligence. *Gross v. Lyons*, 763 So. 2d 276, 279 (Fla. 2000)

This represents an application of the "Indivisible Injury Rule" under which successive tortfeasors cause damages which the jury cannot apportion, thus giving rise to their liability for all of the damages. The Restatement (Second) of Torts provides for the apportionment of damages between various tortfeasors who contribute to injury if each tortfeasor's harm is "distinct" or there is a "reasonable basis for determining the contribution of each cause to a single harm." Restatement

(Second) of Torts § 433A (1965). Conversely, the Restatement explains that when

"two or more causes combine to produce such a single [harm], incapable of division

on any logical or reasonable basis, and each is a substantial factor in bringing about

the harm, the courts have refused to make an arbitrary apportionment for its own

sake, and each of the causes is charged with the responsibility for the entire harm."

*Gross v. Lyons*, 763 So. 2d 276, 279 (Fla. 2000)

WHEREFORE, Plaintiff moves this Honorable Court to DENY the

Motion for Summary Judgment by Defendant Criswell.

Respectfully submitted,

*s/ James V. Cook*
JAMES V. COOK, ESQ.
Florida Bar Number 0966843
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

I CERTIFY the foregoing was filed electronically on 1/27/20, and served the
same date on counsel registered with the CM/ECF electronic mail system.

*s/James V. Cook*