UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JUDITH WALTON, as Personal
Representative for the ESTATE
OF FRANK SMITH, on behalf of the
Estate and Survivor Judith Walton,

        Plaintiff,

v.                        Case No. 3:16-cv-1130-J-39JRK

FLORIDA DEPARTMENT OF
CORRECTIONS, et al.,

        Defendants.
_____

## ORDER

### I. Status & Background

Plaintiff, Judith Walton, as personal representative of her son Frank Smith's estate, is proceeding on a Fourth Amended Complaint (Doc. 62; FAC) filed by counsel. Plaintiff asserts individuals at Union Correctional Institution (UCI) violated Smith's constitutional rights on July 3, 2012, resulting in Smith's death two months later.

Before the Court are the following motions: (1) Defendant Norman's Motion for Summary Judgment (Doc. 98; Norman Motion); (2) Defendant Allen's Motion for Summary Judgment (Doc. 100; Allen Motion); Defendant Criswell's Motion for Summary Judgment (Doc. 114; Criswell Motion); and Defendants Florida Department of Corrections (FDOC), Reddish, Ellis, and Swain's Motion for Summary Judgment (Doc. 117; FDOC Motion). Plaintiff has responded to the

motions (Doc. 124; Pl. Norman Resp.)[1] (Doc. 125; Pl. FDOC Resp.) (Doc. 126; Pl. Criswell Resp.).[2]

## II. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at

[1] Plaintiff responded to Defendants Norman's and Allen's motions together.

[2] Plaintiff provides exhibits with all responses, but most of the exhibits are appended to Plaintiff's response to Defendants Norman's and Allen's motions. Page numbers of all exhibits, including deposition transcripts, are those assigned by the Court's electronic docketing system.

2

trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

### III. Plaintiff's Allegations[3] & Claims

Plaintiff alleges Defendant Criswell used excessive force against Smith, a mentally disabled inmate, during a medical transport from Shands Hospital to UCI's movement center on July 3, 2012. See FAC at 4, 6. Plaintiff alleges Defendants Norman and Allen used excessive force against Smith inside the movement center at UCI, causing injuries an emergency medical technician likened to those suffered by a car wreck victim. Id. at 7-9, 10. Plaintiff alleges Defendants Reddish, Ellis, Swain, and Allen participated in a plan to cover up the force incidents, including hiding or destroying evidence, assisting officers in completing their incident reports, failing to follow protocol, and withholding information from emergency medical technicians and investigators. Id. at 9-11.

Plaintiff asserts six causes of action. Counts I through III (state wrongful death, common law conspiracy, and conspiracy under 42 U.S.C. § 1983) are against Defendants Criswell, Allen, Norman, Ellis, Swain, and Reddish. Count IV is an excessive force claim against Defendants Allen, Criswell, and Norman. Count V is a deliberate indifference claim against Defendants Reddish, Ellis, Swain, and Allen. Count VI is a discrimination claim against the

---

[3] Plaintiff's allegations are fully set forth in this Court's May 14, 2019 Order (Doc. 75).

4

FDOC under the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA).

### IV. Analysis & Conclusions

### A. Timeliness of Constitutional Claims (Counts III through VI)

All Defendants argue Plaintiff's constitutional claims are time-barred.[4] Defendants assert Plaintiff's claims accrued in early July 2012, either on the day of the incidents or shortly thereafter, making her September 6, 2016 complaint untimely. Defendant Criswell argues Plaintiff's cause of action accrued on the day of the alleged incidents, July 3, 2012, because Smith, as the person against whom forced allegedly was used, knew his rights had been infringed. See Criswell Motion at 10-11.

To show Plaintiff's constitutional claims accrued on July 3, 2012, Defendant Criswell cites a six-minute sworn statement Inspector Whatley of the Inspector General's Office obtained from Smith on August 21, 2012 (Doc. 115-1; Criswell Ex. 1).[5] According to medical records (Doc. 115-3; Criswell Ex. 2A), at the time of the interview, Smith was a ventilator-dependent quadriplegic who

---

[4] In ruling on Plaintiff's motion for reconsideration, the Court found Plaintiff showed there was a genuine issue of material fact as to when Plaintiff's claims accrued, based in part of the declarations of Plaintiff and her daughter, Kimberly Walton. See Order (Doc. 61). Defendants re-assert their timeliness arguments, citing the deposition transcripts of Plaintiff and her daughter.

[5] Defendant Criswell's exhibits are designated by number, as set forth in his notice of filing exhibits (Doc. 115).

5

had sustained brain and spinal cord trauma. See Criswell Ex. 2A at 2. In a case summary report prepared by the office of the Inspector General (Doc. 124-5; Pl. Norman Resp. Ex. 5), Inspector Fish wrote, "A medical note from August 21, 2012 documents inmate Smith was 'alert to person and place only' and [could] . . . 'answer[] simple questions.'" See Pl. Norman Resp. Ex. 5 at 11. Inspector Fish reviewed the sworn statement and noted, "it was extremely difficult to decipher what was being said by Inmate Smith in portions of the interview." Id.

The August 21, 2012 interview transcript shows Smith's physical and mental conditions were limited. Smith was confused and unable to articulate his thoughts. In fact, Smith said he preferred responding to questions rather than providing a narrative description of what happened. See Criswell Ex. 1 at 5-6.[6] Many of Smith's responses were unclear and suggested an inability to comprehend or accurately recall past events. He admitted banging his head on the plexiglass divider inside the van, and he said, "the officer hit me." Id. at 6. But, when Inspector Whatley later asked him if the officers hit him, Smith

---

[6] When later interviewed by an agent with the Florida Department of Law Enforcement (FDLE) (Doc. 124-13; Pl. Norman Resp. Ex. 13), Inspector Whatley conceded some of his questions to Smith were "leading" because "Smith was having trouble talking/communicating" and his speech was slurred. See Pl. Norman Resp. Ex. 13 at 3.

said "I don't -- no -- well, no. In a way they did . . . no, really body slam -- try to kill me or something." Id. at 8.

While Smith said someone in the transport van tried to kill him, no version of the facts the parties offer supports such a characterization. Defendant Criswell testified at his deposition (Doc. 106-1; Criswell Dep.)  that he held Smith down and "applied his EID[7] to Smith's leg." See Criswell Dep. at 31. Defendant Hough, at his deposition (Doc. 110-1; Hough Dep.), testified that Defendant Criswell also used some knee strikes. See Hough Dep. at 43. Even if Defendant Criswell used some knee strikes against Smith, reasonable people would not describe Defendant Criswell's actions as an attempt to kill Smith.

Additionally, Smith said he did not recall anything after he fell inside the movement center, see Criswell Ex. 1 at 10-11, but the evidence permits the reasonable inference that force was used against Smith after he fell.[8] For example, Plaintiff's expert Dr. Kris L. Sperry (Doc. 115-19; Criswell Ex. 8A) opines that Smith's spinal injury was not caused by his fall. See Criswell Ex. 8A at 7. Dr. Sperry concludes, "[t]his type of fall . . . would not produce the vertebral and spinal cord injury." Id. Nor were Smith's

---

[7] "EID" stands for electronic immobilization device. See Criswell Dep. at 31.

[8] Smith's inability to recall events after the fall makes sense given FDOC officials, including Defendants, described Smith as being unconscious and unresponsive after he fell.

spinal injuries caused by anything that happened inside the transport van, according to Dr. Sperry. Id. at 8. Dr. Sperry opines Smith's "severe vertebral and spinal cord injury . . . was caused when [Smith] was struck or kicked with great force on the back of the neck." Id.

Accepting as true that something sinister happened to Smith inside the movement center after he fell, Smith's inability to recall those events contradicts an argument Smith was aware of his rights being infringed that day. Even Inspector Whatley, who personally interviewed Smith, doubted Smith's explanation that his injuries were self-inflicted. See Pl. Norman Resp. Ex. 13 at 8. Inspector Whatley explained to an FDLE agent that he asked the medical examiner to send Smith's spinal cord for additional testing because Whatley did not want to "miss anything." Id. Whatley acknowledged Smith said his injuries were self-inflicted, but Whatley said, "I didn't know exactly what happened. I know what he [Smith] told me. But you also don't know what happened to end up then and the [unintelligible] itself." Id.

Upon review of Smith's August 21, 2012 interview, and considering Smith's physical and mental conditions at the relevant time, the Court finds Smith was not "a person with a reasonably prudent regard for his rights" such that the cause of action accrued on July 3, 2012. See Mullinax v. McElhenney, 817 F.2d 711, 716 (11th Cir. 1987) ("In Section 1983 cases, the statute [of

limitations] does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." (internal quotation marks omitted) (alteration in original)).

To the extent Plaintiff's claims did not accrue on July 3, 2012, Defendants assert Plaintiff was on notice of a claim shortly after Smith was hospitalized but before he died on September 4, 2012. See Norman Motion at 10; Allen Motion at 11; Criswell Motion at 12-13; FDOC Motion at 10-11. To show Plaintiff was on notice of a cause of action as early as July 2012, Defendants primarily rely on Plaintiff's and Kimberly Walton's deposition testimonies (Doc. 107-1; Kimberly Dep.) (Doc. 108-1; Plaintiff Dep.).

In their depositions, Plaintiff and Kimberly testified they doubted Smith's injuries were self-inflicted. Plaintiff testified, "I didn't believe he did nothing like that to himself." See Pl. Dep. at 26. However, Plaintiff did not know what could have caused Smith's injuries. Id. Kimberly testified she did not believe Smith harmed himself because she had never heard of Smith injuring himself in the past. See Kimberly Dep. at 25. She testified, "[t]his is not my brother who they are portraying to say he self-inflicted, or whatever." Id. at 32.

Kimberly further testified that she and Plaintiff contacted an attorney "[r]ight away," after hearing her brother had been hospitalized. Id. at 33. According to Kimberly, she went through

a lot of "red tape" to schedule a visit with Smith, so she and her mother contacted an attorney for help. Id. at 30, 64. She explained as follows:

> [W]hat really pushed me to call [the attorney] is the fact that they wouldn't give me a visit. They shut me down. Me, my dad, everybody was trying to, you know, be cordial. We like, okay, can we see him? . . . . Everything was no. You know, they shut us down.
>
> . . . .
>
> A friend of mines (sic) an attorney that was able to call him up, and find out what was going on. And that's when the investigation started. We started investigating what happened to him. What -- Why is it that we can't see him? What is the problem? I. Mean [sic], we on a visiting list. Why we can't see him [sic]?

Id. at 33-34. Kimberly also acknowledged having spoken to doctors and a social worker when Smith was hospitalized. Id. at 43, 44-45, 47, 49, 53-54.

Accepting that Plaintiff and Kimberly doubted Smith could have caused his own injuries, the evidence suggests any immediate investigatory steps they could have taken would not have revealed anything other than that Smith's injuries were self-inflicted. Significantly, only a few prison employees knew what happened to Smith on July 3, 2012, and the officers who completed incident reports (Doc. 126-1; Pl. Criswell Resp. Ex. 1) said Smith banged his head inside the transport van, prompting Defendant Criswell to use some force, and then Smith fell or collapsed inside the

10

movement center. <u>See</u> Pl. Criswell Resp. Ex. 1 at 1-2, 13-14, 15, 18, 23, 25. The nurse who evaluated Smith at the movement center even noted Smith "head butted the window" during transport. <u>Id.</u> at 7.

Upon review of the medical notes documenting conversations between hospital personnel and Kimberly (Doc. 115-9; Criswell Ex. 2G), no one at the hospital spoke to Kimberly about the cause of Smith's injuries. The notes indicate medical personnel updated the family on Smith's medical condition, requested consent for treatment, and responded to Kimberly's frequent requests to visit Smith. <u>See</u> Criswell Ex. 2G at 5-11.

Even if medical staff had discussed with Kimberly how Smith was injured, they would only have been able to report what they knew, which is that Smith injured himself. For instance, in a progress note dated July 8, 2012, Dr. Chou wrote Smith was in the hospital "s/p [status post] self-inflicted head injury breaking a car window." <u>Id.</u> at 2.[9] If medical providers were told Smith's injuries were self-inflicted, and all UCI records reported the

_____

[9] At the time of Dr. Chou's evaluation, Smith was intubated, "largely unresponsive," and "unable to participate." <u>See</u> Criswell Ex. 2G at 2. Thus, the only source of information about Smith's injuries could have been those who transported Smith to Shands or UCI employees. According to the FDLE investigative report (Doc. 124-1; Pl. Norman Resp. Ex. 1), the emergency medical technicians (EMTs) who responded to the call at UCI on July 3, 2012, were informed "Smith had 'beat his head' inside a transport van." <u>See</u> Pl. Norman Resp. Ex. 1 at 75.

same, it is unclear how or why Smith's family could have been able to learn otherwise even if they had subjective doubts about Smith's capacity to harm himself.

Kimberly's comment that she and her family started investigating after contacting an attorney, considered in context, suggests the family was investigating how to schedule a visit with Smith.[10] See Kimberly Dep. at 33-34. There is no indication Plaintiff or Kimberly asked the attorney to investigate Smith's injuries or the events preceding his hospitalization. And, as mentioned above, any inquiries Plaintiff could have made between July 2012 and September 2012, would have been directed to the FDOC and UCI, whose records showed Smith banged his head and fell. Plaintiff and Kimberly would have discovered no records that indicated prison guards used such force against Smith as to cause the spinal cord injury that caused his quadriplegia and ended his life.

Indeed, it appears the first time anyone suggested Smith's fatal injuries may not have been self-inflicted was after Smith

_____

[10] The medical records confirm Kimberly's frequent requests to visit her brother. On July 11, 2012, Kimberly asked Dr. Chakraborty about visiting, and the doctor referred Kimberly to someone else to find out "if visits [are] even possible." See Criswell Ex. 2G at 5. The next day, a social worker left a voicemail for Kimberly, giving her the name and telephone number of a supervisor of classification at UCI to schedule a visit with Smith. Id. at 6. On July 12, 2012, Kimberly spoke with another doctor and again asked about visiting her brother. Id.

died. For instance, the medical examiner reported to an FDLE agent in about April 2013 that she could not say Smith's injuries were self-inflicted. <u>See</u> Pl. Norman Resp. Ex. 1 at 32. The medical examiner reported being concerned by "the lack of identification of any particular mechanism of Smith's injury." <u>Id.</u> In October 2014, the medical examiner sent her report to the FDLE. <u>Id.</u> at 8. The medical examiner classified Smith's manner of death as "undetermined," and noted that "[a]lthough the circumstances surrounding Mr. Smith's injuries and death have been thoroughly investigated, the precise mechanism(s) of injuries is not clear." <u>Id.</u>

A suggestion that officers used force against Smith inside the movement center did not surface until nearly two years after the incident. In an interview summary dated April 28, 2014, an FDLE agent reported that Sergeant Cagle recalled hearing "rumors about what had actually occurred" inside the movement center. <u>Id.</u> at 43. Sergeant Cagle said, "I heard the use of force was when they [the transport officers and Smith] got back to the institution," and Cagle said he believed the officer who used force was "[w]hoever was waiting in the [m]ovement [c]enter at UCI." <u>Id.</u> On May 12, 2014, an FDLE agent reported that another officer also heard "rumors" about a use of force occurring at the movement center. <u>Id.</u> at 48.

It appears the earliest Plaintiff could have suspected Smith's injuries may not have been self-inflicted was when the FDOC issued press releases the month after Smith died (Doc. 124-6; Pl. Norman Resp. Ex. 6). In October 2012, the FDOC announced the Inspector General's office had opened several investigations related to "recent use of force incidents" at UCI and that some staff members were placed on administrative leave. See Pl. Norman Resp. Ex. 6 at 1-2. In a press release dated October 8, 2012, the FDOC mentioned Smith as one of the inmates involved in the investigation and identified the employees placed on administrative leave, including Defendants Allen and Ellis and former Defendant Jeffcoat. Id. Even if these October 2012 press releases should have put Plaintiff on notice of a possible cause of action related to her son's death, she filed her complaint less than four years later, in September 2016.

For the above reasons, the Court finds there remain genuine issues of material fact regarding whether Plaintiff timely filed her constitutional claims. Thus, Defendants' motions are due to be denied on this issue.

**B. Excessive Force & Deliberate Indifference Claims**

**i. Defendants Norman and Allen (Counts IV & V)**

In Count IV, Plaintiff alleges Defendants Norman and Allen violated Smith's Eighth Amendment rights by using excessive force against him or failing to intervene in the use of such force. See

14

FAC at 25-26. In Count V, Plaintiff alleges Defendant Allen was deliberately indifferent to the uses of force against Smith by ignoring Smith's obvious injuries when he stepped out of the transport van and by moving Smith via wheelchair when he was unconscious. Id. at 27-28. Plaintiff also alleges Defendant Allen was deliberately indifferent to "correctional officers' tendency to [use] excessive force against the inmates." Id. at 27.[11]

Both Norman and Allen invoke qualified immunity, contending Plaintiff fails to demonstrate the violation of a clearly established right. See Norman Motion at 8-9; Allen Motion at 9-10. Defendants point to no record evidence, however, to support their arguments. Rather, they both simply conclude the "[f]acts and discovery developed to date" do not show excessive force was used against Smith or the violation of a constitutional right by Norman or Allen. See Norman Motion at 9; Allen Motion at 10. On summary judgment, Defendants have the burden to "show there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). They must point to evidence in the record supporting their positions. See Clark, 929 F.2d at 608. Defendants' simple reference to "[f]acts and discovery," with no direct references to the record

---

[11] This latter allegation the Court addresses below because Plaintiff asserts this allegation against Defendants Reddish, Ellis, Swain, and Allen collectively.

and no explanation, is insufficient to carry their burden on summary judgment.

Moreover, Plaintiff offers evidence suggesting Smith's spinal cord injury was caused by an assault that occurred inside the movement center when Smith was under the control of Defendants Allen and Norman. Plaintiff's expert Dr. Sperry opines that Smith's spinal injury was not caused by him falling, which is the only explanation Defendants Allen and Norman offer as to what happened inside the holding cell. See Criswell Ex. 8A. at 7. Plaintiff's other expert, Aubrey Land (Doc. 124-3; Pl. Norman Resp. Ex. 3), a law enforcement, prison, and jail consultant, concludes Smith "was physically abused by correctional staff or in the presence of correctional staff while in the holding cell." See Pl. Norman Resp. Ex. 3 at 13.

Aside from Plaintiff's experts' opinions, there is other evidence suggesting someone used force against Smith inside the movement center. For instance, the medical examiner told an FDLE agent her findings were hard to "reconcile with events as described" by the officers and Smith's appearance in the video. See Pl. Norman Resp. Ex. 1 at 32. Additionally, two officers told an FDLE agent they heard "rumors" that force had been used against Smith inside the movement center. Id. at 43, 48.

As to the deliberate indifference claims against Defendant Allen, Aubrey Land opines Defendant Allen acted willfully and

16

recklessly by not summoning medical care for Smith both when he exited the transport van and was "a little wobbly on his feet," Allen Dep. at 36, and after he fell in the holding cell. See Pl. Norman Resp. Ex. 3 at 12. As to the more serious injury Smith sustained, Land concludes Defendant Allen "acted with reckless disregard for Mr. Smith's safety by moving him in a wheelchair" when Smith was unable to move on his own and had an "obvious head injury." Id. According to Land, "It is beyond correctional comprehension that Mr. Smith was transported in a wheelchair and medical professionals were not summoned to his aid prior to moving him." Id. at 10.

According to Dr. Sperry, a video of Smith sitting in the wheelchair shows he was obviously unconscious. See Criswell Ex. 8A at 4. A photo of Smith in the wheelchair shows his head hanging back unnaturally (Doc. 125-2; Pl. FDOC Resp. Ex. 1). Even Defendant Norman told an FDLE agent (Doc. 124-9; Pl. Norman Resp. Ex. 9) that, when Smith was being pushed from the movement center to the medical unit, his feet kept dragging on the concrete to the point where his socks ripped and his feet bled. See Pl. Norman Resp. Ex. 9 at 7. See also Pl. Norman Resp. Ex. 1 at 62.

Construing the facts in the light most favorable to Plaintiff, the evidence permits the reasonable inference that Defendants Allen and Norman used unnecessary force against Smith inside the holding cell causing a severe spinal injury and that Defendant

17

Allen was deliberately indifferent to Smith's obvious injuries. If true, such conduct amounts to the violation of a clearly established constitutional right. Thus, Defendants Allen and Norman are not entitled to qualified immunity as to the claims against them in Counts IV and V.

### ii. Defendant Criswell (Count IV)

In Count IV, Plaintiff alleges Defendant Criswell used excessive force against Smith inside the transport van. See FAC at 25. Defendant Criswell argues Plaintiff fails to present evidence that he used force against Smith other than that "applied in a good-faith effort to maintain or restore discipline." See Criswell Motion at 14, 17. According to Criswell, he "made the discretionary decision to use force because he feared that Smith would seriously injure himself if not restrained." Id. at 15. Criswell maintains that any injuries he caused Smith were de minimis because he says he only used his EID on Smith's right leg and held Smith down. Id. at 18, 20. Criswell denies having punched or kicked Smith. Id. at 18.

Contrary to Defendant Criswell's description of events, the other officer assigned to the transport van, Officer Hough, reported Defendant Criswell used "several knee strikes" against Smith. See Pl. Norman Resp. Ex. 1 at 57. Given the dispute regarding the extent of force Defendant Criswell exerted during transport, there remain genuine issues of material fact regarding

18

whether Defendant Criswell used more force than necessary to respond to Smith's conduct inside the transport van. Accordingly, Defendant Criswell is not entitled to summary judgment on Count IV.

### iii. Defendants Ellis, Reddish, Swain, and Allen (Count V)

In Count V, Plaintiff alleges Defendants Ellis, Reddish, Swain, and Allen were deliberately indifferent to the use of excessive force against inmates generally and against Smith on July 3, 2012. See FAC at 27.

#### a. Deliberate Indifference to Force Incidents Generally

As to uses of force against inmates generally, Plaintiff alleges Defendant Reddish, in his role as the warden, and Defendants Ellis and Swain, as officers-in-charge (OIC) of Smith's dorm (T-dorm), "were aware of the correctional officers' tendency to [use] excessive force against the inmates," and were deliberately indifferent to the officers' conduct. Id. Plaintiff alleges, "Defendants maintained a practice of arranging or facilitating the use of excessive force and suppressing investigations of misconduct, altering, suppressing or destroying evidence or ordering others to do the same."[12] Id.

---

[12] It is unclear whether Plaintiff also asserts Defendant Allen was deliberately indifferent to correctional officers' use of force against inmates. See FAC at 27. In paragraph 202, Plaintiff identifies only Reddish, Ellis, and Swain, as those Defendants to whom Count V is directed. Id. Plaintiff says, the "aforementioned Defendants [Reddish, Ellis, and Swain] evinced

Agents with the FDLE interviewed several inmates to determine whether officers had used force against Smith or otherwise abused him before June 26, 2012, which is the last day Smith was housed at UCI.[13] Inmate Lester Williams said officers abused Smith by not feeding him at every meal. See Pl. Norman Resp. Ex. 1 at 20. Williams also reported he thought officers had beaten Smith over the course of several days before he was found unresponsive on June 26, 2012, but Williams did not see the beating, nor could he identify officers who may have been involved. Id.

Inmate Allen Ballard did not know of incidents involving Smith but reported that a different inmate had died because officers refused to feed him. Id. at 26. Inmate Eugene Washington said he was in Smith's dorm on June 26, 2012. Id. at 29. Washington was

---

deliberate indifference to constitutional rights of inmates" because they "were aware of the correctional officers' tendency to [use] excessive force against the inmates" and facilitated the use of force or suppressed evidence of force incidents. Id. ¶¶ 203-06 (emphasis added). But in paragraph 207, Plaintiff includes Defendant Allen in the enumerated list of conduct Plaintiff maintains shows Defendants were deliberately indifferent to Smith's health and safety on July 3, 2012. Id. ¶207(a)-(k). To the extent Plaintiff seeks to hold Defendant Allen liable for his alleged use of excessive force against Smith on July 3, 2012, and for Allen's deliberate indifference to Smith's injuries, those claims proceed as addressed above.

[13] On June 26, 2012, Smith was found unresponsive in his cell and transported to Shands hospital (Doc. 115-7; Criswell Ex. 2E). Smith was discharged from Shands on July 3, 2012, the day of the incidents that are the basis of the complaint. See Criswell Ex. 2E at 2-3. There is no direct evidence Smith's condition on June 26, 2012, was caused by Defendants or any staff member at UCI.

awakened by an inmate yelling "staff abuse," but Washington did not see anything other than officers dragging an inmate out of his cell. Id. Washington also provided an account of officers attacking him (Washington) but reporting he had tried to harm himself. Id.

Inmate Marcellas Harris also gave a sworn statement (Doc. 124-12; Pl. Norman Resp. Ex. 12). Harris said officers used force against Smith on June 26, 2012, and he saw Defendant Criswell slap Smith on one occasion. See Pl. Norman Resp. Ex. 12 at 3. While a bit unclear, Harris said he believes Criswell and Norman "beat" Smith inside his cell one day (not June 26, 2012). Id. at 5-6. Harris identified pictures of other officers he said had beaten Smith and other inmates over the years. Id. at 6-9. Harris said numerous officers were known to "beat [inmates] good," and he said the nurse "fabricate[d] the paperwork to justify an incident," such as recording that an inmate tried to harm himself. See Pl. Norman Resp. Ex. 1 at 34-35.

One of the officers Harris identified as "physically beat[ing]" inmates was Defendant Swain. See Pl. Norman Resp. Ex. 12 at 2-3.[14] Harris also described an incident in 2010 in which

---

[14]    Inmate Harris also identified Defendant Allen by photograph, but Harris denied having had knowledge of Allen harming Smith. See Pl. Norman Resp. Ex. 12 at 10. The FDLE agent did not ask whether Allen was known to beat other inmates because the agent was focused solely on incidents involving Smith. Id. Inmate Harris did not say whether Defendant Allen knew other officers had harmed Smith or other inmates. Id.

officers (Jenkins and Bell) handcuffed Smith and took him to the
"TV room" in T-dorm, where there are no cameras and a screen covers
the door. Id. at 5. Harris did not see what happened because the
screen blocked the door, but he believes the officers beat Smith:
he heard Smith yelling, "Stop. Leave me alone. . . . Help," and
Smith was crying and bleeding when he exited the room. Id. at 4.
Harris said, "the lieutenant that was working that day was Swain."
Id. at 11.

Accepting as true that Defendant Swain was one of the officers
known to beat mentally ill inmates and allowed the nurse to
fabricate paperwork, and accepting the inference that Swain knew
other officers did the same, Plaintiff provides just enough
evidence to create a genuine issue of material fact as to whether
Swain was deliberately indifferent to "correctional officers'
tendency to [use] excessive force against the inmates." See FAC at
27.

However, none of the inmates reported that Defendants
Reddish, Ellis, or Allen participated in or were present during
any of the incidents they mentioned. Additionally, Plaintiff
provides no use-of-force reports, grievance records, or
disciplinary records indicating Defendants Reddish, Ellis, and
Allen were subjectively aware that certain officers tended to use
gratuitous force against the inmates or that inmates regularly
complained about such conduct. In fact, if true that the nurse

helped some officers conceal wrongdoing, supervisors such as Reddish, Ellis, and Allen may not have known officers were behaving badly.

Moreover, at his deposition (Doc. 112-1; Reddish Dep.), Defendant Reddish denied having had knowledge that inmates faced a significant risk of harm at the hands of officers. See Reddish Dep. at 22. He acknowledged there were some severe injuries to inmates around the time Smith was injured, but he did not recall specific incidents of officers tormenting inmates or using gratuitous force against them. Id. at 22. He also said he did not have any concerns that Defendant Ellis allowed officers to use excessive force against inmates who exhibited "problem behavior." Id. at 27. Plaintiff's counsel engaged Defendant Reddish in the following exchange at deposition:

> Q:   2012, is it fair to say that that was an extremely active year for severe uses of force?
>
> A:   Yeah, I'm not -- could you be more specific as to what you mean by severe use of force?
>
> Q:   Yes, I can. Of course there was some press about this at the time, but I believe that the same day that Frank Smith was being transported, another inmate, Leslie Smith, was apparently also at Shands, and he ended up with severe brain damage.
>
> Another inmate, Ronnie Daniels, had severe hypothorax (sic). They thought he was going to die.

I think that the press clippings have the names of some other inmates. I don't know necessarily the whole story, but Rudolph Rowe, Christopher Arnold, Willie Knight, all apparently severe beatings, and, of course, Frank Smith died. Leslie Smith got severe brain damage, and Ronnie Daniels almost died.

Was that not a kind of blip on the radar? Wasn't that unusual?

A:   Any time there's severe injuries to inmates, that's something that's of concern and something that's going to be scrutinized.

Q:   Okay. And, obviously, that does happen, but was it not -- did it not seem to you to be anomalous?

A:   It was -- it was concerning.

Q:   Okay. . . . [D]id you feel like you had some people on your staff who were a little heavy-handed with the inmates?

A:   I did -- I had no reason to specifically identify any staff that I thought was acting inappropriately. If I had, then I would have had a responsibility to report those individuals to the Office of [the] Inspector General for possible investigation.

Q:   Okay. But you just -- that wasn't apparent to you?

A:   It wasn't apparent to me, no.

Id. at 15-17 (objections omitted). At most, Plaintiff's counsel

established Defendant Reddish was concerned that other inmates

were seriously injured around the same time as Smith. However,

there is no evidence establishing the other incidents occurred

before the one involving Smith such that administrators were on

24

notice of a history of widespread abuse against inmates at UCI.[15] Even more, Defendant Reddish denied knowing any officer or officers tended to be "heavy-handed" with the inmates.

Upon review, Plaintiff provides no evidence that Defendants Reddish, Ellis, or Allen knew officers tended to use excessive force against inmates and condoned or concealed such conduct. "[T]o defeat a motion for summary judgment, [the plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor," that is, that prison officials "harbored a subjective awareness that [the plaintiff] was in serious danger." See Goodman v. Kimbrough, 718 F.3d 1325, 1332 (11th Cir. 2013). This, Plaintiff has not done as to Defendants Reddish, Ellis, or Allen.

Even if, because of their administrative positions, Defendants Reddish, Ellis, and Allen should have perceived that officers were intentionally harming inmates, the Supreme Court has explicitly rejected "an objective test for deliberate indifference." Farmer v. Brennan, 511 U.S. 825, 838 (1994) ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").

---

[15] Plaintiff's counsel provides no documentation regarding the other alleged force incidents that occurred in 2012 and, indeed, admitted when questioning Reddish that he did not know "the whole story" involving those incidents. See Reddish Dep. at 16.

Accordingly, Defendants Reddish, Ellis, and Allen are entitled to summary judgment on Count V to the extent Plaintiff seeks to hold them liable for deliberate indifference to officers' general tendency to use excessive force against inmates.

### b. Deliberate Indifference to Smith's Injuries

As to Plaintiff's theory that Defendants Reddish, Ellis, Swain, and Allen were deliberately indifferent to Smith's health and safety on July 3, 2012, Plaintiff alleges as follows:

> a) Ellis and Allen coordinated Smith's return with Warden Reddish and Jeffcoat,[16] instructing control not to log in the returning inmate in order to obscure timelines while a "lesson" was taught to Smith.
>
> b) Ellis learned of the breach and use of force but failed to order a video camera as required by the rules until after the "lesson" had been taught.
>
> c) Ellis, Swain, and Allen pretended Smith was not seriously injured by putting him in a wheelchair instead of calling medical for a stretcher.
>
> d) Ellis and Swain, arriving and departing Officers in Charge, failed to call the Emergency Action Center (EAC) as required by protocol.
>
> e) Ellis and Swain failed to notify the Inspector as required by protocol.
>
> f) Ellis and Swain passed on to EMS that Smith banged his head in the van[.]

---

[16] Nan Jeffcoat is no longer a Defendant.

26

g) Reddish, Jeffcoat, Ellis, Swain and Allen encouraged or ordered EMS and corrections staff not to report the obvious beating injuries.

h) Reddish, Ellis, and Swain, [sic] ordered and permitted evidence, including blood, to be cleaned up before an investigation could take place.

i) Reddish, Ellis and Swain allowed the witnesses to disperse.

j) Reddish and Jeffcoat ordered that the investigation be halted.

k) Reddish and Jeffcoat arranged to ensure and promise that there would be no discipline of any officer for the injuries to Smith.

FAC at 27-28.

Defendants Reddish, Ellis, and Swain assert there is no evidence substantiating Plaintiff's allegations as enumerated above except for paragraph (e)—that Ellis and Swain failed to notify the inspector, which they concede. See FDOC Motion at 16.[17] Though Plaintiff provides numerous documents in support of her response to the FDOC's motion, she does not specify what evidence in the record substantiates the enumerated allegations in Count V. Instead, Plaintiff simply asserts the evidence shows a conspiracy, "including the series of events that followed the 'inspection' of the damaged van that suggests manipulation of events at the highest

_____

[17] The Court previously addressed Plaintiff's claim that Defendant Allen was deliberately indifferent to Smith's condition on July 3, 2012.

27

levels." See Pl. FDOC Resp. at 14. Plaintiff also says Defendants Reddish, Ellis, and Swain are not entitled to qualified immunity because the evidence shows "Smith was gratuitously beaten in the transport van or the Movement Center." Id. at 15.

As an initial matter, to the extent Plaintiff asserts Defendants Reddish, Ellis, and Swain are responsible for the actions of others, such a theory of liability is not viable under § 1983. "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks and citation omitted). "The standard by which a supervisor is held liable in [her] individual capacity for the actions of a subordinate is extremely rigorous." Id. Supervisor liability arises only "when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007) (internal quotation marks and citation omitted).

The evidence indisputably shows Defendants Reddish, Ellis, and Swain were not involved in the force incidents against Smith on July 3, 2012. Accepting that Defendants Allen or Norman used force against Smith inside the movement center, there is no

28

evidence Defendants Reddish, Ellis, or Swain witnessed it, condoned it, or learned of it.

The only enumerated allegation in Count V Plaintiff substantiates with some evidence is the following: "Ellis, Swain, and Allen pretended Smith was not seriously injured by putting him in a wheelchair instead of calling medical for a stretcher." See FAC at 28 (¶ 207(e)). Defendants Ellis and Swain did not participate in moving Smith by wheelchair; Defendants Allen and Norman were the ones who placed Smith in the wheelchair, and Officer Browning pushed it. See Pl. Norman Resp. Ex. 1 at 68, 72, 74. However, both Defendants Ellis and Swain saw Smith in the wheelchair outside the movement center. Id. at 72; see also Swain Dep. at 20. Defendant Swain testified at deposition that he saw Smith "sitting up" in the wheelchair but did not notice Smith was unresponsive. See Swain Dep. at 20, 22.

A jury confronted with the video and photographic evidence of Smith in the wheelchair reasonably could conclude Defendants Ellis and Swain had to have noticed Smith was unconscious or severely injured. The still photo alone shows Smith's head hanging back unnaturally. See Pl. FDOC Resp. Ex. 2. Additionally, all who reviewed the video concluded it was apparent Smith was unconscious.[18] Aubrey Land noted, "Smith is observed in a

_____

[18] Plaintiff provided a copy of the audio recording only. The Court has not received the video.

wheelchair with his head back in an unnatural position. His [mouth] is open and no movement is observed." <u>See</u> Pl. Norman Resp. Ex. 3 at 9. Land even emphasized (in italics and underlining): "Mr. Smith displays no signs of movement or consciousness during any portion of the video." <u>Id.</u> at 10. Land found it "disturbing that trained staff would move an injured inmate or any person in such manner." <u>Id.</u>

Dr. Sperry similarly noted, "On video, it is apparent that Smith was unconscious." <u>See</u> Criswell Ex. 8A at 4. Even the FDLE agent commented, "[Smith] hardly looks alive in that video," when interviewing Inspector Whatley. <u>See</u> Pl. Norman Resp. Ex. 13 at 6. Inspector Whatley noticed Smith's feet were dragging on the concrete during transport, and he wondered, while watching the video, why the officers did not obtain a stretcher instead of a wheelchair. <u>Id.</u>

While Defendants Ellis and Swain did not actively take part in moving Smith, they both were at the movement center and saw Smith in the wheelchair. There is also evidence that Defendant Ellis may have seen Smith inside the movement center, moments after he was placed in the wheelchair. In a sworn statement to the FDLE (Doc. 124-10; Pl. Norman Resp. Ex. 10), Defendant Allen said Defendant Ellis "walked back [to the holding cell] and verbally informed [Allen] there had been a use of force" inside the transport van. <u>See</u> Pl. Norman Resp. Ex. 10 at 14. Defendant Allen

could not recall whether Defendant Ellis appeared before or after Smith fell, but he said it was probably after, or "about the time [he and Norman] got [Smith] in the chair."[19] Id.

Viewing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, a jury reasonably could conclude that officers with even limited first aid training who saw Smith in the wheelchair would have appreciated Smith's condition and intervened. In fact, Aubrey Land concludes the officers, including Defendants Ellis and Allen, "acted with reckless disregard for Mr. Smith's safety by moving him in a wheelchair." See Pl. Norman Resp. Ex. 3 at 12.

Aside from the evidence permitting an inference that Defendants Ellis, Swain, and Allen were deliberately indifferent to Smith's injuries (as addressed above), Plaintiff fails to point to evidence substantiating the other allegations in Count V. Because these allegations are also relevant to Plaintiff's conspiracy claims, the Court will address them in turn.

First, as to paragraph 207(a) (the alleged failure to record Plaintiff's return to UCI), Plaintiff provides the control room log for July 3, 2012 (Doc. 124-11; Pl. Norman Resp. Ex. 11). As

---

[19] Contrary to Defendant Allen's statement, Defendant Ellis told an FDLE agent he stayed outside the movement center speaking with Defendant Criswell when Defendants Allen and Norman escorted Smith inside. See Pl. Norman Resp. Ex. 1 at 72. Defendant Ellis said he next saw Smith "when Smith was wheeled out of the movement center." Id.

Plaintiff contends, that log does not record Smith returned to UCI at about 4:00 p.m. See Pl. Norman Resp. Ex. 11 at 1.[20] But Plaintiff fails to show the omission from the control log was intentional or done at the direction of Defendants to hide or obscure Plaintiff's return to UCI. Additionally, the fact and time of Smith's return is apparent in countless other UCI records, which suggests there was no conspiracy or plan to hide that information.

For instance, the vehicle log for July 3, 2012, documents that D. Hough arrived at 4:05 p.m. in vehicle #8293, along with R. Criswell and one unnamed inmate, which could only have been Smith. See Criswell Dep. at 69. The UCI incident reports completed on July 3, 2012 (Doc. 126-1; Pl. Criswell Resp. Ex. 1) also show Smith returned to UCI sometime after his 2:55 p.m. discharge from Shands but before 4:30 p.m.[21] See Pl. Criswell Resp. Ex. 1 at 1 (Defendant Criswell's report noting the transport van left Shands at approximately 3:45 p.m.); id. at 19-22 (reports by Shaffer and Cagle noting they were in the "chase" vehicle following the van carrying Smith (vehicle #8293), which left Shands at about 3:45 p.m.); id. at 25 (Defendant Norman's report noting he met the

---

[20] However, the log does record that Smith was "out by permission to Shands" at about 5:00 p.m. Pl. See Norman Resp. Ex. 11 at 4.

[21] A record from Shands shows Smith was discharged on July 3, 2012, at 2:55 p.m. (Doc. 126-2; Pl. Criswell Resp. Ex. 2).

transport van at the movement center at about 4:15 p.m.); id. at
18 (Officer Browning's report noting he assisted Defendants Allen
and Norman escort Smith to the movement center at about 4:15 p.m.);
id. at 17 (Sergeant Coleman's report noting he received a call at
about 4:25 p.m. to report to the movement center with a camera).

Second, as to paragraph 207(b) (Ellis's alleged failure to
arrange for a camera), Plaintiff offers no evidence showing
Defendant Ellis knew a camera was necessary under the circumstances
known to him. Everyone involved in the events agrees Defendant
Ellis did not learn Defendant Criswell used force against Smith
until after Smith was escorted inside the movement center.
Defendant Criswell told an FDLE agent he was "not clear about
telling [Ellis] that [he] had used force," and "Ellis was not
happy" about that. See Pl. Norman Resp. Ex. 1 at 80-81. At
deposition, Defendant Criswell testified he did not recall telling
Defendant Ellis he had used force against Smith until after Smith
was removed from the transport van. See Criswell Dep. at 41-42,
44.

Defendant Ellis's incident report and his statement to the
FDLE are consistent with Defendant Criswell's recollection. Ellis
said he first heard about Defendant Criswell's use of force after
Defendants Allen and Norman escorted Smith to the holding cell
inside the movement center. See Pl. Norman Resp. Ex. 1 at 72; Pl.
Criswell Resp. Ex. 1 at 9, 10. Defendant Ellis reported as follows:

33

> I was unaware that Sergeant Criswell had used
> force on inmate Smith during the transport,
> therefore, I did not instruct Lieutenant Allen
> to video tape inmate Smith upon his return to
> the institution. As soon as I was made aware
> of force being used, I immediately instructed
> Lieutenant Allen to begin videotaping.

Pl. Criswell Resp. Ex. 1 at 9.

Defendant Allen, who was the administrative lieutenant of Smith's dorm, similarly reported having first learned about Defendant Criswell's use of force after the van returned. See Pl. Criswell Resp. Ex. 1 at 14. At his deposition (Doc. 109-1; Allen Dep.), Defendant Allen testified that Defendant Ellis instructed him (Allen) to report to the movement center for an inmate's return to the institution. See Allen Dep. at 24. Allen did not recall hearing there was a use of force, however; he heard only that a window had been damaged. Id. at 14, 24, 33, 51. Allen's sworn statement to the FDLE was consistent with his deposition testimony in this regard. See Pl. Norman Resp. Ex. 10 at 10.

Defendant Reddish, who reviewed and signed Defendant Ellis's incident report, noted he and other administrators were unaware when the transport van returned to UCI that force had been used during transport. See Pl. Criswell Resp. Ex. 1 at 9. Reddish noted, "staff could have done a better job of communicating," a topic he said would be discussed at the next OIC meeting. Id. at 9-10. Even Inspector Whatley, in his sworn statement to the FDLE, acknowledged the "[officers] involved in the incident did not immediately notify

34

'administration' that 'force had been used.'" <u>See</u> Pl. Norman Resp. Ex. 1 at 51.

Fourth, as to paragraphs 207(b)-(e) (Defendants Ellis's and Swain's admitted failure to call the EAC or the inspector's office), Plaintiff offers no evidence showing Defendants Ellis or Swain acted with deliberate indifference to Smith's health or safety or as part of an elaborate scheme to conceal what happened. At most, the evidence permits the inference the omission was the result of negligence given a change-in-shift occurred about the time the transport van returned. <u>See</u> Pl. Norman Resp. Ex. 11 at 1 (noting a change in shift occurred at 4:00 p.m.). Defendant Swain told an FDLE agent, "the scene was the responsibility of the day shift Captain," who was Defendant Ellis. <u>See</u> Pl. Norman Resp. Ex. 1 at 74. At the start of his shift, Swain asked Defendant Ellis if he (Ellis) needed any assistance, and Ellis said "no." <u>Id.</u> at 73. Defendant Ellis concedes he did not notify the inspector's office of Smith's injury, <u>id.</u> at 72, but there is no evidence he failed to do so intentionally or with deliberate indifference to Smith's health or safety. Additionally, Plaintiff shows no causal connection between the failure to timely contact the EAC or the inspector's office and Smith's injuries. The failure to contact the EAC or the inspector's office did not impede or delay the provision of necessary medical care to Smith.

35

Finally, as to paragraphs 207(f)-(k) (Defendants' alleged actions to conceal evidence or frustrate investigations), there is no evidence showing a genuine issue of material fact exists. For instance, Plaintiff alleges Defendants Ellis and Swain lied to the EMTs about what caused Smith's apparent head injury and Defendants Reddish, Ellis, Swain, and Allen told the EMTs not to report the "obvious beating injuries." See FAC at 28 (¶ 207(f), (g)). The EMTs did in fact hear that Smith had "beat his head" inside the transport van. See Pl. Norman Resp. Ex. 1 at 75-76. However, they told an FDLE agent they could not recall who told them that. They thought it may have been the prison nurse.  Id.

The only Defendants who could have spoken to the EMTs were Allen and Norman, who, along with Officer Browning and the camera operator, accompanied Smith to the medical unit.[22] There is no evidence Defendants Reddish and Ellis were present when the EMTs arrived. Even if they had been, however, and they told the EMTs Smith banged his head inside the transport van, there is no evidence they had reason to believe otherwise given they did not witness the events and were themselves told Smith banged his head. Moreover, the EMTs, who were interviewed by an FDLE agent, did not

---

[22] Notably, Plaintiff does not allege Defendant Allen told the EMTs Smith had banged his head. See FAC at 27 (¶ 207(f)). However, even if Defendant Allen spoke to the EMTs and omitted important information about Smith's injuries, such conduct would constitute deliberate indifference consistent with his effort to conceal his own actions against Smith, as previously addressed.

say anyone asked, encouraged, or threatened them not to report either what they were told or what they witnessed. Id. at 75-76.

Plaintiff also points to no evidence showing Defendants Reddish, Ellis, or Swain attempted to conceal physical evidence, hide witnesses, or obstruct the investigation process. All officers who were involved in Smith's transport and return to the movement center completed or commented on incident reports that day. See Pl. Criswell Resp. Ex. 1 at 1-4, 9-10, 13-26. Defendant Criswell informed his superiors he had used force during transport, albeit not immediately, and he documented the incident in his own report. Id. at 1-2.

Assuming Defendants Allen or Norman intentionally harmed Smith inside the movement center, there is no evidence they told anyone else or reported it. Id. at 13-14, 25-26. Indeed, to this day, both Defendants Allen and Norman steadfastly maintain Smith fell as he entered the holding cell. Id. No other corrections staff witnessed Smith fall or anything that may subsequently have happened inside the holding cell.[23] Thus, there would have been no reason for the holding cell not to have been cleaned in the ordinary course of business or for employees not to have gone home

---

[23] Officer Browning told an FDLE agent he saw Defendants Allen and Norman place Smith in the holding cell, and Browning heard what sounded like someone falling. See Pl. Norman Resp. Ex. 1 at 68. But he did not see Smith fall or see Smith on the floor. He was told Smith "fell face first." Id.

when their shifts ended and they completed any reports. As Defendant Swain testified at deposition, "It wasn't a crime scene." See Swain Dep. at 15.

No staff member involved in events that day even reported or could recall whether the cell had been cleaned. Defendant Allen testified at deposition he was not sure who cleaned the cell, but counsel's question to him assumed someone had in fact done so: "who cleaned that blood up?" See Allen Dep. at 47. Allen did not see anyone clean the cell. Id. at 54. Defendant Swain told an FDLE agent it was "'very possible' the holding cell had been cleaned," but he also said he saw "a 'tiny bit' of blood in the cell when he opened the cell for Inspector Whatley." See Pl. Norman Resp. Ex. 1 at 74. It appears the only person who suggested evidence may purposely have been tampered with was Inspector Whatley, who told an FDLE agent that, when he arrived at UCI that evening, "the cell where Smith allegedly fell had been cleaned." Id. at 50-51. He could not say why he thought that, though, nor could he recall whether anyone told him that. Id.

Finally, Plaintiff offers no evidence showing Defendant Reddish ordered an investigation to be halted or promised those involved they would not be disciplined. On the contrary, administrators reviewed the use-of-force incident of which they were aware—Defendant Criswell's—and found it complied with the relevant provision of the Florida Administrative Code. See Pl.

Criswell Resp. Ex. 1 at 1. The incident was referred to the Inspector General's Office for further review. Id. Moreover, Defendant Reddish appointed Major Jefferson to review Criswell's decision to breach the passenger compartment of the transport van and, based on Jefferson's report, suspended Defendant Criswell for his "poor judgment." Id. at 1, 9, 11, 13; Reddish Dep. at 13. See also Pl. Norman Resp. Ex. 5 at 27-28 (IG's report sustaining Criswell's suspension). Defendant Reddish also noted Defendant Criswell could have better communicated with Defendant Ellis about his need to use force and added the topic of "communication" to the next OIC meeting agenda. See Pl. Criswell Resp. Ex. 1 at 9.

In summary, Plaintiff's deliberate indifference claims against Defendants Ellis, Swain, and Allen may proceed to the extent stated in this order. Defendant Reddish, however, is entitled to summary judgment on Count V and is due to be dismissed from this action.

### C. Conspiracy Claims (Counts II & III)

Plaintiff alleges Defendants Reddish, Allen, Ellis, Swain, Criswell, and Norman, acting with malice and deliberate indifference, conspired to deprive Smith of his constitutional rights and agreed to conceal any wrongdoing. See FAC at 22-25. As to the civil conspiracy claim under Florida law, Plaintiff alleges the individual Defendants "each conspired, acting outside the scope of their employment, to cause the underlying tort of murder

39

or manslaughter of Frank Smith, which formed the purpose of the conspiracy." Id. at 22. In the alternative, Plaintiff asserts, Defendants "are liable for the tort of civil conspiracy, standing alone." Id. at 23.

Defendants Reddish, Ellis, and Swain argue they are entitled to summary judgment because Plaintiff fails to establish an independent, underlying claim against them in Counts I (wrongful death) and V (constitutional deliberate indifference). See FDOC Motion at 19. They also posit Plaintiff presents no evidence "Defendants reached an agreement to perform an unlawful act." Id. In the alternative, they assert the intracorporate conspiracy doctrine bars the claims. Id. at 20-22.

Similarly, Defendant Criswell argues Plaintiff offers no evidence of a conspiracy and maintains "civil conspiracy is not an independent cause of action." See Criswell Motion at 23-24. Defendants Allen and Norman adopt the other Defendants' arguments regarding the application of the intracorporate conspiracy doctrine. See Norman Motion at 5-7; Allen Motion at 5-7.

A conspiracy requires an agreement between two or more people. Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., Fla., 956 F.2d 1112, 1122 (11th Cir. 1992) (explaining a conspiracy claim under § 1983 requires evidence that the parties "reached an understanding"); Vista Marketing, LLC v. Burkett, 999 F. Supp. 2d 1294, 1297 (M.D. Fla. 2014) (setting forth the elements of a civil conspiracy

claim). "[T]he linchpin for conspiracy is agreement, which presupposes communication." <u>Bailey</u>, 956 F.2d at 1122. On summary judgment, "[t]he plaintiff does not have to produce a 'smoking gun' . . . but must show some evidence of agreement between the defendants." <u>Rowe v. City of Fort Lauderdale</u>, 279 F.3d 1271, 1283–84 (11th Cir. 2002) (internal citation omitted). Proof of an agreement may be based on circumstantial evidence, <u>Grider v. City of Auburn, Ala.</u>, 618 F.3d 1240, 1260 (11th Cir. 2010), but the evidence must be more than a "scintilla." <u>Rowe</u>, 279 F.3d at 1284.

Plaintiff suggests the events on July 3, 2012, permit the reasonable inference Defendants agreed "to follow a certain course of conduct and that the intent of the agreement could have been a criminal act." <u>See</u> Pl. Norman Resp. at 17. <u>See also</u> Pl. FDOC Resp. at 14; Pl. FDOC Resp. at 12. Plaintiff contends the following anomalies permit the inference of a conspiracy: the unexplained, last-minute change to have Defendant Criswell transport Smith from Shands to UCI;[24] Criswell's breach of the passenger compartment in

---

[24] Plaintiff suggests the alleged conspiracy began when someone ordered Defendant Criswell to transport Smith even though Criswell initially was assigned to guard a different inmate at Shands. <u>See</u> FAC at 16. Defendant Criswell confirmed at his deposition that someone called to tell him to relieve the officer guarding Smith because officials did not want Criswell to incur more overtime. <u>See</u> Criswell Dep. at 17. There is no evidence indicating who directed the change in transport detail for Smith, nor is there evidence permitting the inference the change was made to enable Criswell to harm Smith. It does not appear the other officers involved in the transport, Hough, Cagle, or Shaffer, were reassigned.

violation of FDOC policy and the inconsistent accounts of force Criswell used against Smith; the failure to have a camera recording when the transport van returned to UCI; Dr. Sperry's conclusion that Smith did not have face injuries consistent with him having forcefully banged his head on the metal grate inside the transport van;[25] Defendant Reddish's insistence to immediately inspect the damage to the van when it returned to UCI; the omission from the control room log of Smith's return to UCI; the delay in contacting Inspector Whatley and Whatley's inability to inspect the "evidence" or question witnesses; and the striking similarity between the officers' incident reports. See Pl. Norman Resp. at 16-17.

For the reasons discussed at length above, there is no evidence permitting a reasonable inference Defendants Reddish, Ellis, Swain, and Criswell reached an agreement to harm Smith or to conceal any reported instances of force on July 3, 2012. Additionally, Plaintiff points to no evidence showing the supervisory officials, Reddish, Ellis, and Swain, adopted a policy or custom of covering up constitutional violations like the ones

---

[25] Dr. Sperry concludes, "There is no evidence that Mr. Smith struck his head and/or face on the interior metal grill-covered surfaces of the transport vehicle with any significant degree of force, as there are no patterned injuries on his face and head." See Criswell Ex. 8A at 8. Any injuries Smith sustained by banging his head inside the van, according to Dr. Sperry, were "minor." Id.

Plaintiff alleges Defendants Criswell, Allen, and Norman committed against Smith. See <u>Weiland v. Palm Beach Cty. Sheriff's Office</u>, 792 F.3d 1313, 1330 (11th Cir. 2015) ("[A] conspiracy claim against a municipality must include the existence of a policy or custom underlying the conspiracy.").

As to Defendants Allen and Norman, however, the evidence permits the reasonable inference they used unnecessary force against Smith inside the movement center, as previously addressed. Assuming they used unnecessary force against Smith but failed to report it and instead told everyone Smith fell, a reasonable jury could find they reached an agreement to beat Smith; conceal their actions; pretend Smith was not seriously injured by moving him via wheelchair; lie about what happened to the EMTs, their superiors, and investigators; and direct other officers to report Smith fell. Moreover, if they engaged in such conduct, which may be criminal, the intracorporate conspiracy doctrine does not bar the claim.[26] See <u>McAndrew v. Lockheed Martin Corp.</u>, 206 F.3d 1031, 1040-41 (11th Cir. 2000) (holding the intracorporate conspiracy doctrine does not apply when the conspiracy is criminal in nature).

---

[26] Defendants' suggestion that the alleged actions were not criminal in nature is dubious given the events surrounding Smith's hospitalization and death sparked a criminal investigation by the FDLE.

Accordingly, Defendants Reddish, Ellis, Swain, and Criswell are entitled to summary judgment on Counts II and III, but these claims survive against Defendants Allen and Norman.

### D. Sovereign Immunity (Counts I & II)

Defendants Norman and Allen seek dismissal of Plaintiff's state law claims (Counts I and II: wrongful death and conspiracy), asserting they are entitled to sovereign immunity under Florida Statutes section 768.28(9)(a). See Norman Motion at 4-5; Allen Motion at 4-5. According to Defendants Norman and Allen, Plaintiff alleges in her complaint only "a threadbare recital" that they acted maliciously and in bad faith and fails to allege facts of a conspiracy. See Norman Motion at 4, 5; Allen Motion at 4, 5.

By referencing only Plaintiff's complaint allegations rather than pointing to record evidence, Defendants Norman and Allen do not carry their burden on summary judgment. See Clark, 929 F.2d at 608. In her complaint, Plaintiff alleges facts that, accepted as true, permit the inference Defendants Norman and Allen acted in bad faith or with malicious purpose and conspired to deprive Smith of his constitutional rights. See FAC at 8, 13, 15-16, 17-18. Thus, Defendants Norman and Allen do not demonstrate they are entitled to sovereign immunity as to Plaintiff's state law claims.

### E. Wrongful Death (Count I)

In Count I, Plaintiff asserts a wrongful death claim against all individual Defendants. See FAC at 22. Defendants Norman and

Allen seek dismissal of this Count based on sovereign immunity, an argument that fails, as addressed above. The remaining Defendants assert slightly different arguments for summary judgment on this Count.

### i. Defendant Criswell

Defendant Criswell argues Plaintiff's wrongful death claim is untimely because Plaintiff did not file her complaint within two years of Smith's death. See Criswell Motion at 25. Defendant Criswell also contends his actions were not the proximate cause of Smith's death. Id. As to the second argument, Plaintiff counters that the "indivisible injury rule" applies because the harm caused by each Defendant is incapable of division. See Pl. Criswell Resp. at 15-16.

Under the Florida Wrongful Death Act, a plaintiff must show the defendant's actions proximately caused the death. See Fla. Stat. § 768.19. When there is reasonable disagreement on the issue of proximate causation, the question should be decided by a jury. City of Pinellas Park v. Brown, 604 So. 2d 1222, 1228 (Fla. 1992), Ross v. City of Jacksonville, 274 So. 3d 1180, 1183-84 (Fla. Dist. Ct. App. 2019).

According to the autopsy report (Doc. 46-4; Autopsy Report), Smith died from "complications of blunt head injuries." See Autopsy Report at 5. At deposition (Doc. 105-1; Sperry Dep.), Dr. Sperry testified that the ultimate cause of Smith's death was pneumonia

along with organ system failure and sepsis, which were "caused by the quadriplegia, that arose from the . . . cervical spinal cord injury." See Sperry Dep. at 19. A defense expert, Dr. Matthew F. Lawson (Doc. 135-3; Lawson Report), acknowledges "Smith sustained a severe spinal cord injury on July 3, 2012," which ultimately caused his death. See Lawson Report at 4.

While the evidence is somewhat contradictory as to what occurred inside the transport van, there is no evidence Defendant Criswell struck Smith's head or otherwise caused head injuries. In fact, Plaintiff's own expert witnesses conclude Smith's head and spinal injuries, which led to his death, occurred inside the movement center, not the van. Dr. Sperry maintains Smith "did not sustain the intracranial brain injuries or the spine and spinal cord injuries when he was within the transport van." See Criswell Ex. 8A at 8, 9. At deposition, Dr. Sperry agreed that "any fall or striking to the back of [Smith's] head that would've caused the injuries to his spinal cord—that would eventually be the cause of his death . . . would've been caused in [t]he [m]ovement [c]enter." See Sperry Dep. at 39. Similarly, Aubrey Land concludes, in part based on Dr. Sperry's opinions, that Smith was "physically abused" inside the movement center where he sustained "life ending injury." See Pl. Norman Resp. Ex. 3 at 12-13. Land acknowledges force was used during transport, but the nature of force used was limited to

46

the EID and knee strikes, neither of which were to the head. Id.
at 11.

The evidence shows the conduct that caused Smith's serious
injuries rendering him quadriplegic and contributing to his death
occurred inside the movement center, and it is undisputed Defendant
Criswell did not accompany Smith inside the movement center. See
Pl. Norman Resp. Ex. 1 at 54, 68, 72. Thus, Defendant Criswell
carries his burden on summary judgment as to Plaintiff's wrongful
death claim against him.

The "indivisible injury rule" does not apply under these
circumstances because Plaintiff's own expert, Dr. Sperry, opines
Smith's injuries can be apportioned, at least between those
sustained inside the transport van (if any) versus those sustained
inside the movement center. Cf. Gross v. Lyons, 763 So. 2d 276,
280 (Fla. 2000) (explaining the "indivisible injury rule" as
follows: "When the tortious conduct of more than one defendant
contributes to one indivisible injury, the entire amount of damage
resulting from all contributing causes is the total amount of
damages recoverable by the plaintiff"). Dr. Sperry concludes the
injuries that resulted in or contributed to Smith's death occurred
inside the movement center. See Criswell Ex. 8A at 8, 9; Sperry
Dep. at 39. Because Defendant Criswell did not accompany Smith
inside the movement center, he cannot be held responsible for the
harm that befell Smith once there. Accordingly, Plaintiff fails to

47

overcome summary judgment in favor of Defendant Criswell on Count I.

### ii. Defendants Reddish, Ellis, & Swain

Like Defendant Criswell, Defendants Reddish, Ellis, and Swain argue they are entitled to summary judgment on Count I because there is no evidence any conduct by them caused Smith's death. See FDOC Motion at 12.[27] Plaintiff does not respond to the causation argument. See Pl. FDOC Resp. at 14.

It is undisputed that neither Defendants Reddish, Ellis, or Swain rode in the transport van or accompanied Smith inside the movement center. And there is no evidence that Defendants Reddish, Ellis, or Swain observed the alleged use of force inside the movement center. Defendants Norman and Allen denied any other Defendant being present when Smith entered the holding cell, where they say Smith fell. See Pl. Norman Resp. Ex. 1 at 61; Pl. Norman Resp. Ex. 9 at 6-7; Pl. Norman Resp. Ex. at 11. When Defendants Norman and Allen were inside the movement center with Smith, Defendant Criswell was outside briefing Defendant Ellis about what occurred during transport; Defendant Reddish was at the

---

[27] They also contend they are entitled to sovereign immunity, and Plaintiff did not notify the municipality in writing of her intent to file a wrongful death claim as required by Florida Statutes section 768.28(6)(a). See FDOC Motion at 12-13. The Court does not address these arguments because it finds they are entitled to relief on a different basis.

48

administration building inspecting the damage to the van; and Defendant Swain was just reporting for duty.[28] See Criswell Dep. at 44; Reddish Dep. at 11-12; Pl. Norman Resp. Ex. 1 at 54, 72, 73.

Not only were Defendants Reddish, Ellis, and Swain not involved in or present during any uses of force against Smith, the evidence shows these Defendants later learned only of the use of force that occurred during transport (involving Defendant Criswell). See Pl. Norman Resp. Ex. 1 at 72, 74; Pl. Criswell Resp. Ex. 1 at 1. Defendants Reddish, Ellis, and Swain did not hear of any use of force having occurred inside the movement center. In fact, they reported having heard Smith fell. See Pl. Norman Resp. Ex. 1 at 72, 74; Reddish Dep. at 15.

Based on the above undisputed evidence, Defendants Reddish, Ellis, and Swain did not participate in and were not present during any reported or alleged use-of-force incident against Smith on July 3, 2012. Thus, they cannot be said to have proximately caused Smith's death. And, as addressed above, there is no evidence to show or permit the reasonable inference that, before Smith was transported from Shands to UCI on July 3, 2012, Defendants Reddish,

---

[28] Even if Defendant Ellis entered the movement center to speak to Defendant Allen, see Pl. Norman Resp. Ex. 10 at 14, there is no evidence Ellis contributed to or observed conduct that rendered Smith unconscious.

Ellis, and Swain concocted a plan to enable Defendants Criswell, Norman, or Allen to physically harm Smith.

For these reasons, Defendants Reddish, Ellis, and Swain carry their burden to show there is no genuine issue of material fact whether their actions caused Smith's death. Defendants Reddish, Ellis, and Swain are thus entitled to summary judgment in their favor on Count I because there is no evidence showing they caused or contributed to the injuries resulting in Smith's death.

### F. Claims Against the FDOC (Count VI)

Against the FDOC, Plaintiff asserts claims under the ADA and RA. See FAC at 29. Plaintiff alleges Smith was a qualified individual in need of reasonable accommodation of which employees and staff were aware but refused to provide. Id. at 30-31. The FDOC concedes Plaintiff was a qualified individual with a disability (mental illness) but contends Plaintiff presents no evidence showing Smith was excluded from participation in or denied the benefits of services, programs, or activities because of his disability. See FDOC Motion at 23. Plaintiff, in response, asserts "UCI administrators, including Defendants, [failed] to control officers like Criswell, Norman, and Allen, [and] the programs that were nominally designed to help inmates like Mr. Smith served to render him a victim of officers who enjoyed taunting and tormenting mentally-ill inmates." See Pl. FDOC Resp. at 18.

Title II of the ADA, which applies to state prisons, provides as follows: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. See also Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 213 (1998) (holding Title II of the ADA "unambiguously extends to state prison inmates"). Similarly, section 504 of the RA provides, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Accordingly, a claim of discrimination under the ADA and RA requires a plaintiff to establish "(1) that he is a qualified individual with a disability; and (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." Owens v. Sec'y, Fla. Dep't of Corr., 602 F. App'x

475, 477 (11th Cir. 2015) (quoting Bircoll v. Miami-Dade Cty., 480
F.3d 1072, 1083 (11th Cir. 2007)).[29]

Plaintiff alleges the FDOC knew Smith needed a reasonable
accommodation but failed to provide that accommodation
intentionally or with deliberate indifference. See FAC at 30-31.
Plaintiff asserts officers were permitted to use force against
Smith because of his mental illness. Id. at 31. Plaintiff
concludes, "As a proximate result of defendant FDOC's, its
employees', and agents' failure and intentional refusal to provide
Mr. Smith with a reasonable accommodation for his disability, he
suffered physical harm and death." Id.

Upon review, Plaintiff offers no evidence that prison
officials denied Smith a reasonable accommodation for his mental
illness. Plaintiff does not even propose what accommodations
should have been made but were not. Instead, in response to the
FDOC's motion, Plaintiff only vaguely says the FDOC is "well aware
of the special protections persons with mental illness need to
live safe and meaningful lives." See Pl. FDOC Resp. at 20. It is

---

[29] "With the exception of its federal funding requirement, the
RA uses the same standards as the ADA, and therefore, cases
interpreting either are applicable and interchangeable." Badillo
v. Thorpe, 158 F. App'x 208, 214 (11th Cir. 2005) (citing Cash v.
Smith, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000)); J.S., III by
& through J.S. Jr. v. Houston Cty. Bd. of Educ., 877 F.3d 979, 985
(11th Cir. 2017) ("Discrimination claims under the ADA and the
[RA] are governed by the same standards, and the two claims are
generally discussed together.").

undisputed Smith was housed in the mental health dorm at UCI, which speaks to an effort to accommodate his disability. To the extent Plaintiff's outburst during transport on July 3, 2012, may have been attributable to Smith's mental illness or the medications he was taking, Plaintiff offers no evidence specifically addressing the reasonableness of Defendant Criswell's response to Smith's outburst. For instance, other than Criswell's "poor judgment" in entering the passenger compartment of the van, Plaintiff offers no evidence showing Defendant Criswell and other officers involved in the transport were ill-equipped or improperly trained to handle such an outburst by a mentally disabled inmate.

However, to the extent Plaintiff's claim relies upon application of the general "discrimination" clauses of the ADA and RA, Plaintiff points to the statements of other inmates who told FDLE agents that officers at UCI would beat or deny food to mentally ill inmates, whom the officers referenced as "bugs." Pl. FDOC Resp. at 18-20. See also Pl. Norman Resp. Ex. 12 at 2.

One of the inmates, Marcellas Harris, identified numerous officers of different rank at UCI who would beat inmates or deny them food because of their mental disabilities: Sergeant Michael Wiggs, Captain Shawn Swain (Defendant in this case), Sergeant Charles Williams, Sergeant Eric Jackson, Sergeant Criswell (Defendant in this case), Sergeant Coleman, Officer Norman (Defendant in this case), Officer Milliard Bell, Esfred (precise

name and rank unknown), Sergeant MacCord, Sergeant Carasquillo, Lieutenant John Curtis, Officer Metz, Jenkins (no rank provided), Sergeant Strong, Sergeant Bart, and a lieutenant whose name Inmate Harris could not recall. See generally Pl. Norman Resp. Ex. 12. Harris concluded the interview by saying, "You got a bunch in that stack [of pictures] right there and I'm talking about they were -- I mean, I can point them out and they will beat you good. And that nurse . . . she down with it . . . . She would fabricate some paperwork." Id. at 15.

The FDOC asserts that if the Court finds in favor of the individual Defendants on Counts IV and V (excessive force and deliberate indifference), then Plaintiff automatically fails to demonstrate the requisite discriminatory intent under the ADA and RA. See FDOC Motion at 23. The FDOC's position is flawed, however, because liability under the ADA and RA may be based on a theory of respondeat superior, whereas liability under § 1983 may not. See Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 350 (11th Cir. 2012). Thus, the Court's ruling on Plaintiff's § 1983 claims against individual corrections employees does not dictate a ruling on Plaintiff's ADA and RA claims against the FDOC.

In Liese, the Eleventh Circuit held a public entity (a hospital) could be liable under the RA for the conduct of an official with supervisory authority (a doctor) if a jury were to find the official's conduct constituted deliberate indifference.

54

Id. at 350-51. The plaintiff in Liese argued a doctor was deliberately indifferent to her disability by refusing to provide her with auxiliary aids knowing she needed them to communicate effectively. Id. at 351. The court found the plaintiff presented enough evidence on which a jury could find the doctor made an "official decision" for the hospital by failing to provide the plaintiff auxiliary aids and that such failure was "enough to infer intentional discrimination" under the RA. Id. at 351-52.

Extending the Liese holding here, like the hospital, the FDOC can be held liable for the actions of its officials with supervisory authority, such as lieutenants and sergeants, if those officials intentionally discriminated against inmates because of their mental illness. Plaintiff offers some evidence that prison staff intentionally discriminated against inmates because of their mental illness, which creates a genuine issue of material fact precluding summary judgment. Accordingly, Plaintiff's ADA and RA claims may proceed against the FDOC.

### G. Punitive Damages

Defendants Reddish, Ellis, Swain, and the FDOC assert Plaintiff is not entitled to punitive damages as to the claims against them. See FDOC Motion at 25. The claims that survive against these Defendants are the following: deliberate indifference against Ellis and Swain under § 1983 (Count V) and discrimination against the FDOC under the ADA and RA (Count VI).

Plaintiff is not entitled to punitive damages on the claims against the FDOC. See Barnes v. Gorman, 536 U.S. 181, 189 (2002) (holding punitive damages are not available under Title II of the ADA or section 504 of the RA).

The same is not true as to the claims against Defendants Ellis and Swain, however. That is because, under § 1983, punitive damages are appropriate "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves callous or reckless indifference to the federally protected rights of others." Wright v. Sheppard, 919 F.2d 665, 670 (11th Cir. 1990) (quoting Smith v. Wade, 461 U.S. 30 (1983)). Accepting as true that Defendant Ellis was deliberately indifferent to Smith's condition on July 3, 2012, and that Defendant Swain tormented or beat mentally ill inmates as described by Inmate Harris, the issue of punitive damages may be submitted to a jury.

### V. Conclusion

To the extent stated in this Order, the parties shall be prepared to proceed to trial on the following claims: wrongful death under Florida law against Defendants Allen and Norman (Count I); conspiracy under Florida and federal law against Defendants Allen and Norman (Counts II and III); excessive force under § 1983 against Defendants Criswell, Allen, and Norman (Count IV); deliberate indifference under § 1983 against Defendants Ellis, Swain, and Allen (Count V); discrimination against the FDOC under

56

the ADA and RA (Count VI). The deadlines set forth in this Court's April 1, 2020 Order (Doc. 134) remain in effect.

Accordingly, it is now

**ORDERED:**

1.    Defendant Norman's Motion for Summary Judgment (Doc. 98) is **DENIED.**

2.    Defendant Allen's Motion for Summary Judgment (Doc. 100) is **DENIED.**

3.    Defendant Criswell's Motion for Summary Judgment (Doc. 114) is **GRANTED in part** and **DENIED in part.** Defendant Criswell is entitled to summary judgment on Counts I, II, & III only.

4.    Defendants FDOC, Reddish, Ellis, and Swain's Motion for Summary Judgment (Doc. 117) is **GRANTED in part** and **DENIED in part.** Defendant Reddish is entitled to summary judgment as to all claims against him. Judgment in favor of Defendant Reddish will be withheld pending adjudication of the action as a whole. See Fed. R. Civ. P. 54. Defendants Ellis and Swain are entitled to summary judgment on Counts I, II, & III only.

**DONE AND ORDERED** at Jacksonville, Florida, this 3rd day of September 2020.

BRIAN J. DAVIS
United States District Judge

```
Jax-6
c:
Counsel of Record
```